## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

RICHARD INZA
2451 SW 126th Way
Miramar, FL 33027;

MICHAEL INZA;
14826 SW 45 Lane
Miami, FL 33185;

VOIP-PAL.COM INC.

7215 Bosque Blvd
Suite 102
Waco, TX 76710;

individually and on behalf of themselves and
all others similarly situated;

*Plaintiffs*,


v.


Apple Inc.
Apple Park, 1 Apple Park Way,
Cupertino, California 95014

Arthur D. Levinson (Chair)

Tim Cook (CEO)

Andrea Jung

Alex Gorsky

Ronald D. Sugar

Monica Lozano

Susan L. Wagner

Katherine L. Adams


Alphabet Inc.
1600 Amphitheatre Parkway,
Mountain View, California 94043

CIVIL ACTION NO. _____


JURY TRIAL DEMANDED

Google LLC.
1600 Amphitheatre Parkway,
Mountain View, California 94043

John L. Hennessy (Chair)

Sundar Pichai (Chief Executive Officer)

Larry Page

Sergey Brin

Frances Arnold

L. John Doerr

Roger W. Ferguson Jr.

K. Ram Shriram

Robin L. Washington

Ann Mather

Halimah DeLaine Prado


Samsung Electronics Co., Ltd.
85 Challenger Road, Ridgefield Park,
New Jersey 07660

Samsung Electronics America, Inc.
85 Challenger Road, Ridgefield Park,
New Jersey 07660

Jong-Hee Han

Kyehyun Kyung

Hark-Kyu Park

Jeong-Ho Park

Yoon-Ho Choi

Seung Hyun Hong

Jae Hoon Jung

Soo-Jin Kim

In Ho Lee

Ken Murata

*Defendants.*

## COMPLAINT

## TABLE OF CONTENTS

COMPLAINT ............................................................................................................... 3

TABLE OF CONTENTS ........................................................................................... 3

RELATED CASE DESIGNATION AND NOTICE OF UPCOMING MOTION TO
    CONSOLIDATE FOR LIMITED PURPOSES ............................................. 8

PREAMBLE – PLATFORM-LEVEL FRAUD, MONOPOLIZATION, AND GLOBAL
    DECEPTION ...................................................................................................... 9

CALL TO THE COURT: A CLASS ACTION TO LIBERATE WI-FI CALLING FOR 373
    MILLION SUBSCRIBERS ............................................................................. 11

    A.   THE PLATFORM-CONTROLLED LOCK ON VOICE INFRASTRUCTURE ................................... 11

    B.   THE CONSUMER HARM: ARTIFICIAL BUNDLING AND INFLATED PRICES ........................... 11

    C.   RESTORING SUBSCRIBER CHOICE: THE RIGHT TO STANDALONE WI-FI CALLING ............. 12

    D.   LIBERATING THE MVNO: FROM RESELLERS TO REAL COMPETITORS .............................. 13

    E.   THE FINAL DOMINO: FORCING CARRIERS TO COMPETE ON WI-FI CALLING .................... 14

    F.   THE COMING TRANSFORMATION: WI-FI CALLING AS A PLATFORM BENEFIT ................... 14

    G.   LEGAL CONSEQUENCES: UNIFIED ANTITRUST AND RICO LIABILITY ............................... 15

    H.   THE COURT'S ROLE: UNLOCKING THE VOICE ECONOMY .................................................. 15

PRELIMINARY STATEMENT ............................................................................ 15

    A.   APPLICATION TO THE PLATFORM-BASED CLASS ACTION: MONOPOLIZATION OF 373
    MILLION AMERICAN SUBSCRIBERS BY GOOGLE, APPLE, SAMSUNG, AND THEIR CARRIER CO-
    CONSPIRATORS (SHERMAN ACT § 2) ............................................................................... 18

    B.   CONSUMER HARM AND MARKET SUPPRESSION: BLINDED, COERCED, AND DEPRIVED OF
    CHOICE .............................................................................................................................. 22

    C.   NO NEED FOR TYING ANALYSIS UNDER SHERMAN ACT § 1 ............................................. 23

D.  CONCLUSION....................................................................................................24

**INTRODUCTION**..............................................................................................**25**

A.  PRO-CARRIER WI-FI CALLING / ANTI VoIP CALLING .......................................26

B.  HOW THE DEFENDANTS' ANTICOMPETITIVE SYSTEM WORKS: SELF-PREFERENCING AND COMPETITIVE DISADVANTAGE BY DESIGN ................................................27

C.  GOOGLE AND APPLE'S DUAL ROLES AND CONFLICTS OF INTEREST .................29

D.  RESTRICTED NATIVE DIALER AND OS-LEVEL TELEPHONY ACCESS FOR VoIP PROVIDERS31

E.  THE STRUCTURAL COSTS OF SYSTEMIC ACCESS CONTROL ..............................33

F.  THE DEFENDANTS' SYSTEM FAVORS CARRIERS .............................................34

**THE PARTIES**..................................................................................................**35**

A.  THE PLAINTIFFS ..........................................................................................35

B.  THE DEFENDANTS ........................................................................................36

C.  CO-CONSPIRATORS (NON-DEFENDANT PARTIES) ..........................................38

**JURISDICTION AND VENUE**.........................................................................**39**

A.  INJURY IN THIS DISTRICT AND NATIONWIDE ................................................40

B.  SYSTEMIC INFRASTRUCTURE BIAS AND ENTERPRISE CONDUCT .......................41

**FACTS OF THE CASE**......................................................................................**42**

A.  THE DEFENDANTS AND THEIR CARRIER CO-CONSPIRATORS ENGINEERED A CLOSED INFRASTRUCTURE TO EXCLUDE INDEPENDENT VoIP SERVICES FROM THE WI-FI CALLING MARKET ..............................................................................................42

B.  HOW APPLE AND GOOGLE'S OPERATING SYSTEMS CONTROL THE SMARTPHONE MARKET — AND SHUT OUT FAIR COMPETITION ................................................55

C.  RESTRICTING COMPETITION IN THE U.S. TELECOMMUNICATIONS WI-FI CALLING MARKET 66

D.  PHONE NUMBER INTEGRATION & NATIVE DIALER ACCESS DISPARITY UNDER THE ESSENTIAL FACILITIES DOCTRINE..................................................................82

E.  PERSONAL LIABILITY FOR THE FIVE ANTITRUST BREACHES AND RICO VIOLATIONS: EXECUTIVE, DIRECTOR, AND GENERAL COUNSEL RESPONSIBILITY FOR PLATFORM EXCLUSION 90

F.  ONGOING ANTITRUST ACTIONS AGAINST DEFENDANTS SUPPORT THE STRUCTURE OF THIS COMPLAINT.................................................................................................97

G. Anticipated Defenses and Rebuttals: System-Level Privilege Disparities and the Exclusion of 373 Million Class Members from Competitive Voice Access ........ 101

**CLASS ACTION CERTIFICATION UNDER RULE 23 ..................................................... 104**

A. Class-Wide Liability Based on Exclusionary OS-Level Practices, Not Patent Origin .......................................................................................................................... 104

B. Independent Claim for Equitable Restitution: API and Access Value ............. 105

C. Representation Statement: Why VoIP-Pal Strengthens the Class ................... 106

D. Class Definition ...................................................................................................... 107

E. Certification Under Rule 23(a) and 23(b) ........................................................ 107

F. Platform–Carrier Coordination Reinforces Class-Wide Harm ....................... 108

G. Conclusion: Platform Class Is Legally Certifiable ........................................... 109

**PRE-DISCOVERY STANDING AND DISCOVERY-RELEVANT FRAMEWORK ...... 110**

A. Introduction ............................................................................................................ 110

B. Platform Discovery Rule – Legal Foundation for Pre-Discovery Standing .. 110

C. Consumer Awareness Gap – Misperception of Wi-Fi Calling as Carrier Feature 111

D. Emergency Services Access – VoIP Parity and FCC Compliance ....................... 112

E. Clarification on Technical Feasibility .................................................................. 112

F. Closing Observation ............................................................................................... 113

**FEDERAL STANDING FOR ANTITRUST AND RICO CLAIMS AGAINST PLATFORM DEFENDANTS ............................................................................................. 114**

A. Statutory Standing Under the Five Antitrust Breaches and Two RICO Violations ................................................................................................................... 114

B. Sherman Act § 1 – Unreasonable Restraint of Trade .......................................... 115

C. Sherman Act § 2 – Monopolization and Attempted Monopolization ................. 115

D. Clayton Act § 3 – Exclusive Dealing .................................................................... 116

E. Clayton Act § 4 – Treble Damages ...................................................................... 116

F. Clayton Act § 14 – Executive and Director Liability ......................................... 117

G. RICO §§ 1962(c) and (d) – Enterprise-Level Racketeering ........................... 117

H. Exclusion of the Class subscribers ....................................................................... 118

I.   CONCLUSION ..................................................................................... 119

CONSUMER DAMAGES – STRUCTURAL HARM CAUSED BY UNEQUAL
PLATFORM PRIVILEGE ALLOCATION ................................................. 119

A.   DISCLAIMER AND SCOPE ................................................................... 119

B.   INTRODUCTION: CLASS HARM FROM PRIVILEGE DISPARITY ............. 119

C.   THREE DIMENSIONS OF CONSUMER HARM ...................................... 120

D.   DAMAGES MODEL – STEP-BY-STEP ................................................. 121

E.   SUMMARY TABLE – CONSUMER DAMAGES FROM PRIVILEGE DISPARITY ....... 122

F.   TREBLE DAMAGES UNDER FEDERAL LAW ........................................ 122

G.   LEGAL AUTHORITY FOR CONSUMER RECOVERY ............................. 122

H.   CONCLUSION ................................................................................... 123

EQUITABLE LIEN AND DISGORGEMENT REMEDY FOR THE FIVE ANTITRUST
BREACHES AND RICO VIOLATIONS: CLASS-BASED UNJUST
ENRICHMENT FROM PLATFORM-CONTROLLED VOICE ACCESS ........... 124

A.   INTRODUCTION ............................................................................... 124

B.   TRACEABLE ENRICHMENT DERIVED FROM STRUCTURAL VOICE SERVICE EXCLUSION ... 125

C.   LEGAL FOUNDATION FOR IMPOSING AN EQUITABLE LIEN ............... 125

D.   REMEDY REQUESTED ...................................................................... 126

SUFFICIENT FACTUAL ALLEGATIONS TO SUPPORT THE FIVE ANTITRUST
BREACHES AND TWO RICO VIOLATIONS: CLASS-BASED EXCLUSION
UNDER FEDERAL LAW ..................................................................... 127

A.   INTRODUCTION ............................................................................... 127

B.   APPLICATION TO THE FIVE ANTITRUST BREACHES AND TWO RICO VIOLATIONS ........... 128

C.   FACTUAL ALLEGATIONS SUPPORTING PLATFORM-LEVEL EXCLUSION ............ 128

D.   ARTICLE III AND STATUTORY STANDING ........................................ 130

E.   PLAUSIBILITY AND SUPPORTING PRECEDENTS ............................... 130

TECHNICAL VERIFICATION: OPERATIONAL FUNCTIONALITY OF VOIP-PAL'S
PLATFORM AND STRUCTURAL EXCLUSION FROM CONSUMER ACCESS
....................................................................................................... 131

A.   OWNERSHIP AND ORIGIN ............................................................... 131

B.   INDEPENDENT TECHNICAL AUDIT — SMART421 (UK) .................... 131

C.   RELEVANCE TO THE CLASS .............................................................. 132

D.   CONCLUSION ................................................................................... 132

**SHERMAN ACT § 2: DENIAL OF ACCESS TO AN ESSENTIAL FACILITY – OS-LEVEL VOICE INTEGRATION AS A PLATFORM BOTTLENECK ................ 133**

A.   LEGAL FRAMEWORK: THE ESSENTIAL FACILITY DOCTRINE UNDER SHERMAN ACT § 2.. 133

B.   APPLICATION TO THE CLASS OF 373 MILLION SMARTPHONE USERS ............................... 135

C.   REMEDY SOUGHT .............................................................................. 135

**THE COUNTS ............................................................................................... 136**

A.   INTRODUCTION ................................................................................. 136

B.   COUNT I – MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION OF ESSENTIAL TELEPHONY INFRASTRUCTURE .............................................................. 136

C.   COUNT II – MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION OF THE WI-FI CALLING MARKET ......................................................................... 137

D.   COUNT III – TYING TELEPHONY PRIVILEGES TO CARRIER AFFILIATION .... 137

E.   COUNT IV – EXCLUSIVE DEALING THROUGH OS AND DEVICE ENFORCEMENT ..................................................................................... 138

F.   COUNT V – DAMAGES, RESTITUTION, AND STRUCTURAL RELIEF ............... 138

G.   COUNT VI – UNEQUAL CONTROL OVER AN ESSENTIAL FACILITY ............... 139

H.   COUNT VII – OPERATION OF A COMMERCIAL ENTERPRISE THROUGH RACKETEERING ..................................................................................... 140

I.   COUNT VIII – CONSPIRACY TO STRUCTURALLY FAVOR CARRIER-INTEGRATED SERVICES THROUGH A COORDINATED ENTERPRISE ..................... 140

J.   CONCLUSION AND REMEDIES SOUGHT .............................................................. 141

**CLOSING ARGUMENTS: ANTITRUST AND RICO LIABILITY ARISING FROM UNEQUAL PLATFORM PRIVILEGE STRUCTURE ........................................... 142**

A.   PLATFORM DISPARITY: STRUCTURAL HARM FROM TWO-TIER ACCESS TO NATIVE VOICE SERVICES ..................................................................................... 142

B.   CLASS HARM: WIDESPREAD OVERCHARGES AND LOST ACCESS FOR 373 MILLION U.S. SMARTPHONE USERS ..................................................................................... 143

C.   CONSUMER DAMAGES AND DISCLAIMER .......................................................... 144

D.   STRUCTURAL REFORM AND MARKET CORRECTION ......................................... 145

**DEMAND FOR JURY TRIAL**........................................................... **145**

**PRAYER FOR RELIEF**.................................................................. **146**

   A.   MANDATORY INTEGRATION ORDER ............................................ 146

   B.   MONETARY RELIEF............................................................ 146

   C.   TREBLE DAMAGES UNDER FEDERAL LAW ................................... 147

   D.   EQUITABLE RELIEF AND DISGORGEMENT ................................... 147

   E.   LEGAL COSTS AND ADDITIONAL RELIEF ................................... 148

   F.   CONDUCT REMEDIES ......................................................... 148

## RELATED CASE DESIGNATION AND NOTICE OF UPCOMING MOTION TO CONSOLIDATE FOR LIMITED PURPOSES

1.    Plaintiffs respectfully submit that this consumer class action against Google LLC, Apple Inc., and Samsung Electronics Co., Ltd. is related in substance to the previously filed antitrust class action against AT&T Inc., Verizon Communications Inc., and T-Mobile US, Inc., as both cases challenge a vertically coordinated scheme to exclude standalone Wi-Fi Calling from the U.S. mobile voice market.

2.    Although the defendant groups differ, the exclusionary conduct alleged in both actions is unified in purpose and effect: to foreclose consumer access to non-carrier voice alternatives and preserve market control over mobile call origination. The complaints allege violations of the same core federal statutes—including the Sherman Act, Clayton Act, and RICO—based on interdependent conduct at different layers of the mobile ecosystem.

3.    Accordingly, this action is properly designated as related under the Court's rules, as it arises from overlapping facts, targets a shared exclusionary structure, and alleges coordinated harm to the same nationwide class of smartphone subscribers. Plaintiffs anticipate filing a motion under

Federal Rule of Civil Procedure 42(a) seeking limited-purpose consolidation of discovery and rulings on shared exclusionary conduct, while preserving the procedural independence of each case.

## PREAMBLE – PLATFORM-LEVEL FRAUD, MONOPOLIZATION, AND GLOBAL DECEPTION

4.    This Complaint is brought under Federal Rule of Civil Procedure 23 by Lead Plaintiff VoIP-Pal.com, Inc. and individual Plaintiffs Richard Inza, Michael Inza, and others on behalf of a nationwide consumer class consisting of approximately 373 million U.S. mobile subscribers. It targets a decade-long scheme by Google LLC, Apple Inc., and Samsung Electronics Co., Ltd. to monopolize and restrict access to non-carrier Wi-Fi Calling and other voice services, using their joint dominance over smartphone operating systems and device manufacturing to execute a coordinated platform exclusion strategy.

5.    Plaintiffs allege that these three Defendants—each a global technology giant with significant control over the mobile ecosystem—co-conspired with AT&T Inc., Verizon Communications Inc., and T-Mobile US, Inc. (hereinafter, "the Carrier Co-Conspirators") to construct the design, distribution, and operating system layers of smartphones in favor of carrier-integrated voice offerings. Through API restrictions, firmware manipulation, default dialer controls, and anti-competitive certification regimes, Defendants unlawfully suppressed all standalone Wi-Fi Calling alternatives, including those developed by VoIP-Pal, while falsely convincing consumers that Wi-Fi Calling could only be available as a bundled feature of paid carrier plans.

6.    Plaintiffs further allege that the Defendants' conduct violated the Sherman Antitrust Act (15 U.S.C. §§ 1-2), the Clayton Antitrust Act (15 U.S.C. §§ 3-4, 14), the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1961-1968), and the Telecommunications Act of

1996 (47 U.S.C. §§ 151 et seq). These violations were not isolated, technical oversights. They were deliberate acts of monopolization, concealment, and collusion designed to entrench the market power of carriers while eliminating VoIP competition at the source—the smartphone interface itself.

7.     The result of this exclusionary design was an ecosystem where mobile subscribers—many of whom trust their carriers and devices implicitly—were led to believe that Wi-Fi Calling must be tied to cellular voice, texting, and mobile data to function. That belief was false. The Defendants exploited this manufactured dependency to coerce recurring payments, suppress innovation, and block non-carrier services from entering the U.S. market. Consumers were misled into thinking they needed to purchase expensive mobile bundles to place Wi-Fi calls, even when those calls were initiated over home or public internet connections that were already separately paid for.

8.     This scheme not only overcharged Americans—it institutionalized misinformation across the globe. The same exclusionary features, firmware restrictions, and integration barriers were deployed across billions of devices sold internationally. With Android and iOS powering over 99% of global smartphones, and with Samsung and Apple controlling the overwhelming majority of global handset sales, this conduct extends beyond the 373 million U.S. subscribers to more than 7.2 billion mobile users worldwide. It is a global deception built on monopoly power, concealment, and market foreclosure.

9.     What unites these Plaintiffs is not just a shared economic injury—but a shared truth: that competition was never allowed to exist, and that Defendants knowingly buried the possibility of standalone Wi-Fi Calling to protect carrier partnerships and inflate profits. This lawsuit seeks to uncover the concealed infrastructure, correct the legal record, and restore the freedom of voice communication in a mobile world.

**CALL TO THE COURT: A CLASS ACTION TO LIBERATE WI-FI CALLING FOR 373 MILLION SUBSCRIBERS**

10.    This is a case about structural denial, systemic exclusion, and the unlawful suppression of consumer choice. Plaintiffs respectfully call upon this Court to uphold the rights of 373 million American mobile subscribers, who for over a decade have been denied access to standalone, non-carrier Wi-Fi Calling by the coordinated conduct of six dominant players: Google, Apple, and Samsung, together with AT&T, Verizon, and T-Mobile.

### A.  The Platform-Controlled Lock on Voice Infrastructure

11.    This market failure is not the result of technological limitation or lack of demand. It is the product of intentional platform-level exclusion reinforced by commercial alignment between OS vendors, device manufacturers, and mobile carriers. Google enforces restrictive APIs and firmware controls on Android, blocking non-carrier VoIP access to the system dialer, number provisioning, and SIM-based integration. Apple restricts access to CallKit, PushKit, and native dialer privileges unless the software is pre-approved by a carrier partner. Samsung, the largest Android OEM in the U.S., enforces firmware-level preferences that favor preloaded, carrier-branded apps, including enforced default call handling. Meanwhile, AT&T, Verizon, and T-Mobile dictate SIM provisioning, device approval, and backend telephony integration—ensuring that only carrier-certified services are granted full access to the voice infrastructure of modern smartphones.

12.    The result is a closed system where only the carriers may deliver Wi-Fi Calling as a native feature—while independent VoIP providers like VoIP-Pal are forced into degraded, app-based alternatives with no access to dialer parity or integrated number control.

### B.  The Consumer Harm: Artificial Bundling and Inflated Prices

13.    Under this exclusionary model, consumers are forced to purchase bundled cellular voice and texting plans, even when they rely primarily or exclusively on Wi-Fi. This artificially bundled structure routinely costs users $100 to $157 per month, offering no option to unbundle basic telephony. This price distortion persists because:

- Platform vendors block non-carrier VoIP access to dialer and SIM layers;
- Hardware policies enforce carrier defaults;
- And the three carriers retain monopoly control over number assignment and call handling.

14.    By contrast, a standalone Wi-Fi Calling service built on independent VoIP technology—like VoIP-Pal's patented platform—could deliver:

- Native calling over Wi-Fi using independently provided PSTN numbers;
- Optional fallback cellular minutes;
- Seamless user experience on the native dialer;
- All for $6.50/month or less.

15.    This alternative could save more than $1,000 per year per household, especially for seniors, students, low-income families, rural users, and global travelers—yet it remains entirely foreclosed by design.

### C. Restoring Subscriber Choice: The Right to Standalone Wi-Fi Calling

16.    Today's mobile subscriber should not be locked into a legacy cellular package just to receive a working phone number or dialer. In a Wi-Fi-only or Wi-Fi-first world, millions of users could fully operate with:

- A phone number provisioned by a non-carrier,

- Access to the native dialer and messaging stack,

- Optional fallback cellular connectivity only when needed and if and when they choose to purchase it.

17.    This is not hypothetical. It is technically viable and economically transformative—but only if the current structural exclusion is dismantled.

### D. Liberating the MVNO: From Resellers to Real Competitors

18.    Mobile Virtual Network Operators (MVNOs) are similarly blocked. Despite leasing bandwidth from the carriers, MVNOs cannot:

- Assign their own PSTN numbers to the native dialer,

- Direct calls through their own VoIP platforms using Wi-Fi,

- Offer continuity between Wi-Fi and cellular on a single phone number only when needed and under conditions determined by the MVNO.

19.    Thus, currently MVNOs are merely resellers of carrier capability, completely dependent on carrier infrastructure, reduced to repackaging the carriers' products, unable to innovate or compete on price, features, or efficiency. If this Court removes the integration barriers, an alternative MVNO model could emerge, where MVNOs could become engines of innovation, enabling regional, niche, and community-based providers to offer custom-built voice services. In an unrestricted MVNO environment, leased cellular capacity from established carriers could be used to offer a fully integrated "Wi-Fi First" model where calls go through the MVNO's own VoIP servers when Wi-Fi is available and are automatically connected to a carrier when Wi-Fi is

not available, using the same MVNO controlled PSTN number.

### E. The Final Domino: Forcing Carriers to Compete on Wi-Fi Calling

20.     Once VoIP providers and MVNOs are free to compete, carriers will no longer be insulated from market forces. They will have to:

- Offer standalone Wi-Fi Calling plans,

- Compete on pricing, service quality, and global reach,

- Unbundle voice and SMS from their legacy infrastructure offerings.

21.     This is how fair markets work. For the first time in decades the subscriber wins. Innovation wins.

### F. The Coming Transformation: Wi-Fi Calling as a Platform Benefit

22.     Freed from artificial gatekeeping, Wi-Fi Calling will become not just a commodity—but a competitive layer for every major service platform. Real-World Scenarios:

- Amazon could bundle Wi-Fi Calling with Prime, offering free minutes for monthly shopping thresholds or Alexa integration;

- Banks could cover your VoIP subscription as part of premium credit or checking packages;

- Utilities and insurers could sponsor calling plans in exchange for integrated support lines or billing alerts;

- Advertising platforms could offer sponsored minutes, just as YouTube and Spotify offer free access in exchange for attention.

23.     The price of standalone voice connectivity will drop below $6.50/month, and ultimately reach

zero for users who participate in value-sharing models.

### G. Legal Consequences: Unified Antitrust and RICO Liability

24.    The defendants' exclusionary conduct is not just unjust—it is illegal:

- Sherman Act §§ 1 and 2: Monopolization and refusal to deal with qualified competitors;
- Clayton Act §§ 3, 4, and 14: Tying voice service to cellular infrastructure and retail devices;
- RICO §§ 1962(c) and (d): Coordinated enterprise behavior to suppress competition and extract over $565 billion in subscriber revenue through collusive control of infrastructure access and user lock-in.

25.    This is not a technical dispute—it is a structural market offense sustained by platform-level deception and economic coercion.

### H. The Court's Role: Unlocking the Voice Economy

26.    This Court has the opportunity to:

- Break the artificially imposed tie between voice identity and cellular subscriptions;
- Restore telephony to its role as a neutral, interoperable service layer;
- And enable a market where choice—not collusion—drives price, access, and innovation.

27.    Let this Court be the one to break the lock. Let it begin here.

## PRELIMINARY STATEMENT

28.    This class action challenges a vertically integrated scheme by dominant smartphone platform and device vendors—Google, Apple, and Samsung—to suppress independent competition in mobile

voice services by foreclosing consumer access to non-carrier Wi-Fi Calling. The Defendants, jointly and through coordinated conduct, have created technical, policy, and commercial barriers that prevent consumers from using third-party alternatives to traditional bundled cellular voice plans.

29.    At the core of this scheme is control over the smartphone operating systems—Google's Android OS and Apple's iOS—which grant full telephony functionality to pre-approved, carrier-certified software, while systematically denying equivalent access to independent VoIP-based competitors. That functionality includes:

- Native dialer integration

- Emergency call and E911 access

- OS-level phone number provisioning

- Voicemail, call log, and system identity registration

- Background execution and telephony API access

- Bluetooth and car system call handling

30.    These privileges are not made available to standalone VoIP apps, even though the same functionality is already extended to mobile carriers. As a result, independent VoIP providers are forced to operate as degraded, over-the-top (OTT) apps—relegated to background status with inferior performance, battery drain, and incomplete access to core system services. Apple and Google, as platform owners, enforce this disparity by:

- Controlling entitlement frameworks and OS permissions

- Locking dialer and call stack APIs to carrier-only software

- Blocking OS-level registration of numbers not assigned by carriers

- Making system-level access conditional on carrier integration

  Samsung, Apple (in their hardware roles), and Google (through Pixel) reinforce these exclusions through:

- Firmware-level restrictions that prevent non-carrier VoIP apps from replacing native telephony

- Carrier-preloaded configurations

- Enforced compatibility rules that lock out non-carrier apps

31.    The exclusion is not justified by technical necessity. It is commercial. The Defendants grant full access to mobile carriers—but deny that same access to third-party alternatives. This constitutes structural, policy-driven exclusion of competitors from a market that would otherwise allow affordable, non-carrier voice service over Wi-Fi networks. Consumers are harmed because they are forced to purchase bundled cellular plans in order to access Wi-Fi Calling—despite the fact that the underlying technology could be delivered over any data connection. This is not innovation. It is control. And it results in higher prices, suppressed alternatives, and eliminated consumer choice. This lawsuit challenges Defendants' conduct under:

- Sherman Act § 1 – for unreasonable restraint of trade

- Sherman Act § 2 – for monopolization and monopoly maintenance

- Clayton Act §§ 3, 4, 14 – for exclusive dealing, tying, and competitive foreclosure

- RICO §§ 1962(c) and (d) – for a pattern of exclusionary enterprise conduct through fraud, policy manipulation, and misrepresentation

32.    This action also invokes the Essential Facilities Doctrine: where a dominant firm controls infrastructure that competitors must access in order to compete, it must make that access available on fair and non-discriminatory terms. Apple and Google control operating systems that serve as the gateway to all voice functionality on modern smartphones. By denying non-carrier access to that infrastructure while extending it to carrier partners, they violate this principle and entrench market power to the detriment of consumers.

33.    Consumers have never been shown what a competitive market for Wi-Fi Calling would look like. No one has been allowed to offer it. The result is a locked ecosystem where voice communication is tethered to expensive, bundled plans and no competitor can enter.

A.  **Application to the Platform-Based Class Action: Monopolization of 373 Million American Subscribers by Google, Apple, Samsung, and Their Carrier Co-Conspirators (Sherman Act § 2)**

34.    Unlike the carriers' tying scheme, the antitrust violations committed by Google LLC, Apple Inc., and Samsung Electronics Co., Ltd. arise not from tying one product to another, but from monopolizing the operating system layer of U.S. smartphones in concert with their carrier co-conspirators. Together, Google (via Android OS) and Apple (via iOS) controlled more than 95% of the U.S. mobile OS market, while Samsung—by manufacturing Android-powered smartphones for exclusive carrier integration—served as the primary hardware enabler of this exclusion. The Class alleges three independent violations of Sherman Act § 2:

- Monopolization (Sherman Act § 2): Google and Apple, through Android and iOS, granted privileged access to system-level telephony APIs only to AT&T, Verizon, and T-Mobile—thereby monopolizing the delivery path for Wi-Fi Calling. All other VoIP

competitors were denied full native dialer integration, battery optimization, number provisioning, and user entitlement functions required for standalone Wi-Fi-based voice services. The result: consumers were deprived of competitive choices and locked into high-cost bundles by design.

- Attempted Monopolization (Sherman Act § 2): Even where full monopolistic control was not absolute, the Defendants' conduct—pre-loading their devices with carrier-favored dialers, locking out SIP-based alternatives, removing system access for independent Wi-Fi providers, and falsely labeling Wi-Fi Calling as "included"—created a highly exclusionary system that rendered standalone competition functionally impossible.

- Conspiracy to Monopolize (Sherman Act § 2): Google, Apple, and Samsung acted in close coordination with their carrier co-conspirators by enforcing consistent software, firmware, and certification rules that ensured only carrier-integrated software could initiate native calls using fully integrated system-level functions. Each party benefited: the OS vendors retained power over software distribution and monetization; the carriers kept control over voice services; and Samsung secured placement deals and network subsidies. The exclusion was not incidental—it was systemic and mutually enforced.

35. The monopolization claims brought against Google, Apple, and Samsung under Sherman Act § 2 are grounded in two of the most authoritative antitrust rulings of the past decade—both involving platform-based exclusion schemes by Google, and both affirming that when dominant technology firms design systems to block market entry and suppress competitors, they incur full liability under federal law.

36. First, in *United States v. Google LLC*, Case No. 1:20-cv-03010 (D.D.C.), Judge Amit P. Mehta ruled in August 2024 that Google unlawfully preserved its monopoly over search and search

advertising by blocking rival access to critical distribution paths. Google's exclusive browser deals, mobile pre-installation arrangements, and control over search defaults gave it structural power to prevent user choice and neutralize competitor innovation. Judge Mehta held that such conduct constitutes monopolization, attempted monopolization, and conspiracy to monopolize, even where consumers faced no direct pricing coercion—because structural exclusion alone violates Sherman Act § 2.

37.    In this case, Google and Apple hold over 95% of the U.S. smartphone operating system market, and both serve dual roles—as OS gatekeepers (Android and iOS) and device manufacturers (Google Pixel and iPhone). In parallel, Samsung manufactures over 60% of Android-powered smartphones in the U.S. market and participates directly in the same scheme by enabling carrier-preferred dialers, certification regimes, and firmware policies that block competitive VoIP entry at the hardware level. These three Defendants—Google, Apple, and Samsung—each played a distinct and critical role in the scheme:

- Google (OS + Pixel): Denied full system API and dialer access to non-carrier VoIP providers, while privileging Pixel phones with integrated Android controls and preconfigured carrier software.

- Apple (OS + iPhone): Embedded system-level restrictions (CallKit, entitlement gating, push notification throttling) that locked out VoIP competitors and favored iMessage/FaceTime over third-party services.

- Samsung (OEM): Preloaded carrier-customized dialers, collaborated with OS manufacturers to choose operating systems that removed SIP stack support from devices, and enforced certification policies that aligned tightly with AT&T, Verizon, and T-Mobile demands—thereby cementing exclusion at the device layer.

20

38. This combination of software exclusion (OS layer) and hardware exclusion (OEM layer) mirrors the distribution control condemned by Judge Mehta. Just as search rivals were structurally locked out from browser and device pathways, standalone Wi-Fi Calling competitors were locked out from dialers, call APIs, entitlement systems, and number provisioning tools—even if having access rights and able to provide viable consumer alternatives.

39. Second, in *United States v. Google LLC*, Case No. 1:23-cv-00108 (E.D. Va.), Judge Leonie M. Brinkema ruled in April 2025 that Google violated both Sherman Act § 1 and § 2 by using its dominance over one infrastructure product (its ad server, DFP) to force integration with its own ad exchange (AdX), thereby foreclosing competing exchanges. The decision affirmed that technical integration and platform design—when used to entrench monopoly power and block competitors—constitutes monopolization, even without contract tying or overt pricing mandates.

40. Judge Brinkema emphasized that platform control creates legal responsibility: a dominant firm may not exploit control over infrastructure, APIs, or distribution systems to reinforce partner dominance and suppress rivals. Where technical separability exists, and where consumers are denied meaningful choice through exclusionary defaults or discriminatory design, the platform's conduct is actionable under Sherman Act § 2.

41. This principle applies directly here. Google and Apple, through Android and iOS, have engineered their operating systems to permit native telephony access only to carrier partners, while denying identical privileges to all standalone VoIP providers. Samsung, by aligning its hardware design, certification process, and firmware customization with the carriers, reinforced this exclusion—creating a unified barrier across both software and hardware layers. The result: VoIP competitors like VoIP-Pal were locked out from the infrastructure needed to offer their services. Consumers were left with no access to standalone Wi-Fi Calling, even though the

technology was technically feasible and cost-saving. Like DFP and AdX in *Brinkema*, here the dialer, entitlement APIs, call handling systems, and number provisioning pathways were all locked into a closed ecosystem—favoring only AT&T, Verizon, and T-Mobile.

42.     Together, these two rulings confirm that the combined exclusion by Google (Android + Pixel), Apple (iOS + iPhone), and Samsung (Android OEM) constitutes monopolization under Sherman Act §2. The Class has standing to seek treble damages, equitable relief, and market restructuring based on a unified, platform-plus-device exclusion scheme that structurally foreclosed VoIP alternatives from ever entering the market

### B.  Consumer Harm and Market Suppression: Blinded, Coerced, and Deprived of Choice

43.     The result of this monopolistic structure is not theoretical—it is catastrophic. For over a decade, Google, Apple, and Samsung, in concert with their carrier co-conspirators AT&T, Verizon, and T-Mobile, engineered a communications ecosystem designed not for transparency or competition, but for entrapment. Through their collective control of the operating system layer (Android and iOS), the hardware layer (Pixel, iPhone, Samsung Galaxy), and the retail carrier layer, these six companies constructed a false technological narrative—one that blinded 373 million American subscribers into believing that:

1.  Wi-Fi Calling must be tied to cellular calling and texting;

2.  That voice services cannot exist without a paid mobile data plan;

3.  And most egregiously, that there is no way to use a standalone voice platform, even when the subscriber is connected to Wi-Fi.

44.     This is not a misunderstanding. It is an orchestrated deception—reinforced by default device

settings, preloaded software, firmware restrictions, false "included at no charge" marketing, and the removal of features (such as SIP support and dialer switching) that would otherwise allow competitors to offer alternatives. The truth is damning: every Wi-Fi call initiated by a subscriber was separately charged—through data usage, infrastructure access, or bundled pricing—despite Defendants advertising it as "free" or "included." And yet, none of that revenue ever went to consumers who were never told that cheaper, non-carrier options were technically feasible and lawfully entitled to operate. Instead, the Defendants colluded to cripple standalone competition at the root, ensuring that Wi-Fi Calling could only be accessed when tethered to a carrier contract. In doing so, they eliminated innovation, blocked market entry, and entrenched a false norm—one in which the average American family believes, to this day, that they must pay on average $157/month for a bundled phone plan just to "keep their phone working."

45.    That lie—that Wi-Fi voice must be locked to cellular plans—has now become conventional wisdom. But it is a lie with a $565 billion price tag: the collective gross profit these six companies share by manufacturing scarcity, suppressing competition, and denying consumers choice. And the damage extends far beyond U.S. borders. Android and iOS power over 99% of the world's smartphones, and Samsung, Apple, and Google's Pixel line account for the overwhelming majority of global smartphone sales. Through the same device-level restrictions, API barriers, and partner-only certifications, this fraudulent and exclusionary scheme now spans over 7.2 billion mobile subscribers worldwide. This is not an isolated market failure. It is a global business model built on concealment, collusion, and coerced overpayment.

## C.  No Need for Tying Analysis under Sherman Act § 1

46.    Unlike the earlier claims against the carrier defendants, the antitrust violations asserted against Google, Apple, and Samsung do not rely on a traditional "tying" theory under Sherman Act § 1.

There is no need to prove that one product (such as operating system access) was explicitly sold as a condition of purchasing another (such as a carrier plan). Instead, the violations arise under Sherman Act § 2, where monopolization occurs through design—not contracts. Through exclusive privilege allocation, platform-based discrimination, and hardware-level exclusion of alternatives, the Defendants monopolized the entire pathway for voice communication on smartphones—from the dialer to the identity system to the carrier certification stack. By doing so, they extinguished the possibility of non-carrier Wi-Fi-based voice services from ever emerging as a legitimate choice, despite the fact that such services were not only technically possible, but more affordable, more accessible. This was not innovation. It was institutionalized obstruction—and it was done to maintain profits, preserve control, and deny consumers the very choices that the free market and federal law were meant to guarantee

47. Under Sherman Act § 2, monopolization through systemic exclusion, even without a tied sale or price manipulation, triggers full antitrust liability. The Class is entitled to:

- Treble damages for all overcharges, as quantified by VoIP-Pal's damages model based on call volumes and suppressed competition;

- Equitable relief requiring non-discriminatory API and dialer access for VoIP competitors;

- Declaratory judgment that the control exercised by Google, Apple, and Samsung over voice infrastructure violates antitrust law.

### D. Conclusion

48. The Class's legal theory against Google, Apple, and Samsung is distinct from the carrier tying claims, yet equally supported by controlling precedent. Just as Google's distribution lockout in *United States v. Google* suppressed rival search engines, the Defendants' OS-level lockout of

standalone Wi-Fi Calling suppressed voice competition for 373 million Americans. This conduct is exactly the type of platform-based monopolization that Sherman Act § 2 was designed to prohibit.

## INTRODUCTION

49.    This case challenges the exclusionary conduct of three dominant technology corporations—Google LLC, Apple Inc., and Samsung Electronics Co., Ltd.—whose platform and device-level practices sustain a vertically integrated structure that makes it functionally impossible for standalone Wi-Fi Calling competitors to operate on equal footing with carrier-affiliated services. Working in alignment with mobile carriers AT&T Inc., Verizon Communications Inc., and T-Mobile US, Inc., these Defendants have created a closed ecosystem where full telephony functionality is granted with enhanced privileges to carrier-certified software, while independent alternatives are permitted only limited integration, rendering them commercially and functionally uncompetitive.

50.    Today, more than 7.4 billion smartphones are in circulation globally, functioning not merely as communication devices but as primary gateways to public safety, economic inclusion, healthcare, and digital commerce. Yet the ability to deliver core telephony services over those devices is tightly controlled by a small group of platform owners and hardware manufacturers who reserve privileged access for commercial partners, while structurally disadvantaging third-party competition. This case alleges that such conduct is not incidental—it is the result of deliberate policy, entitlement frameworks, and device-level enforcement that suppress consumer choice and preserve monopoly control over mobile-originated voice services.

51.    Google, Apple, and Samsung have engineered a system where only carrier-integrated software are granted deep integration with the smartphone dialer, emergency call functionality, voicemail,

call logs, Bluetooth routing, and background execution privileges. Independent Voice over IP (VoIP) applications—those not aligned with or certified by a carrier—may access some APIs, but with significantly reduced capabilities that strip them of the seamless experience required to compete on equal footing. These restrictions collectively degrade the user experience of independent services and prevent them from functioning as viable alternatives.

52.    As a result, consumers are denied the ability to choose non-carrier voice alternatives that could operate over Wi-Fi or data-only networks at a fraction of the cost of bundled carrier plans. The harm is structural, systemic, and nationwide—affecting over 373 million U.S. smartphone users who are required to purchase expensive mobile voice plans in order to access basic call functionality that could, technically, be delivered independently.

### A. Pro-Carrier Wi-Fi Calling / Anti VoIP Calling

53.    The exclusionary conduct challenged in this Complaint has produced a two-tier telecommunications infrastructure—a system in which mobile carriers are granted privileged, full access to native telephony features, while VoIP competitors are systematically relegated to inferior access. Defendants Apple and Google, through their control of iOS and Android respectively, have structured their operating systems to extend full integration privileges—including enhanced access to the native dialer, call and messaging control, and seamless call handoff—exclusively to carrier-affiliated services. These privileges are enforced and reinforced by the Defendant device manufacturers such as Apple (in its hardware role), Google Pixel, and Samsung, whose firmware and bootloaders are preconfigured to prioritize carrier pathways and constrain third-party voice platforms. As a result, carrier-branded voice services operate as native, always-on infrastructure, while independent VoIP providers operate in restricted, downgraded modes that limit functionality and market viability.

54.    This results in a structurally discriminatory two-tier model. On the one hand, mobile carriers enjoy deep system integration: their services auto-register, persist across networks, and interact directly with the phone's telephony stack. On the other hand, VoIP competitors—including Plaintiff VoIP-Pal—are relegated to application status, with diminished background privileges, unreliable session continuity, and constrained call-processing logic. Even when VoIP platforms would be technically capable of delivering equal or superior service, they are locked out of meaningful competition by restrictive OS policies and device-level enforcement. This dual access regime is not a byproduct of innovation or performance; it results from aligned design choices by the Defendants—choices that have the effect of systematically denying independent voice platforms functional equality.

### B. How the Defendants' Anticompetitive System Works: Self-Preferencing and Competitive Disadvantage by Design

55.    Google, Apple, and Samsung—working closely with their carrier co-conspirators—have built a vertically aligned system in which only carrier-certified software receives privileged access, including enhanced system-level integration with the dialer, background calling, emergency call routing, and battery optimization. Independent VoIP competitors are technically allowed access, but only to a constrained subset of functionality that makes standalone Wi-Fi Calling commercially infeasible.

56.    As operating system gatekeepers, Google and Apple embed all core telephony and messaging capabilities directly into Android and iOS, including the frameworks for Wi-Fi Calling. These systems are deliberately designed to reserve full-featured OS-level functionality for carrier-integrated applications, while non-carrier VoIP providers are limited to over-the-top roles with significantly fewer entitlements. Specifically, independent apps lack:

- Equal integration with the native dialer

- Direct support for SIP or IMS tunneling

- Reliable access to emergency fallback services

- Unrestricted background execution rights

57.   On the hardware side, Samsung, Apple, and Google (via Pixel devices) reinforce these disparities through preloaded carrier configurations, firmware restrictions, and entitlement enforcement. These restrictions ensure that call-handling functions remain exclusive to carrier-certified software, while third-party apps are functionally disqualified from becoming native-like options.

58.   Meanwhile, AT&T, Verizon, and T-Mobile—the carriers with whom these Defendants are aligned—refuse to allow access to Wi-Fi Calling integration or interconnection with independent VoIP services. They advertise Wi-Fi Calling as "included at no charge," but only within expensive postpaid bundles that also require voice, text, and data plans. This distorts consumer expectations, creates artificial dependencies on mobile plans, and erases the perceived value of standalone Wi-Fi Calling before the market has a chance to form.

59.   The result is a tightly controlled system in which every layer—OS, hardware, and interconnection—is locked down. Consumers cannot access independent Wi-Fi-based voice services not because the technology is unavailable, but because the gatekeepers have rendered such access commercially impossible and functionally inferior by design.

60.   By linking native voice capabilities to cellular SIMs and reserving deep integration for carrier pathways, Defendants ensure that every user must purchase mobile voice service even when Wi-Fi is available and sufficient. Low-income users, students, and rural Americans are prevented from using devices without a cellular access plan, and the market for affordable alternatives is foreclosed—not by consumer choice, but by structural design. Today, no iOS or Android

smartphone in the U.S. market supports a fully integrated Wi-Fi-only voice plan that bypasses the carriers.

### C. Google and Apple's Dual Roles and Conflicts of Interest

61.    Two of the clearest examples of structurally enforced exclusion appear in the conduct of Google and Apple—each of whom holds a dual role in the mobile ecosystem. Both serve as operating system gatekeepers while simultaneously competing in the same market as the third-party voice and messaging services they structurally disadvantage.

### 1.  Google's Dual Role

62.    Google controls the Android operating system, used by the majority of smartphones globally. At the same time, Google operates its own voice and messaging products—including Google Fi as a mobile virtual network operator utilizing T-Mobile's infrastructure as well as Google Voice and Google Messages which directly compete with independent VoIP providers. In this dual role, Google uses its control over Android to grant its own apps and carrier-certified software privileged access to the platform's telephony stack. These apps benefit from:

- Seamless integration with the native dialer

- Network switching between cellular and Wi-Fi

- Full access to system-level telephony APIs

- Persistent background execution and emergency services compatibility

63.    Meanwhile, third-party VoIP providers receive only partial access to these capabilities. They are forced to operate in degraded application mode, subject to power-saving limitations, API gating, and denied access to privileged entitlements. Google maintains a closed certification regime and

entitlement system that ensures only carrier-aligned or Google-owned applications can function as native calling options.

### 2. Apple's Dual Role

64.    Apple likewise functions as both a platform owner and a direct market participant. It controls iOS, the operating system on every iPhone, while also offering OS-integrated communication services such as FaceTime Audio, FaceTime Video, and iMessage—all of which operate over data networks and compete with independent VoIP providers.

65.    In this dual role, Apple reserves dialer and telephony privileges for its own services. It restricts access to CallKit, PushKit, and background calling entitlements, selectively granting these capabilities to first-party apps or tightly controlled partnerships. Although Apple markets FaceTime and iMessage as data-based alternatives to traditional voice calling, it limits third-party VoIP apps from integrating with the same messaging and telephony subsystems. The result is a closed system where Apple's own offerings benefit from OS-level preference while others are restricted from competing on equal terms.

### 3. Monopolistic and Self-Preferential Restraint of Trade

66.    The exclusion of independent VoIP alternatives from critical smartphone infrastructure is not driven by technical necessity—it is the result of deliberate self-preferencing by vertically integrated platform owners. Both Google and Apple regulate the mobile operating systems upon which nearly all third-party apps must rely. At the same time, they deploy their own competing voice and messaging services from within those same platforms. This dual role creates a legally actionable conflict of interest. As gatekeepers to the mobile operating environment, Google and Apple exercise control over dialer access, background execution, telephony APIs, and user

permissions—all functions essential to delivering real-time voice services. But instead of maintaining a neutral environment, they use that control to suppress competition and reinforce their own market dominance.

67. Google's internal services (such as Google Fi and Google Messages) and Apple's proprietary applications (such as FaceTime and iMessage) benefit from deep system integration, while independent VoIP services are technically permitted but structurally limited. These restrictions are not imposed for user protection or technical performance—they are deliberately designed to prevent market disruption.

68. This constitutes an unlawful restraint of trade. By conditioning full telephony access on carrier affiliation or internal ownership, Google and Apple distort the mobile voice market, reduce consumer choice, and ensure that only their own or affiliated services can operate as fully functional communication platforms. This behavior falls squarely within the scope of monopolization and exclusionary conduct prohibited under federal antitrust law

### D. Restricted Native Dialer and OS-Level Telephony Access for VoIP Providers

69. Independent VoIP providers and software-based telephony platforms—many of which operate with telephone numbers provisioned through FCC-licensed intermediaries like Twilio and Bandwidth—are permitted to operate on both iOS and Android platforms, but only with heavily restricted access to the system's native dialer, telephony stack, and default communication interfaces. Despite meeting technical and regulatory prerequisites, these providers are structurally constrained from delivering their services through the phone's primary calling infrastructure in a manner equivalent to that of SIM-based carriers.

70. Apple and Google, as vertically integrated mobile OS vendors, maintain tight control over access to core mobile telephony functions—including the default dialer, call logs, SMS/MMS

subsystems, caller ID frameworks, and emergency calling features. While third-party apps are technically allowed to exist on the platform, Apple and Google reserve deep, privileged integration for their own affiliated services and select mobile carriers with whom they maintain provisioning partnerships. As a result, independent VoIP providers are effectively barred from:

- Designating their number as the device's system default

- Seamlessly routing calls through the native dialer or receiving calls therein

- Logging calls or messages into the phone's integrated communication history

- Accessing OS-managed emergency call frameworks (e.g., 911/E911 services)

71.    These functional constraints operate as a de facto barrier to entry, denying competitive VoIP alternatives meaningful parity in the mobile voice and messaging markets. The native dialer and associated APIs function as essential facilities—critical infrastructure components that cannot be reasonably replicated, but are indispensable for any provider seeking equal footing in the mobile communications space.

72.    Under well-established antitrust doctrine, including *Terminal Railroad Ass'n v. United States*, 224 U.S. 383 (1912), and *Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973), a dominant firm that controls an essential facility and imposes discriminatory access conditions on rivals may be found liable under § 2 of the Sherman Act. In this case, Apple and Google use their gatekeeping power to maintain exclusive control over essential voice infrastructure, restricting competition and distorting consumer access to lower-cost alternatives.

73.    Additionally, Apple and Google's policy of tying full telephony integration to activation with a certified, SIM-based carrier constitutes an unlawful tying arrangement under § 1 of the Sherman Act and § 3 of the Clayton Act. Users must activate their smartphones with an approved carrier

in order to access native voice features—even where a VoIP alternative could offer comparable or superior service. This conduct mirrors the exclusionary scheme condemned in *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001), in which Microsoft's refusal to provide API access to rival browsers was held to preserve its platform monopoly.

74.   The consequences are broad and systemic. Independent VoIP providers are locked out. Innovation is stifled. And consumers are denied more affordable, more flexible, and more secure voice services—not because those services were rejected in the marketplace, but because they were never allowed to compete within it.

### E.  The Structural Costs of Systemic Access Control

75.   The exclusionary practices described in this Complaint result in tangible and ongoing financial harm to American consumers. U.S. smartphone users routinely pay $70 to $90 per month for bundled voice, text, and data plans. When factoring in device installment payments, taxes, insurance, and app bundle subscriptions, the total monthly cost often exceeds $100—and in many cases reaches $150 per user.

76.   These costs persist even as the underlying infrastructure has shifted. With the widespread availability of Wi-Fi networks in homes, workplaces, and public spaces, the majority of voice calls today are initiated over Wi-Fi—not carrier cellular towers. Yet consumers receive no pricing benefit for using their own networks. Instead, carriers offload billions of dollars in infrastructure costs onto users' private Wi-Fi networks while preserving high prices as though traffic still flows over carrier-managed systems. The financial benefits of that offloading are not passed on to consumers—they are absorbed and reinvested by the same vertically integrated entities: the carriers, the operating system vendors, and the hardware manufacturers.

77.   Google, Apple, and Samsung reinforce this closed ecosystem by ensuring that independent VoIP

competitors remain commercially unviable. Their platforms grant system-level dialer and emergency service integration privileges exclusively to carrier-certified apps, while restricting non-carrier VoIP services to less privileged modes of operation. Their devices are preloaded with carrier-approved dialers and messaging apps, and their app store policies and entitlement frameworks impose technical and licensing burdens that effectively preclude equal participation. App developers face fees, permission hurdles, and functional limitations that collectively foreclose the development of non-carrier voice alternatives.

78.    In a competitive market, Wi-Fi Calling would be available as a standalone service for as little as $6.50 per month—without requiring bundled cellular voice or data. That offering is technically feasible. It is financially viable. And yet it remains unavailable to consumers because the dominant Defendants have structured the mobile ecosystem to suppress it. Through the combined forces of platform privilege, firmware-level enforcement, and restrictive access to critical telephony capabilities, standalone Wi-Fi Calling is not merely disfavored—it is rendered commercially impractical.

### F. The Defendants' System Favors Carriers

79.    The current mobile voice ecosystem operates not as a competitive marketplace, but as a closed, revenue-preservation system engineered by dominant platform providers and reinforced by vertically aligned mobile carriers. Together, Google, Apple, and Samsung—alongside AT&T, Verizon, and T-Mobile—generate over $560 billion in annual gross profits under this structure.

80.    This is not the result of technological constraint. It is a deliberate design built on technical inequality, commercial privilege-gating, and consumer misdirection. The infrastructure that could support standalone, low-cost Wi-Fi Calling services exists, but access to key OS-level capabilities is selectively privileged. System APIs, deep dialer integration, and emergency service

compatibility are made available only to carrier-certified software—ensuring that non-carrier providers cannot offer a comparable experience.

81.    This system is maintained not by necessity, but through deliberate alignment between platform vendors and their carrier co-conspirators. The result is a platform that systematically limits functional alternatives, preserves inflated pricing, and suppresses competition before it can take root. In doing so, the Defendants have not only entrenched their own dominance—they have granted the carriers a preferred and exclusive role, using technical levers to maintain a bundled service model that forces consumers to purchase what they do not need in order to access what they do. This conduct violates multiple provisions of federal law, including:

- Sherman Act §§ 1–2, for unreasonable restraint of trade and monopolization;
- Clayton Act §§ 3, 4, and 14, for exclusive dealing, tying, and resulting damages;
- RICO §§ 1962(c) and (d), for enterprise conduct carried out through coordinated exclusion and commercial misrepresentation;
- The Unlocking Consumer Choice and Wireless Competition Act of 2014, Public Law 113–144, which was enacted to promote competition in the mobile services market and to prevent anti-consumer restrictions on device use.

## THE PARTIES

### A.  The Plaintiffs

82.    The named Plaintiffs bring this Class Action lawsuit on behalf of approximately 373 million smartphone subscribers who have been harmed by the Defendants' anticompetitive practices (the "General Subscribers" Class).

83.    VoIP-Pal.com Inc. ("VoIP-Pal" or "Lead Plaintiff") is a publicly traded technology company

incorporated in the State of Nevada, with its principal place of business in Waco, Texas. VoIP-Pal is a developer of a call classification and routing system designed for Voice over IP (VoIP) services. Since 2016, VoIP-Pal has pursued legal redress against discriminatory practices that it alleges have foreclosed competition in mobile voice markets—particularly in connection with the delivery of non-carrier Wi-Fi Calling.

84. VoIP-Pal brings this action as the current lead plaintiff on behalf of its shareholders as members of the approximately 373 million smartphone subscribers who have been harmed by the Defendants' anticompetitive practices and intends to amend to include additional class representatives who, like VoIP-Pal, were harmed by the exclusionary conduct detailed herein.

85. Plaintiffs Richard Inza and Michael Inza, residing in Florida, represent the General Subscribers Class. This class includes millions of subscribers who have experienced inflated prices, reduced service quality, lack of consumer options, and other harms resulting from the Defendants' unlawful conduct.

### B. The Defendants

#### 1. Apple Inc.

86. Apple Inc. is a corporation organized under the laws of the State of California, with its principal place of business at 1 Apple Park Way, Cupertino, California 95014. On information and belief, Apple is registered to do business in the District of Columbia and maintains substantial business contacts within the District. The following individuals served on Apple's board of directors or held legal executive roles during the relevant period:

- **Board of Directors** (7 members): Arthur D. Levinson (Chair), Tim Cook (CEO), Andrea Jung, Alex Gorsky, Ronald D. Sugar, Monica Lozano, Susan L. Wagner *(noting that Al Gore and James Bell retired in January 2024)*

36

- **General Counsel**: Katherine L. Adams (Senior Vice President & General Counsel)

### 2. Alphabet Inc. and Google LLC

87.    Alphabet Inc. is a Delaware corporation with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043. Alphabet is the parent company of Google LLC and serves as the holding entity for its operating units.

88.    Google LLC is a Delaware limited liability company and wholly owned subsidiary of Alphabet Inc., with the same principal place of business. Google operates as the primary entity responsible for the Android mobile operating system, the Google Play Store, and Google's communications products, including Google Voice and Google Meet. Google also enforces Android OEM compliance and manages platform integrations with wireless carriers.

89.    On information and belief, during the relevant period, Google and Alphabet worked in concert with their co-conspirators to structure Android's telephony and messaging stack in a way that excluded independent VoIP competitors from full system access. The following individuals served on Alphabet's board of directors or held legal executive roles during the relevant period:

- **Board of Directors** (10 members): John L. Hennessy (Chair), Sundar Pichai (CEO), Larry Page, Sergey Brin, Frances Arnold, L. John Doerr, Roger W. Ferguson Jr., K. Ram Shriram, Robin L. Washington, Ann Mather

- **General Counsel**: Halimah DeLaine Prado (General Counsel, Google LLC)

### 3. Samsung Electronics Co., Ltd.

90.    Samsung Electronics Co., Ltd. is a corporation organized under the laws of the Republic of Korea, with its global headquarters at Samsung Digital City, 129 Samsung-ro, Yeongtong-gu, Suwon-si, Gyeonggi-do 16677, Republic of Korea. Its U.S. subsidiary Samsung Electronics America, Inc.

is a foreign corporation in the State of New York and maintains its principal place of business at 85 Challenger Road, Ridgefield Park, New Jersey 07660.

91.    Samsung is one of the world's largest manufacturers of Android-based smartphones. It participated in the exclusionary enterprise by embedding carrier-preferred calling defaults, enforcing firmware-level restrictions, and supporting lock-in policies that blocked VoIP competitors from accessing system-level features. The following individuals served on Samsung's board of directors or held relevant legal executive roles during the relevant period:

- **Board of Directors** (9 members): Jong-Hee Han, Kyehyun Kyung, Hark-Kyu Park, Jeong-Ho Park, Yoon-Ho Choi, Seung Hyun Hong, Jae Hoon Jung, Soo-Jin Kim, In Ho Lee

- **General Counsel**: Ken Murata (Senior Vice President & General Counsel, Samsung Electronics America)

### C. Co-Conspirators (Non-Defendant Parties)

92.    While not named as Defendants in this Complaint, the following entities are alleged to be co-conspirators in a vertically integrated enterprise that collectively suppressed market entry by independent VoIP providers and foreclosed consumer access to standalone Wi-Fi Calling services. These entities are alleged to have participated in a shared exclusionary strategy alongside the named Defendants, contributing to the technical, contractual, and commercial barriers described herein.

- **AT&T Inc.** – Co-Conspirator
- **Verizon Communications Inc.** – Co-Conspirator
- **T-Mobile US, Inc.** – Co-Conspirator

93.    Their conduct is relevant to multiple counts in this Complaint, including coordination of technical

standards, app integration policies, and public representations that reinforce a system of exclusion. These entities are further referenced in allegations related to enterprise activity and liability under **RICO § 1962(d)** for conspiracy to preserve market dominance and suppress competitive entry.

94.    Although they are not named as Defendants in this action, their boards of directors, legal officers, and related affiliates remain material to the broader exclusionary conduct at issue. Their roles may be further addressed in subsequent filings, future related actions, or through discovery.

## JURISDICTION AND VENUE

95.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and § 1337 (commerce and antitrust), because the claims arise under the following federal statutes:

- Section 1 of the Sherman Act, 15 U.S.C. § 1 (Unreasonable Restraint of Trade)

- Section 2 of the Sherman Act, 15 U.S.C. § 2 (Monopolization and Attempted Monopolization)

- Section 3 of the Clayton Act, 15 U.S.C. § 14 (Exclusive Dealing and Tying)

- Section 4 of the Clayton Act, 15 U.S.C. § 15 (Private Right of Action for Treble Damages)

- Section 14 of the Clayton Act, 15 U.S.C. § 24 (Personal Liability of Directors and Officers)

- Section 1962(c) of the RICO Act, 18 U.S.C. § 1962(c) (Conducting an Enterprise through a Pattern of Racketeering Activity)

- Section 1962(d) of the RICO Act, 18 U.S.C. § 1962(d) (Conspiracy to Violate RICO)

96.    Jurisdiction is also proper under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, which authorize private parties injured by antitrust violations to seek treble damages, injunctive relief, costs, and attorneys' fees.

97.    This Court has supplemental jurisdiction over any related state law claims pursuant to 28 U.S.C. § 1367, as such claims arise from a common nucleus of operative fact and form part of the same case or controversy under Article III of the U.S. Constitution.

98.    Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) and (c), because:

- One or more Defendants reside in this District;

- The Defendants transact business in this District; and

- A substantial portion of the exclusionary conduct—including its implementation, enforcement, and resulting consumer injury—occurred in this District.

### A. Injury in This District and Nationwide

99.    Google, Apple, and Samsung—together with non-defendant co-conspirators AT&T, Verizon, and T-Mobile—have:

- Reserved native telephony privileges exclusively for carrier-certified software

- Denied consumers the option to use third-party VoIP providers with system-level parity

- Reinforced this exclusion through platform design, device firmware, and coordinated technical policies

100.    This exclusionary framework has caused widespread injury across the United States, including in

this District. Those injuries include:

- The elimination of meaningful consumer access to standalone Wi-Fi Calling

- The inability of VoIP providers to compete on equal technical terms

- Artificial inflation of mobile plan prices due to forced bundling and platform-level denial of alternatives

### B. Systemic Infrastructure Bias and Enterprise Conduct

101. This action does not challenge isolated product decisions or narrow implementation policies. It challenges a coordinated exclusionary system—spanning software, hardware, and commercial enforcement—that created a vertically integrated enterprise in which Defendants systematically denied consumers and competitive service providers access to core mobile voice infrastructure.

102. The system was designed not merely to favor mobile carriers, but to make it structurally impractical for any independent VoIP provider to deliver full-featured voice services. That exclusion was reinforced by:

- Google and Apple, who withheld full dialer and telephony API access from third-party VoIP apps

- Samsung and Apple (as OEMs), who implemented firmware and entitlement policies that blocked non-carrier integration

- The carrier co-conspirators, who refused interconnection and enforced bundling requirements while advertising "Wi-Fi Calling included"—a claim rendered misleading by their own policies requiring full postpaid activation

103. The commercial structure that enabled this exclusion was neither coincidental nor fragmented. It

was continuous, deliberate, and enterprise-driven—meeting the statutory thresholds for liability under both the Sherman and Clayton Acts and the Racketeer Influenced and Corrupt Organizations Act (RICO)

## **FACTS OF THE CASE**

### **A. The Defendants and Their Carrier Co-Conspirators Engineered a Closed Infrastructure to Exclude Independent VoIP Services from the Wi-Fi Calling Market**

104.    This case challenges how Google LLC (as the provider of Android OS and Pixel devices), Apple Inc. (as the developer of iOS and manufacturer of iPhones), and Samsung Electronics Co., Ltd. (as the leading Android OEM) constructed and enforced a closed, vertically integrated system that prevents independent Voice over IP (VoIP) providers from offering standalone Wi-Fi Calling services on equal technical and commercial terms. This system was implemented in coordination with non-defendant co-conspirators AT&T Inc., Verizon Communications Inc., and T-Mobile US, Inc.

105.    Together, these companies granted privileged access to operating system-level telephony features exclusively to carrier-certified applications while providing significantly reduced access to independent alternatives. The result is a mobile ecosystem where:

- Full-featured voice services—such as deep dialer integration, emergency calling, call logs, background execution, and privileged telephony APIs—are available only to carrier-affiliated software;

- VoIP providers are permitted to exist as over-the-top apps, but with restricted access that makes competition commercially unviable, even when they possess valid telephone numbers and meet all technical and regulatory standards;

- Device manufacturers preload firmware and UI defaults that prioritize carrier-integrated apps and prevent independent apps from being set as functional defaults;

- And mobile carriers reinforce the exclusion by refusing interconnection or E911 integration with VoIP providers, while misleadingly advertising Wi-Fi Calling as "included at no charge"—but only within bundled postpaid plans.

106.   While these companies do not share common ownership, they function as a coordinated enterprise. Their respective control over operating systems, hardware, and network policies is used to reinforce one another's exclusionary advantages—creating a structure that offers no viable access point to market for non-carrier alternatives. This systemic self-preferencing is visible in:

- The assignment of OS-level entitlements that reserve key dialer and messaging privileges for carrier-approved software;

- Firmware constraints that prevent third-party dialers from being designated as defaults;

- Carrier-subsidized device pricing dependent on software lock-ins and activation dependencies;

- And backend policies that limit interconnection and E911 compatibility for non-carrier VoIP services.

107.   This design reflects structural exclusion, not competition. Independent providers are not outperformed—they are blocked from participating meaningfully in the market through a deliberately constructed access hierarchy.

### 1. Antitrust Claims Based on Concerted Action

108. The named Defendants—Google LLC, Apple Inc., and Samsung Electronics Co., Ltd.—together with their carrier co-conspirators AT&T Inc., Verizon Communications Inc., and T-Mobile US, Inc., have jointly structured the smartphone ecosystem to prevent independent VoIP providers from entering and competing in the Wi-Fi Calling market. By restricting privileged access to essential system-level infrastructure, including OS-native dialers, telephony APIs, and emergency services capabilities, Defendants have preserved monopoly control over mobile-originated voice services. This coordinated conduct—spanning software, hardware, and carrier integration—constitutes an unlawful restraint of trade, the suppression of viable alternatives, and the systematic exclusion of consumer-facing voice innovations.

### 2. The Five Antitrust Breaches and Two RICO Violations Arising from Platform-Controlled Mobile Telephony Access

109. Based on the facts set forth above, this Complaint asserts five core violations of U.S. antitrust law and two under the Racketeer Influenced and Corrupt Organizations Act (RICO), arising from a vertically integrated exclusionary scheme involving platform vendors (Google, Apple), device manufacturers (Google Pixel, Apple iPhone, Samsung), and mobile carrier co-conspirators (AT&T, Verizon, and T-Mobile). Each count is supported by longstanding precedent and clear legal standards demonstrating how the conduct forecloses competition in the mobile voice and Wi-Fi Calling markets.

#### a. Five Antitrust

##### i. Sherman Act § 1 – Unreasonable Restraint of Trade

110. Violation: Defendants coordinated with mobile carrier co-conspirators to configure their operating systems, firmware, and app certification policies to prioritize native telephony

privileges for carrier-affiliated services while limiting independent VoIP competitors to reduced-access frameworks. Effect: This restraint distorted market conditions, foreclosed price-disruptive innovation, and suppressed consumer choice across the national mobile voice market. Legal Standard: Section 1 of the Sherman Act (15 U.S.C. § 1) prohibits agreements that unreasonably restrain trade and impact interstate commerce. A violation requires:

- Concerted action by two or more entities;

- An unreasonable restraint of trade (per se or rule-of-reason);

- A substantial effect on interstate commerce.

111.    Precedents:

- Microsoft (2001): Technical integration used to block rival browsers.

- Qualcomm (2020): Privilege-based restrictions excluding rivals.

- Continental Ore (1962): Courts must consider combined conduct, not isolated elements.

112.    Application: Google, Apple, and Samsung, in coordination with carriers, jointly enforced platform configurations and hardware defaults that limited VoIP competition and preserved the bundled mobile voice ecosystem.

### ii.    Sherman Act § 2 – Monopolization and Attempted Monopolization

113.    Violation: Defendants monopolized access to native mobile telephony infrastructure by reserving full system integration for carrier-certified software and preventing VoIP competitors from competing on equal terms, despite their technical qualifications. Effect: This sustained monopolization of voice platform access prevented non-carrier VoIP services from entering the market or gaining fair access to dialer registration, emergency calling, background execution, and

other necessary system functions. Legal Standard: Section 2 of the Sherman Act (15 U.S.C. § 2) prohibits conduct that seeks to acquire, maintain, or abuse monopoly power in a defined market. A claim requires:

- Possession of monopoly power;

- Willful maintenance or acquisition of that power;

- Exclusionary conduct not justified by legitimate business reasons.

114. Precedents:

- United States v. Grinnell Corp., 384 U.S. 563 (1966): Monopoly power must be coupled with willful exclusion of competitors.

- Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585 (1985): Refusal to deal with a competitor to protect a monopoly.

- Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451 (1992): Denial of access to parts essential for competition.

115. Application: Google and Apple retain exclusive control over OS-level access to telephony APIs, dialer integration, and system privileges. Their refusal to extend the same level of access to VoIP-Pal—despite technical capability—satisfies each prong of the § 2 monopolization standard.

### iii.    Clayton Act § 3 — Exclusive Dealing

116. Violation: Apple, Google, and Samsung entered into de facto exclusive dealing arrangements by configuring their platforms and firmware to grant full functionality only to carrier-partnered apps. Effect: These arrangements foreclosed the Wi-Fi Calling market to otherwise qualified VoIP competitors and limited consumer access to lower-cost alternatives. Legal Standard: Section 3 of

46

the Clayton Act (15 U.S.C. § 14) prohibits sales or leases conditioned on exclusive dealing that tends to lessen competition substantially.

117.    Precedents:

- Tampa Electric (1961): Market foreclosure through exclusive supply arrangements.

- Standard Oil (1949): Exclusive access that prevents rivals from competing.

- In re EpiPen (2022): Lock-in mechanisms that restrict market access for competitors.

118.    Application: Apple's and Samsung's firmware and device behavior reserved full telephony features for carrier software, excluding third-party VoIP platforms from accessing the same resources.

### iv.    Clayton Act § 4 — Private Damages and Standing

119.    Violation: VoIP-Pal lost licensing revenue, deployment capacity, and competitive viability due to structural exclusion. Effect: Treble damages are sought under federal law for economic injury suffered directly from the anticompetitive conduct. Legal Standard: Section 4 of the Clayton Act (15 U.S.C. § 15) grants private entities the right to recover damages for antitrust violations.

120.    Precedents:

- Brunswick (1977): Antitrust injury established by suppressed competition.

- Hanover Shoe (1968): Damages traceable to exclusionary conduct.

- Zenith Radio (1971): Successive claims are allowed for new harms over time.

121.    Application: VoIP-Pal was directly injured by Defendants' integration policies and denied market access between 2018 and 2025, satisfying all required standing elements.

### v.    Clayton Act § 14 — Executive and Director Liability

122.   Violation: Executives and board members at Apple, Google, and Samsung knowingly permitted platform policies that disadvantaged VoIP competition, despite formal notice through litigation and licensing requests. Effect: Personal liability attaches under federal law for corporate officers who direct or knowingly perpetuate antitrust violations. Legal Standard: Section 14 of the Clayton Act (15 U.S.C. § 24) holds corporate officers liable when they authorize, enforce, or ignore illegal restraints of trade.

123.   Precedents:

- Lawlor (2000): Director-level liability for systemic exclusion.

- Perma Life Mufflers (1968): Corporate form cannot shield knowing participants.

- Philip Morris (2009): Executives liable for sustaining false or anti-competitive conduct.

124.   Application: Corporate leaders continued to enforce restrictive OS policies and distribution arrangements after VoIP-Pal provided formal notice of exclusion. These decision-makers may be held individually accountable.

### b.  Two Rico Violations

### i.  RICO § 1962(c) — Enterprise Racketeering Through Fraud

125.   Violation: Defendants—Google, Apple, and Samsung—participated in the operation of an association-in-fact enterprise that used misleading public representations, concealed technical restrictions, and discriminatory access privileges to preserve exclusive control over Wi-Fi Calling functionality and suppress competition from independent VoIP services such as VoIP-Pal. This enterprise functioned through coordinated conduct between OS vendors and device manufacturers to ensure that only carrier-approved apps received access to native dialers, telephony APIs, entitlement certificates, and firmware-level routing features—while VoIP

competitors were denied these same integration rights.

126.   Effect: VoIP-Pal and the proposed class were injured by this enterprise through systematic exclusion, consumer deception, and platform-level gatekeeping practices sustained by a pattern of racketeering activity. The pattern included repeated use of interstate mail and wire communications to:

- misrepresent the openness of Android and iOS platforms;

- obscure the true role of carrier entitlements in gating access to native calling;

- and conceal the commercial arrangements that preserved the exclusive delivery of Wi-Fi Calling through carrier apps.

127.   Legal Standard: Under 18 U.S.C. § 1962(c), it is unlawful to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity. A plaintiff must demonstrate:

- The existence of an enterprise that affects interstate commerce;

- That the defendant was employed by or associated with the enterprise;

- That the defendant conducted or participated in the enterprise's affairs; and

- That the defendant engaged in a pattern of predicate acts, including mail or wire fraud.

128.   Each Defendant—Google LLC, Apple Inc., and Samsung Electronics Co., Ltd.—conducted and participated in the affairs of a de facto commercial enterprise through a pattern of racketeering activity. This enterprise was sustained by the Defendants' shared control over smartphone operating systems (Android and iOS), native dialers, telephony APIs, entitlement certificates, and firmware-level access. Through these tools, the Defendants preserved the dominance of carrier-integrated voice infrastructure while functionally excluding all lawful standalone competitors,

including VoIP-Pal. The racketeering pattern included:

- Wire and mail fraud, by misrepresenting that developers could build lawful VoIP telephony apps with full system-level parity, while secretly limiting those privileges to carrier-certified apps.

- Honest services fraud and commercial bribery, through arrangements with carrier partners whereby OS access, device preloads, and routing privileges were exchanged for financial incentives, to the exclusion of neutral or unaffiliated VoIP competitors.

- Obstruction of lawful competition, by denying essential number provisioning, dialer parity, and voice integration to otherwise qualified non-carrier entities.

129.  This pattern of activity persisted over multiple years, impacted every U.S. subscriber market, and was directly responsible for VoIP-Pal's exclusion from licensing, deployment, and lawful commercialization.

### ii.    RICO § 1962(d) — Conspiracy to Commit Racketeering Acts

130.   Violation: Defendants—Google, Apple, and Samsung—conspired with each other, and with non-defendant co-conspirators (AT&T, Verizon, and T-Mobile), to violate § 1962(c) by maintaining an exclusionary enterprise that denied VoIP-Pal and all similarly situated providers access to lawful system-level telephony features necessary to compete. Each Defendant had actual knowledge of the joint exclusionary architecture and took affirmative steps to sustain it— such as enforcing developer restrictions, embedding carrier-preferred dialers, gating entitlements, and conditioning device-level voice integration on carrier relationships.

131.  Effect: The conspiracy ensured that no third-party VoIP provider could launch a fully integrated, standalone Wi-Fi Calling platform on equal footing with the carriers. VoIP-Pal's patented

technology was functionally locked out from both platform access and the U.S. mobile market, eliminating any opportunity to commercialize or license its innovations.

132. Legal Standard: Under 18 U.S.C. § 1962(d), it is unlawful to conspire to violate any of the provisions of RICO, including § 1962(c). A plaintiff must demonstrate:

- That two or more persons agreed to conduct the affairs of an enterprise through a pattern of racketeering activity; and

- That the defendant knowingly joined the conspiracy with the intent to further its objectives, even if the defendant did not personally commit the predicate acts.

133. Google, Apple, and Samsung violated § 1962(d) by conspiring with one another—and with non-party co-conspirators AT&T, Verizon, and T-Mobile—to perpetuate the racketeering enterprise. Each Defendant had knowledge of the shared exclusion scheme and contributed overt acts to maintain it including:

- A joint refusal to grant system-level parity for VoIP apps unless they were tied to a carrier-approved identity.

- A shared practice of tying critical voice features (like native dialer access, 911 integration, push notifications, and Bluetooth routing) to pre-installed carrier applications while denying these same features to lawful competitors.

- A coordinated technical and commercial framework that made it impossible for independent Wi-Fi Calling services to meet the same regulatory and performance standards permitted to carrier-branded apps.

134. This was not parallel conduct arising independently. It was a sustained and coordinated scheme

to enforce a platform-wide exclusion model that protected the vertically integrated carrier business model while denying consumers lower-cost, infrastructure-neutral voice alternatives. Through this conspiracy, Google, Apple, and Samsung preserved the illusion of openness while maintaining a tightly controlled gateway to mobile voice infrastructure—foreclosing VoIP-Pal from even entering the market

### c. Legal Precedents

135.    *Bridge v. Phoenix Bond & Indemnity Co.,* 553 U.S. 639 (2008): The Court held that civil RICO claims may proceed even where plaintiffs were not the direct recipients of fraudulent communications, as long as they were harmed by the fraudulent scheme. **Application:** VoIP-Pal's market exclusion resulted from false public claims and technical concealment orchestrated by the Defendants, including misleading messages to regulators, developers, and consumers about "open" platform access and "free" Wi-Fi Calling.

136.    *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479 (1985): Civil RICO liability may arise from predicate acts causing commercial harm, regardless of whether prior criminal convictions exist. **Application:** Defendants' use of backend technical controls, restricted API access, and false marketing messages—all communicated through interstate media—constitutes racketeering activity under Sedima's broad scope.

137.    *Philip Morris USA Inc.,* 566 F.3d 1095 (D.C. Cir. 2009): Corporate liability may attach when executives and companies promote false public narratives while concealing exclusionary backend practices. **Application:** The "Wi-Fi Calling included at no charge" narrative concealed the reality that VoIP competitors were limited to reduced-access app modes and could not participate in native voice infrastructure. This fraudulent framing supported enterprise-wide exclusion and denied consumers access to lower-cost alternatives.

138.    **Summary:** The conduct of Google, Apple, and Samsung constitutes racketeering activity under 18 U.S.C. § 1962(c). By jointly participating in an enterprise that concealed technical discrimination through public deception and selective privilege enforcement, Defendants sustained a closed voice communications ecosystem under false pretenses. VoIP-Pal and the class were harmed not merely by market exclusion—but by the systemic misrepresentation of how mobile voice access is controlled, priced, and restricted across platforms and devices.

139.    This Complaint relies on foundational Supreme Court decisions that condemn the kind of coordinated, infrastructure-based exclusion practiced by Defendants in this case. These rulings establish that when a consortium of powerful market actors collectively controls an essential facility, their refusal to offer fair access to competitors—particularly when done for anticompetitive purposes—constitutes unlawful monopolization under Sherman Act § 2.

140.    *United States v. Terminal Railroad Ass'n*, 224 U.S. 383 (1912) – Consortium Control of a Bottleneck Facility. In *Terminal Railroad*, a group of railroad companies jointly owned and controlled the only terminal bridge into St. Louis. They denied competing railroads the ability to interconnect, thus controlling a chokepoint that prevented market entry. The Supreme Court held that the collective denial of access to essential infrastructure—when that infrastructure is not practically duplicable—constitutes an illegal restraint of trade and a violation of Sherman Act § 2.

141.    **Application to the Present Case:** Here, Apple and Google jointly control over 99% of the mobile operating system market. They exercise complete control over OS-level dialer integration, telephony entitlements, emergency call functions, and phone number provisioning—functions that are indispensable for any voice service wishing to operate natively on a smartphone. Like the railroads in *Terminal Railroad*, the Defendants (along with Samsung, AT&T, Verizon, and T-

53

Mobile) collectively manage and enforce the only viable entry point into mobile voice services and restrict access to qualified VoIP competitors like VoIP-Pal. This shared control forms a modern bottleneck infrastructure that is both essential and exclusive.

142. *Otter Tail Power Co. v. United States,* 410 U.S. 366 (1973) – Refusal to Deal Despite Feasibility. In *Otter Tail*, a utility company refused to sell or transmit electricity to municipalities that were seeking to set up their own public power systems. The Supreme Court held that Otter Tail's refusal to interconnect—even though technically feasible—constituted monopolization under Sherman Act § 2 because it was done to suppress competition.

143. **Application to the Present Case:** Apple and Google have the technical capacity to extend full OS-level access to VoIP-Pal's services—just as they do for carrier-certified apps. The necessary APIs, telephony interfaces, and integration privileges are already in place. The refusal to allow VoIP competitors to access those same tools is not based on security, feasibility, or system integrity—it is based on protecting the vertically aligned revenue structures of the Defendants and their carrier partners. As in *Otter Tail*, the refusal to interconnect is a form of commercial exclusion designed to eliminate competition.

144. *Lorain Journal Co. v. United States,* 342 U.S. 143 (1951) – Platform Loyalty and Conditional Access. In *Lorain Journal*, the Court reviewed the conduct of a newspaper that monopolized local advertising. The publisher refused to accept ads from businesses that also advertised on a competing radio station, conditioning access on loyalty. The Supreme Court found this practice illegal under antitrust law, holding that leveraging control over one platform to suppress participation in another is unlawful coercion.

145. **Application to the Present Case:** Apple and Google condition system-level access—such as default dialer privileges, call log visibility, and emergency calling—on alignment with mobile

carriers. Independent VoIP providers must either (1) partner with their direct competitors (AT&T, Verizon, or T-Mobile) or (2) operate with substantially reduced system privileges. This is functionally equivalent to *Lorain Journal*'s loyalty condition: access is only granted to those aligned with the dominant ecosystem, thereby suppressing all non-carrier competition.

### d. Conclusion

146.    The exclusionary conduct detailed in this Complaint—spanning OS design, device firmware enforcement, SIM-lock behaviors, entitlement restrictions, and carrier marketing deception—is not novel. It mirrors the consortium-driven infrastructure control, refusal to deal, and conditional access condemned in *Terminal Railroad*, *Otter Tail*, and *Lorain Journal*. These decisions confirm that when firms with monopoly power over an essential facility collectively restrict access for commercial gain, they violate Sherman Act § 2 and are subject to both injunctive and structural relief.

147.    This precedent confirms the central theory of liability in this case: that Apple, Google, Samsung, AT&T, Verizon, and T-Mobile operate as a consortium that jointly controls the essential infrastructure for mobile voice services—and that their strategic coordination to restrict access to VoIP-Pal and other independent providers constitutes monopolistic exclusion in direct conflict with binding Supreme Court authority.

### B. How Apple and Google's Operating Systems Control the Smartphone Market — and Shut Out Fair Competition[1]

148.    The operating systems that power nearly every smartphone in the United States—Apple's iOS and Google's Android—do far more than manage user interfaces. They control access to the core

---

[1] For additional background see **Appendix A**.

mobile communication functions, determining which apps receive enhanced permissions, which services can interact with the dialer, and who may offer a native, full-featured voice experience.

149.    Apple and Google designed their systems to favor their carrier partners, including AT&T, Verizon, and T-Mobile. Carrier Wi-Fi Calling is embedded at the firmware level—preloaded, privileged, and deeply integrated into the smartphone from the moment of activation. Consumers are not required to configure anything; the service is granted full OS-level privileges by default.

150.    In contrast, independent VoIP services are technically allowed, but are functionally impaired. They are not granted equivalent access to the native dialer, emergency service pathways, persistent background execution, or integrated call history. Instead, they are required to operate in reduced-permission states as standalone applications—offering inferior functionality, degraded reliability, and increased user friction. These conditions suppress adoption and make competition practically impossible.

151.    This structure does not merely disadvantage competitors—it precludes them. Apple and Google did not simply favor their own or affiliated services; they used their control over smartphone platforms to ensure that third-party VoIP providers could not reach users on equal terms.

### 1.    How the Operating Systems Were Built to Keep the Carriers in Control of Wi-Fi Calling

152.    Apple's iOS and Google's Android operating systems—embedded in virtually every smartphone sold in the United States—act as gatekeepers for mobile voice functionality. Their architecture and access controls are not neutral or open. They are designed to reserve system-level privileges for a narrow group of commercial partners—namely, the major mobile carriers—while allowing only limited and functionally inferior access to independent competitors.

153.    For carriers such as AT&T, Verizon, and T-Mobile, Wi-Fi Calling is enabled by default. It is

preloaded onto the device, activated seamlessly, and deeply integrated into the phone's native dialer and communication stack. These apps benefit from privileged access to background services, emergency services, telephony APIs, and integrated call logs—ensuring a frictionless user experience without configuration or user awareness.

154.    Independent VoIP providers, by contrast, are permitted to operate but only in over-the-top (OTT) app mode with significantly reduced privileges. Their services must be manually discovered, downloaded, and configured by users. Even when installed, these apps lack access to essential functions—such as full dialer integration, emergency service compatibility, persistent background execution, and privileged telephony subsystems. OS-level power management and entitlement settings further limit performance, creating the false perception that non-carrier apps are inherently unreliable.

155.    These barriers are not a result of technical limitations. They are the product of intentional platform design. Apple and Google have constructed ecosystems where privileged access to core voice capabilities is reserved for affiliated carriers, foreclosing meaningful entry by independent, non-carrier voice alternatives.

### a.    How Google's Android Operating System Was Designed to Keep VoIP Providers at a Disadvantage

156.    Android, the most widely used smartphone operating system in the world, is often described as open-source. But in commercial practice, it is tightly controlled by Google and governed by a certification and entitlement system that restricts third-party access to key voice functions.

157.    If a service is pre-approved by a carrier, Android grants it enhanced privileges—such as support for SIP signaling, persistent background operation, entitlement-based telephony access, and emergency service integration. These features allow carrier Wi-Fi Calling to operate seamlessly

and without user friction.

158.    Independent VoIP providers, however, receive only limited system access. Until 2021, Android included system-level support for SIP and RTP protocols—standard elements of modern VoIP architecture. That support was removed by Google, requiring VoIP apps to rebuild their own call-handling stacks while still being constrained by OS restrictions on dialer access, telephony APIs, and call logs. Meanwhile, carriers retained full platform integration.

159.    Carrier software comes pre-installed, auto-activated, and embedded in system menus. VoIP apps must be manually located, downloaded, and configured—and are often affected by power-saving policies that reduce call stability. Even when a user attempts to use a VoIP app as their primary dialer, Android redirects emergency calls to the carrier app, ensuring that carrier services always maintain control.

160.    This is not a neutral ecosystem. It is a hierarchical structure in which carrier-certified services enjoy privileged treatment and seamless integration, while independent competitors are confined to an inferior operating tier. These design decisions were not dictated by technical necessity—they were deliberately implemented to preserve carrier influence and suppress competition in mobile voice services.

### b.  How Apple's iOS Creates Unequal Access That Favors Carrier Services

161.    Apple's iOS—the proprietary operating system installed on every iPhone—provides mobile carriers such as AT&T, Verizon, and T-Mobile with preferential treatment. Their calling services are fully integrated into the OS, enabled automatically at activation, and granted access to core system components. These services operate with privileged access to the device's telephony stack, including the native dialer, emergency call services, and background execution.

162.    In contrast, independent VoIP applications are permitted on the platform but are subject to a

structurally reduced access tier. They are unable to use the same call-handling APIs, cannot maintain persistent background activity, and must rely on Apple's proprietary push notification system to signal incoming calls. If those notifications are delayed or throttled, users may miss calls entirely. Apple also reserves the authority to revoke or restrict these permissions, meaning third-party VoIP apps operate under a framework they do not control and cannot fully replicate.

163.  Even when users attempt to set VoIP apps as their preferred method for voice communication, iOS overrides those preferences for essential system functions—such as emergency calling, Siri integration, and native features like call summaries and live voicemail. VoIP apps are excluded from these privileged functions.

164.  The same disparity applies to messaging. Carrier-certified services are allowed to use Apple's native Messages app for SMS, MMS, and in some cases, newer messaging protocols like RCS. Independent VoIP apps must develop standalone messaging stacks, which increases complexity and diminishes ease of use for consumers.

165.  Apple's platform design also grants power and battery efficiency advantages to carrier-based services, along with continuity features across devices. Carrier-affiliated services can seamlessly transition calls across iPhone, iPad, Mac, and Apple Watch. Independent VoIP providers cannot replicate this functionality, because the underlying frameworks are not equally accessible. Apple's design choices result in superior operation for carrier services and degraded functionality for non-carrier competitors—not due to lack of capability, but due to unequal access by design.

###    c.  Global Telephony Control: How Google Android and Apple iOS Dominate the Smartphone Voice Market

166.  As of April 2025, the smartphone operating system market is functionally a global duopoly, with Google's Android and Apple's iOS controlling nearly 100% of mobile device voice

infrastructure:

U.S. Market Share

- Apple iOS (iPhone): 57.6%

- Android (Google): 42.15%

- Samsung OS: 0.2%

- Other (KaiOS, Linux, etc.): < 0.05% (Source: StatCounter April 2025)

Global Market Share

- Android (Google): 72.23%

- Apple iOS (iPhone): 27.39%

- Samsung OS: 0.22%

- Others (KaiOS, Linux, etc.): < 0.05% (Source: StatCounter April 2025)

167. These figures illustrate the vast control held by Apple and Google. While Android dominates globally and iOS leads in the U.S., both systems are embedded in consumer devices and serve as central control points for voice-related functionality including Wi-Fi Calling, dialer integration, and emergency service capabilities.

168. Their ability to grant or restrict access to these features determines which services can compete effectively. Independent VoIP providers may be technically allowed on the platforms, but they are not given the same system privileges needed to offer functionally equivalent services. This is not a matter of user preference or technical feasibility—it is the result of access policies and system design choices that favor carrier-integrated services.

169. This control structure functions as a bottleneck within mobile voice infrastructure. Even if a VoIP

platform meets all regulatory, technical, and consumer expectations, it cannot achieve operational parity without elevated system access. Because Apple and Google control that access, their design frameworks inherently shape market outcomes. The result is a global architecture that favors certain services by design and restricts others to a subordinate operating mode—not through denial of entry, but through unequal

### 2. Alleged Vertical Structure Restricting VoIP Competition in the Wi-Fi Calling Market

170. The commercial framework maintained by the Defendants, in coordination with non-defendant mobile carriers, operates as a vertically aligned structure spanning three interdependent layers of the U.S. mobile communications market. This system does not rely on explicit contracts or common ownership. Instead, it functions through aligned technical restrictions, firmware design, commercial incentives, and mutual enforcement policies—resulting in unequal access and competitive disadvantage for independent VoIP providers.

171. The structure does not categorically block participation. Instead, it permits non-carrier voice providers to operate under conditions that make it functionally impossible to compete on the same level as carrier-affiliated services. This produces a market that appears open, but operates in practice with embedded barriers—preserving inflated pricing, suppressing innovation, and limiting consumer choice.

### a. Software Platforms — Google Android and Apple iOS (Defendants)

172. Google and Apple, as OS vendors, have designed Android and iOS to grant enhanced telephony privileges exclusively to carrier-certified applications. These privileges include:

- Native dialer integration

- Emergency call fallback

- Power-optimized background execution

- Access to SIP and IMS-related telephony APIs

173. Third-party VoIP applications are permitted to function within the OS environment, but only with limited integration and reduced system entitlements. The result is a tiered system in which carrier-certified software benefit from full access and deep integration, while independent VoIP apps operate under constrained conditions that affect their visibility, functionality, and performance reliability.

### b.  Device Manufacturers — Apple, Samsung, and Google Pixel (Defendants)

174. Apple, Samsung, and Google (through Pixel) reinforce OS-level disparities through hardware-level configurations. Devices are programmed to:

- Embed carrier-preferred dialers and communication defaults in firmware

- Implement entitlement systems that regulate access to voicemail APIs, Bluetooth call functions, and emergency services

- Pre-install carrier applications with elevated privileges not extended to independent apps

- Apply device policies and battery optimization settings that deprioritize non-carrier voice apps

175. These configurations result in both technical and commercial disadvantages for non-carrier voice solutions, making their participation in the marketplace less effective despite technical viability.

### c.  Mobile Carriers — AT&T, Verizon, and T-Mobile (Co-Conspirators)

176. Although not named as defendants in this action, AT&T, Verizon, and T-Mobile are alleged co-

conspirators who contribute significantly to the vertically aligned access model. These carriers:

- Decline to support or collaborate with standalone VoIP services that lack elevated OS-level integration privileges
- Tie device certification, marketing support, and subsidy eligibility to compliance with carrier-preferred software defaults
- Advertise Wi-Fi Calling as "included at no charge" while requiring bundled postpaid subscriptions to activate the feature
- Limit consumer awareness of third-party alternatives by ensuring no VoIP competitor can offer a functionally comparable experience under current platform access policies

177.    This three-tier system—across software, hardware, and network policy—has created durable structural barriers. Consumers are not deprived of alternatives due to technical limitations, but because existing design and certification policies prevent those alternatives from competing under the same conditions as incumbent carrier-integrated services.

### 3.    The Harm to the Market and to Independent VoIP Providers

178.    The conduct described in this Complaint is not the result of technological limitations or a lack of consumer demand. It stems from deliberate commercial design. Independent VoIP providers were not limited by technical feasibility; rather, they were placed at a systemic disadvantage because the Defendants, in coordination with their carrier co-conspirators, created a vertically aligned ecosystem in which platform-level access conditions render alternative Wi-Fi Calling solutions commercially impractical.

179.    Each Defendant and co-conspirator played a coordinated role in this framework. Google and Apple developed operating systems that assign advanced telephony integration privileges

exclusively to carrier-certified software. Samsung and other OEMs implemented firmware and preloads that reinforce these settings by default. Mobile carriers structured their interconnection and certification policies to restrict functional system access to software preapproved within their commercial environment. The combined result is a market structure that impairs independent, standards-compliant VoIP services from competing effectively.

180.    This system is not incidental. It reflects strategic alignment. From operating system privilege frameworks to device entitlement enforcement and network policy conditions, each layer supports a unified commercial outcome: the protection of bundled cellular voice revenues and the marginalization of non-carrier voice competition.

181.    This coordinated structure has harmed the mobile voice market in several critical ways:

- It preserves high-margin, vertically integrated revenue streams by limiting downward pricing pressure from lower-cost alternatives.

- It prevents entry by potentially disruptive innovators who might compete on price, functionality, or privacy.

- It denies consumers the ability to select fully independent Wi-Fi-based voice options, thus reducing choice and innovation.

182.    The commercial model challenged in this Complaint is upheld by six of the most dominant corporations in the telecommunications sector: Google LLC, Apple Inc., Samsung Electronics Co., Ltd. (Defendants), and AT&T Inc., Verizon Communications Inc., and T-Mobile US, Inc. (Co-Conspirators). Collectively, these entities generate an estimated $565 billion in annual gross profits by participating in a structure where full voice functionality is granted primarily to carrier-affiliated software—while equivalent privilege access remains out of reach for all others. This is

not the open, competitive environment envisioned by antitrust law. It is a structurally tiered ecosystem that prioritizes closed control, stifles market entry, and deprives consumers of affordable, innovative options.

183. Estimated Annual Gross Profits by Enterprise Member (Based on publicly reported FY 2023 financials and relevant segment disclosures):

- **Apple Inc. (iOS + iPhone): $170 billion/year**

- **Google LLC (Android OS + Pixel): $100 billion/year**

- **Samsung Electronics Co., Ltd. (Android OEM): $40 billion/year**

- **AT&T Inc. (Carrier co-conspirator): $80 billion/year**

- **Verizon Communications Inc. (Carrier co-conspirator): $100 billion/year**

- **T-Mobile US, Inc. (Carrier co-conspirator): $75 billion/year**

- **Total Gross Profits: ≈ $565 billion/year**

184. These financial figures illustrate the scale and economic incentives underlying the vertically integrated system described in this Complaint. Each party benefits from maintaining its respective control layer—whether OS, hardware, or network access—and collectively, they sustain a market that resists alternative participation through technical privilege hierarchies and bundled pricing models.

### 4. The Systemic Harm to Competition and Consumers

185. Independent VoIP providers are permitted to operate only in a limited "app-mode"—a constrained tier of access that structurally disadvantages them relative to carrier-integrated services. In this mode:

- Deep integration with the native dialer is unavailable

- Emergency service support is limited or inaccessible

- SIM-based entitlements are not extended

- Session stability is impacted by system-level restrictions

- Background execution is deprioritized compared to carrier software

186. As a result, independent VoIP services cannot function with the same consistency, integration, or user experience as carrier-certified voice services, even when they are technically capable of similar performance. These disparities affect all smartphone users—especially the 373 million U.S. subscribers whose devices run Android or iOS. Consumers are effectively denied the opportunity to use non-carrier voice services that could otherwise operate over Wi-Fi at a significantly lower cost than bundled cellular offerings. Low-income households, rural users, and underserved populations are especially impacted. In a fair and competitive environment, standalone Wi-Fi Calling services could be offered at prices as low as $6.50 per month. Yet such options remain practically unavailable, not due to technical infeasibility, but because the Defendants have designed a system where alternatives lack the integration privileges needed to compete.

187. This is not simply a competitive issue. It represents a broader structural harm to consumers. Competitive services are not failing due to technical inferiority—they are undermined by a system that reserves key capabilities for a limited group of favored partners. Consumers face higher prices, fewer choices, and limited alternatives—not because of market forces, but because of system-level design and policy.

### C. Restricting Competition in the U.S. Telecommunications Wi-Fi Calling Market

#### 1. Operating System Manufacturers

188. Operating systems are essential infrastructure in the U.S. telecommunications market—particularly for voice services such as Wi-Fi Calling. A mobile OS controls access to nearly all core functions of the device, including voice, messaging, application execution, and connectivity. Android (by Google LLC) and iOS (by Apple Inc.) together manage over 373 million smartphones in the U.S., defining the access conditions under which all voice communications occur.

189. No third-party application—whether from a social media company or a VoIP provider—can access the necessary resources for a full-featured calling service without first obtaining platform-level approval. Critically, full access to the telephony stack—the system services and APIs required for advanced voice call functionality—is selectively granted, with enhanced privileges extended primarily to carrier-affiliated software.

190. The operating system serves as the singular gatekeeper of app privilege. Google and Apple exclusively determine which apps receive what permissions, including full access to the native dialer, emergency calling capabilities, battery optimization entitlements, and Bluetooth call functions. This position gives both Defendants unmatched power to control who can realistically compete in the integrated voice market.

191. In practice, Android and iOS serve not only as platforms but as technical control points that shape market outcomes. Even when third-party VoIP services meet all technical standards, they cannot reach consumers under equal conditions without elevated integration privileges. This control is central to the exclusionary behavior at issue in this Complaint.

   a. **Google and Apple as Gatekeepers to the National Mobile Communications Infrastructure**

192. Google's Android and Apple's iOS platforms operate not simply as operating systems, but as

comprehensive gatekeeping frameworks that determine:

- Which providers may offer services in the Wi-Fi Calling space;

- How those services function relative to native system features;

- Which applications are granted integration privileges necessary for competition on equal terms.

193.   This control is structural, not abstract. Through access rules governing the native dialer, emergency services APIs, call logs, and other telephony features, Google and Apple determine which voice services function as fully embedded components and which remain confined to lower-tier app-based roles. By managing this integration framework, Google and Apple confer competitive advantages on carrier-certified services and select vertically integrated offerings, while placing otherwise capable competitors at a systemic disadvantage. This disparity does not stem from performance gaps or consumer rejection—it results from embedded platform decisions that dictate market access. These mechanisms form the core of the commercial structure alleged throughout this Complaint. They enable Google and Apple to sustain discriminatory access conditions that suppress competition, limit innovation, and prevent consumers from accessing viable, non-carrier alternatives for mobile voice communication. Specific examples of such conduct are described in **Appendix A**.

### b.  Apple's iOS Operating System

194.   Apple Inc., as the exclusive controller of the iOS operating system, uses its platform authority to provide systemic advantages to mobile carriers while limiting the privileges available to VoIP competitors. This access disparity is not based on technical necessity. It reflects a deliberate platform policy—one that helps Apple maintain high-margin hardware sales, support carrier

alignment, and limit the viability of competitive service models. Each aspect of Apple's system-level configuration reinforces a vertically integrated ecosystem that benefits Apple and its partners, while structurally disadvantaging independent alternatives. These practices are central to the antitrust and RICO violations asserted in this Complaint.

195.    **Apple's Design and Enforcement of iOS Telephony Privileges:** Apple's control over the iOS platform allows it to design and enforce a tiered access model that prioritizes carrier-affiliated services over independent voice alternatives. These policies are strategic, not incidental. They reflect Apple's intent to preserve carrier subsidies, prevent low-cost alternatives from scaling, and reinforce ecosystem dependence.

196.    **Preservation of Carrier Subsidies Through Platform Privileges:** Apple configures iOS so that only carrier-certified services receive full integration with core telephony and messaging functions—including native dialer access, seamless call management, and privileged Wi-Fi Calling entitlements. This model supports premium hardware pricing by enabling carriers to subsidize device sales via long-term bundled contracts. If VoIP competitors were provided equivalent access, they could offer standalone Wi-Fi Calling for as little as $6.50/month—undermining the carrier subsidy model entirely.

197.    **Restricted Access to Native Telephony Features:** Apple reserves enhanced integration privileges—including APIs tied to the dialer, voicemail system, emergency call stack, and call session control—for carrier-approved software. Independent VoIP services operate in a reduced-access tier. They cannot function as default dialers, lack emergency call integration, and are not registered with iOS as system-native voice services. This results in a market where elevated access is limited to those aligned with Apple's commercial structure.

198.    **Ecosystem Lock-In via iMessage and FaceTime:** Apple further reinforces its control by

limiting access to proprietary communications features such as iMessage and FaceTime. VoIP developers are not allowed to integrate with these frameworks, which raises switching costs for users and reinforces reliance on Apple's closed environment, even when other providers offer comparable or better service terms.

199.    **Firmware Enforcement of Carrier Defaults:** Because Apple also manufactures the hardware, it implements these policies not only through iOS software, but also through firmware behavior and device-level configurations. This dual-layer control ensures that carrier-preferred settings are preloaded and reinforced across the hardware and software stack, limiting the ability of VoIP providers to achieve comparable functionality.

200.    **App Store Constraints and Developer Limitations:** Third-party VoIP apps face additional friction through Apple's App Store:

- Up to 30% commission fees on subscriptions

- Review delays and discretionary rejections

- Limited ability to run persistently in the background

- Restrictions preventing them from becoming default dialer or messaging apps

201.    Apple's own services (FaceTime, iMessage) are exempt from these restrictions, creating an asymmetric environment in which competitors face elevated costs and limitations.

202.    **Role Within a Vertically Integrated Commercial System:** Apple's actions contribute to the vertically integrated enterprise described in this Complaint. iOS is designed to limit third-party access to core communications functions, and iPhones ship with firmware that further prioritizes carrier integration. This commercial structure:

- Sustains bundled carrier revenue models

- Limits consumer access to affordable, standalone calling options

- Extracts revenue through both App Store policy and device pricing

203.    Through its dual role as OS vendor and device manufacturer, Apple enforces a system in which only carrier-certified or Apple-native services benefit from full platform functionality.

### c.  Google's Android OS

204.    Google LLC uses its control over the Android operating system to implement a similar access hierarchy that benefits mobile carriers and disadvantages independent VoIP developers. These policies are not required by technical architecture; they are commercial choices aligned with Google's broader interests in carrier partnerships, data monetization, and ecosystem control.

205.    **Carrier-Certified Integration via Licensing and Entitlements:** Google licenses Android to OEMs under contractual terms that reinforce carrier integration. These terms include:

- SIM-based trust enforcement

- Firmware defaults favoring carrier software

- Limited exposure of native dialer and call session APIs to non-certified apps

206.    As a result, only carrier-approved services can fully integrate with system telephony features, while VoIP competitors are placed in lower-privilege app modes.

207.    **Data Monetization and Embedded App Advantages:** Google's own communication tools (e.g., Google Voice, Google Meet) receive privileged system access, including persistent background permissions, Wi-Fi entitlement configurations, and preloading across OEM devices. These integrations help drive data collection for Google's advertising business, creating a financial incentive to limit the viability of third-party VoIP apps that could divert usage away from Google

services.

208.    **GMS (Google Mobile Services) Enforcement Android:** OEMs that wish to access Google Play and other core services must comply with the Google Mobile Services (GMS) licensing agreement. This includes preloading Google apps, supporting carrier-preferred dialers, and maintaining call-handling defaults that marginalize non-carrier VoIP providers. GMS enforcement serves as a commercial filter, limiting which apps can access enhanced system capabilities and under what conditions. Google's role, like Apple's, reflects a strategic use of operating system control to shape competition and preserve high-margin alliances. While independent services are not technically barred from the Android ecosystem, they are constrained to reduced functionality, creating systemic disadvantage relative to carrier-preferred and Google-owned applications

209.    **Built-in Carrier Wi-Fi Privileges:** Android includes specialized OS privileges for carrier Wi-Fi Calling, including:

- Automatic SIM-based Wi-Fi authentication

- Deep integration with the native dialer on Wi-Fi networks

- Persistent background session access with OS-level optimizations

210.    These same privileges are not extended to independent VoIP providers on equivalent terms, regardless of compliance or capability.

211.    **Structural Impact:** These practices function as a coordinated platform strategy—not simply product decisions. Google maintains a vertically controlled mobile ecosystem where carrier-integrated apps are granted elevated system privileges, while independent VoIP challengers are permitted only limited access. Despite Android's reputation as "open source," Google's OEM

agreements, certification policies, and access frameworks create a controlled environment that disadvantages non-carrier competitors.

212. **Revenue-Driven Incentives:** This structure supports multiple Google revenue streams:

- Targeted advertising tied to user data obtained through integrated carrier services

- App bundling fees and Play Store commissions

- Preferential access agreements with carriers

213. This business model depends on user retention, restricted integration for competing platforms, and controlled access to core telephony functionality.

214. **Enterprise-Level Participation:** Google's conduct is not incidental; it is a core component of the vertically structured commercial enterprise alleged in this Complaint. By granting elevated access privileges to select partners while limiting system parity for independent VoIP providers, Google sustains a mobile environment that disadvantages competition, limits consumer choice, and suppresses innovation in standalone Wi-Fi Calling.

### 2. Smartphone Manufacturers

#### a. Hardware Tied to Operating Systems

215. Apple Inc., Google LLC, and Samsung Electronics Co., Ltd. maintain vertically aligned hardware-software structures that tie smartphones to proprietary operating systems—iOS and Android. This tie is not merely functional; it is a strategic mechanism designed to preserve platform dominance and restrict interoperability. Apple's model is absolute: iPhones exclusively run iOS, and no alternative OS can be installed without violating compliance or device security protocols. For Android devices, the Google Mobile Services (GMS) licensing framework enforces compatibility, preloading requirements, and OS access terms that bind manufacturers

such as Samsung to Google's platform policies. Samsung, as the leading Android OEM in the U.S., embeds Google-certified Android across all flagship models and configures devices to reflect both platform and carrier requirements. Bootloader locks, firmware restrictions, and system policies prevent the installation of alternative OSs or dialer functionality without violating warranty or certification.

216. As a result, system-level privileges for calling services are primarily reserved for pre-certified, carrier-aligned software. Independent VoIP services are permitted only constrained access, preventing them from offering functionally comparable services even when technically capable. Specific examples of such conduct are described in **Appendix A**.

### b. Samsung's Enforcement of the Controlled Infrastructure

217. Samsung Electronics Co., Ltd. plays a central role in upholding the vertically integrated mobile voice structure described in this Complaint.

218. **Carrier-Based Pricing and System Defaults**: Samsung's flagship smartphones are priced at premium levels and sustained by carrier installment plans. Firmware defaults prioritize carrier applications and configure system behavior to favor those integrations. Non-carrier VoIP applications operate at a reduced system tier and lack equal access to core privileges.

219. **Distribution Incentives and Access Parity:** Samsung's relationships with AT&T, Verizon, and T-Mobile provide exclusive distribution, retail placement, and financing access. In return, Samsung pre-installs carrier software, enforces related system preferences, and limits the ability of VoIP services to achieve comparable integration. These practices serve to protect bundled pricing models and suppress competition.

220. **Licensing Avoidance and Platform Alignment:** Samsung does not offer native VoIP support, citing technical or regulatory obstacles. In practice, it avoids engaging in licensing discussions or

offering integration pathways that would enable equal access for non-carrier services. These policies maintain compliance with Google's GMS terms and prevent friction with carrier partners.

221. **Device Enforcement and Firmware Behavior:** Samsung enforces telephony privilege disparities through firmware-level behavior, including:

- Emergency dialer redirection
- Background execution throttling for VoIP apps
- Restrictions on default app registration

222. These settings create structural barriers that VoIP competitors cannot overcome through technical merit alone.

### c. Apple's Role as Smartphone Manufacturer and Platform Enforcer

223. Apple's dual role as hardware manufacturer and OS provider allows it to maintain platform exclusivity and prioritize its carrier relationships across both the iPhone and iOS.

224. **Carrier-Supported Pricing and Platform Lock-In:** Apple's device pricing strategy relies heavily on multiyear carrier contracts and financing structures. iPhones include embedded voice and messaging defaults, and independent VoIP services are permitted only restricted access to core calling APIs, background execution, and integration privileges. Full access is limited to Apple-native or carrier-certified apps.

225. **Retail and Firmware Strategy:** Apple's firmware defaults and system-level integration privileges reinforce its partnerships with major carriers. Device behavior aligns with carrier service pathways, and alternative calling solutions are not granted equivalent technical permissions.

226. **App Store Governance and Technical Gatekeeping Through the App Store:** Apple enforces

economic and technical conditions that burden independent VoIP developers:

- High transaction fees

- Delayed or discretionary approvals

- Restrictions on system registration and entitlements

### d. Google's Pixel Devices as Android Enforcement Tools

227.    Pixel smartphones serve as both Android reference devices and commercial products. Google configures Pixel devices to reflect its platform standards, which include:

- Preloading of Google and carrier software

- Privileged access to system-level telephony APIs

- Firmware enforcement of dialer defaults and emergency service behavior

228.    VoIP applications are permitted to operate, but not with the same level of access or performance optimization.

229.    **Pricing and Ecosystem Integration:** Pixel pricing and distribution depend on maintaining alignment with carrier and OS-level integration models. Competing telephony services are treated as second-tier apps, limiting their commercial viability even when technically compliant. The coordinated policies enforced across hardware and OS layers constitute:

- Monopolization under Sherman Act § 2

- Exclusive dealing under Clayton Act § 3

- Enterprise participation under RICO §§ 1962(c) and (d)

230.    **Pixel as Reinforcement of Enterprise-Wide Disparities:** Pixel phones do not merely reflect

76

Google's product strategy—they enforce it. As flagship reference devices for Android, Pixel phones are configured to implement Google's platform policies, which include granting elevated telephony privileges to carrier-aligned services while limiting integration opportunities for independent VoIP providers. Through the enforcement of GMS licensing and system-level behavior defaults, Pixel devices influence the broader Android OEM market and ensure that VoIP competitors remain confined to lower-access tiers.

231.    **Legal Implications:** Google's conduct as Pixel manufacturer is integral to the vertically structured enterprise alleged in this Complaint. These actions constitute:

- Monopolization under Sherman Act § 2 (device-level implementation of access restrictions);
- Exclusive dealing under Clayton Act § 3 (conditions embedded in GMS licensing and firmware behavior);
- Racketeering activity under RICO §§ 1962(c) and (d) (ongoing participation in commercial exclusion of competitive services).

     e.  **Evidence Supporting Inference of Coordinated Conduct Contrary to Federal Law and Public Policy**

232.    **Congressional Intent of Public Law 113–144:** Congress enacted the Unlocking Consumer Choice and Wireless Competition Act to ensure that consumers could use their devices with alternative services and to dismantle artificial limitations imposed by carriers. The law was designed to promote switching, choice, and innovation by eliminating device-based restrictions. Legislative commentary confirmed that this Act was meant to foster a market in which alternatives could thrive without being technically or contractually obstructed.

233. **FCC Policy on Device Unlocking and Consumer Access:** The FCC has likewise reinforced consumer access by:

- Proposing rules requiring devices to be unlocked after a short activation period;

- Releasing consumer guidance that emphasizes the role of unlocking in competition;

- Encouraging policies that ensure consumers can choose among competing services.

234. **Conduct Frustrating Legislative and Regulatory Intent:** Despite this federal mandate, Defendants and their co-conspirators have maintained technical and commercial conditions that negate the effect of unlocking laws. Their platform-level restrictions:

- Limit access to essential calling APIs unless carrier certification is present;

- Configure firmware to prioritize carrier software and deprioritize or constrain third-party services;

- Condition core OS functionality on alignment with legacy carrier platforms.

235. As a result, a device may be "unlocked" under federal law, but still functionally incapable of supporting a non-carrier VoIP service such as VoIP-Pal due to lack of system-level access permissions.

236. **The Illusion of Choice:** Consumers are led to believe they can switch to alternative services, but practical use is still blocked by operating system and device restrictions. Core features—including dialer integration, call handling APIs, and emergency support—are not extended to VoIP apps lacking carrier affiliation. Thus, while devices are marketed as "unlocked," platform policies still limit their use, contravening the spirit of Public Law 113–144 and the FCC's policy framework.

237. **Legal Consequences and Traceable Harm:** This platform-level control has caused:

- Direct commercial harm to VoIP-Pal by undermining its ability to license and deploy its patented platform;

- Consumer harm due to blocked access to lower-cost, Wi-Fi-based calling options;

- Institutional harm by frustrating the execution of federal statutes designed to promote competition.

### 3. Mobile Network Operators

238. AT&T Inc., Verizon Communications Inc., and T-Mobile US, Inc. have worked in alignment with Apple, Google, and Samsung to maintain systemic privilege structures across the mobile voice ecosystem. These arrangements create conditions under which:

- Carrier software receives native dialer integration, call handling access, and elevated power entitlements;

- Standalone VoIP services are permitted to operate, but without the privileges required to deliver fully integrated functionality;

- Device behavior and OS design consistently prioritize carrier-aligned workflows.

239. This platform-carrier configuration does not arise from consumer preference or performance merit. It reflects mutual coordination to preserve billing models, lock in users, and preclude meaningful competition.

240. **Preserving Bundled Pricing:** Wi-Fi Calling, while technically a VoIP feature, is treated as a premium add-on by carriers and restricted to postpaid plan customers. Despite being promoted as "free," it is functionally tethered to bundled data plans. Independent VoIP services cannot replicate this offering at scale due to lack of privileged OS integration.

241. **Offloading Without Infrastructure Investment:** Carriers rely on user-funded Wi-Fi networks

to handle increasing voice traffic, reducing the need for new tower builds or spectrum. Yet they maintain billing and service control through integration entitlements granted by Google and Apple. Independent services offering comparable capabilities are prevented from integrating with core OS functions needed to compete on equal footing.

242. **Restricting non-carrier Operation:** Android and iOS do not extend full voice functionality to devices without carrier SIMs. Key services such as dialer registration, emergency calling, and voicemail APIs are available only when a carrier SIM is present and recognized by the OS. This prevents deployment of Wi-Fi-only alternatives and imposes cost burdens on underserved communities.

243. **Device-Level Reinforcement:** Carriers collaborate with OEMs to preload software, configure call behavior, and lock default settings. Even on "unlocked" devices, VoIP competitors face restrictions at the firmware and OS level that preclude equal service delivery.

### 4. The Exclusion of VoIP-Based Alternatives from the Wi-Fi Calling Market

244. Although modern smartphones are capable of VoIP calling over Wi-Fi, platform policies continue to limit who may access that capability. This is not a matter of technical incompatibility—it is a structural decision that favors carrier-integrated apps over non-carrier competitors.

#### a. Wi-Fi Calling as a Carrier-Privileged Feature

245. Wi-Fi Calling, while based on standard VoIP technology, is deeply embedded within carrier-certified apps and inaccessible to non-carrier providers. APIs, integration points, and background permissions necessary to deliver real-time voice services are reserved for apps operating under carrier partnership agreements. Other services are allowed, but not given the tools to achieve parity. Specific examples of such conduct are described in **Appendix A**.

### b.  VoIP-Pal's Technological Capability and Commercial Disadvantage

246.  VoIP-Pal has developed a SIP-based system that is capable of operating on standard smartphones over Wi-Fi. However, due to platform-level access constraints:

- It cannot be designated as a system-level dialer;

- It lacks access to privileged call management and telephony APIs;

- It is unable to integrate emergency call functions or persistent background calling.

247.  This is not a matter of technical inferiority. It reflects systemic platform design choices that reserve advanced access for preferred partners.

### c.  Pixel as Enforcement Example

248.  Google's Pixel devices illustrate how exclusion is implemented at the device level. Despite being fully capable of supporting VoIP alternatives, Pixel phones:

- Provide dialer and call log integration only to carrier or Google-native apps;

- Throttle or deprioritize third-party apps through firmware behavior;

- Limit persistent execution rights for non-carrier services.

249.  These behaviors are not incidental. They represent platform policy as enforced through hardware.

### d.  Messaging and Access Parity

250.  Just as voice services are tiered, messaging is also restricted:

- RCS access on Android is tied to carrier or Google-certified apps;

- SMS/MMS access is confined to apps registered as system messaging handlers;

- Contact linking and cross-app identity resolution are limited by OS-level privilege designations.

251. VoIP-Pal and similar developers face compounded barriers in deploying integrated calling and messaging platforms under current OS and OEM conditions.

### D. Phone Number Integration & Native Dialer Access Disparity Under the Essential Facilities Doctrine

#### 1. Introduction

252. Plaintiffs further allege that Defendants' failure to provide VoIP competitors—such as VoIP-Pal—with system-level phone number integration, meaningful native dialer functionality, and equivalent access to core telephony features constitutes a violation of the Essential Facilities Doctrine, as applied under Section 2 of the Sherman Act. This is not a theoretical issue. It involves the withholding of critical access points by Defendants who:

- Control the essential facility (i.e., the Android and iOS mobile operating systems, including the telephony APIs, native dialer, and number identity frameworks);

- Restrict or limit full access to qualified competitors;

- Provide advanced privileges to vertically aligned partners (i.e., mobile carriers);

- Offer no technical basis for these differentiated access levels.

253. This conduct meets the criteria articulated in MCI Communications Corp. v. AT&T, 708 F.2d 1081 (7th Cir. 1983), and Otter Tail Power Co. v. United States, 410 U.S. 366 (1973), where liability arises if:

- The defendant controls access to an essential facility;

- The facility cannot be reasonably duplicated;

- Access is withheld or materially limited;

- Access could be reasonably granted without technical obstruction.

254.    Each of these conditions is satisfied in this case.

## 2. The "Essential Facility" in the Smartphone Ecosystem

255.    The essential facility at issue includes:

- The ability to assign and integrate a user's mobile number identity at the OS level;

- Access to APIs and system components tied to the native dialer, telephony stack, call logs, voicemail, and background execution;

- Permissions and integration privileges already granted to carrier-certified apps (e.g., emergency services, Bluetooth call control, and identity registration).

256.    While carriers control physical networks, it is Apple and Google that control how mobile phone numbers are registered, authenticated, and processed by end-user devices. OS-level policies determine whether:

- A phone number obtained via VoIP is recognized as a native identity;

- An associated app can function with the same privileges as a carrier-based voice service;

- The system manages communications consistently and reliably for non-SIM-based voice services.

257.    This infrastructure is not practically duplicable. Firmware and OS controls are proprietary and centrally governed. Google and Apple exclusively decide which apps and services qualify for full

integration.

### 3. Technical Feasibility and Reduced Access

258.    There is no technical barrier to providing VoIP-Pal the same integration privileges available to carrier-affiliated software. The necessary frameworks, APIs, and entitlement structures already exist—and are actively used to support services provided by AT&T, Verizon, and T-Mobile. The limited access granted to independent VoIP services is not due to security or stability concerns. It is the result of commercial policy. These restrictions prevent competitive VoIP services from functioning on equivalent terms despite technical readiness and regulatory compliance.

### 4. Enterprise-Level Coordination

259.    The differentiated access privileges described herein reflect enterprise-wide strategic coordination to protect incumbent commercial relationships and preserve legacy voice and device pricing models. This conduct supports monopolization claims under Sherman Act § 2 and racketeering activity under RICO §§ 1962(c) and (d). This Complaint alleges that the OS-level privilege model not only hinders competition but also undermines federal unlocking laws and consumer expectations. Structural relief is necessary to address these access disparities and restore market participation.

### 5. What VoIP Competitors Need — And Why It's Withheld

260.    VoIP-Pal possesses an operational SIP-based voice service that is fully compatible with modern smartphones. However, in order to provide a commercially viable alternative, VoIP-Pal and similar services require:

- Phone number identity recognition and integration at the OS level;

- Access to native functions such as default dialer registration, emergency APIs, background call handling, and system-managed logs;

- Use of the same entitlements and APIs granted to carrier-certified apps.

261. Without this level of access, VoIP services are forced into degraded operation where call stability, reliability, and interoperability are compromised. The system is in place—but the permissions are selectively distributed.

### 6.  Why Access Is Constrained: Strategic Exclusion

262. Defendants do not limit access due to technical risk—they limit access to preserve existing business models. This includes:

- **Protecting Carrier Bundling:** Allowing VoIP services to operate with native parity would unbundle voice from cellular billing, threatening high-margin plans and shifting consumer spending toward independent providers.

- **Maintaining Device Subsidy Economics:** Carrier-supported pricing of $1,000+ smartphones depends on preserving a bundled service model. Enabling independent VoIP access would weaken consumer dependence on installment plans, pressuring manufacturers to lower prices.

- **Preserving Platform Control and Revenue:** OS vendors benefit from gatekeeping privileges through developer fees, monetization of default status, and app ecosystem control. Reducing those privileges would reduce leverage and platform-based revenue.

- **Enforcing Certification as a Barrier:** Through certification policies and SDK control, Defendants determine who can qualify for core telephony features. Broadening access

would weaken their role as commercial gatekeepers and reduce dependence on vertically aligned app ecosystems.

263.    These structural strategies, executed jointly by platform vendors, OEMs, and carriers, preserve legacy revenue models and prevent open participation in the mobile voice market. Defendants maintain functional control over competition by controlling integration privileges rather than network access. This Complaint seeks to dismantle that control.

### 7.    What Happens If VoIP Competitors Are Given Equal Access

264.    If VoIP-Pal and similarly situated VoIP providers are granted equal access to system-level infrastructure—such as number provisioning, native dialer APIs, and integrated call handling— the resulting market transformation would be swift, disruptive, and economically beneficial to consumers, innovators, and underserved populations alike. Defendants fully understand this consequence, which is precisely why such access has been denied.

### a.    Consumer Savings Through Standalone Services

265.    With equal technical integration, VoIP providers could offer full-featured, carrier-independent Wi-Fi Calling services for as little as $6.50 per month—compared to the $100+ monthly bundles marketed by incumbent carriers. These services would not operate as degraded apps, but as native voice platforms: with real telephone numbers, dialer-level integration, voicemail, emergency access, call logs, and Bluetooth access. The impact on consumer choice would be profound, particularly among low-income households, students, retirees, and prepaid users. Millions would migrate to these lower-cost, non-carrier offerings—especially in urban areas with ubiquitous Wi-Fi and rural regions underserved by traditional towers.

### b.    Collapse of the Subsidy-Pricing Shell Game

266. Flagship smartphones are routinely priced above $1,000 but hidden behind 24- or 36-month installment plans tied to carrier service bundles. If VoIP alternatives gained OS-level parity, these carrier subsidies would vanish—forcing hardware manufacturers into direct competition and exposing true market pricing. Smartphone costs would fall significantly, spurring growth in the resale and refurbished markets and potentially reducing average device pricing to below $200.

### c.  Expanded Access in Underserved Regions

267. In communities where cellular infrastructure is weak or absent but Wi-Fi is available—such as schools, libraries, tribal lands, shelters, and remote areas—VoIP-enabled smartphones would become reliable, affordable communication tools. Non-carrier Wi-Fi Calling could offer emergency access, disaster recovery functionality, and basic connectivity to millions who are currently excluded from mobile voice services due to cost or coverage barriers.

### d.  Innovation Unleashed

268. Once platform restrictions are lifted, developers could create advanced telephony experiences: encrypted calls, AI-based voicemail, cross-device continuity, group calling layers, voice transcription, and personalized call routing. Just as innovation in browsers and messaging accelerated following antitrust scrutiny of Microsoft and Apple, similar disruption would emerge in mobile voice—an area long suppressed by gatekeeping and artificial technical constraints.

### e.  Restoration of Platform Neutrality

269. Most critically, the smartphone dialer would be restored to its rightful status as a neutral interface—open to competition. Users could select their preferred voice service just as they do their browser, email client, or music player. The operating system would no longer serve as a private access channel for carriers and their gatekeepers, but as an interoperable environment

where innovation competes on the merits.

270. In short, equal access for VoIP providers like VoIP-Pal would catalyze a long-delayed restructuring of the mobile voice market: slashing consumer costs, expanding access to marginalized users, fostering real innovation, and lowering device pricing through competitive forces. It would replace cartel-like exclusion with open opportunity. And the only reason this hasn't happened is because six entrenched players have aligned—through policy, practice, and technical design—to ensure that it doesn't.

### 8. Requested Structural Remedy

271. Plaintiffs respectfully request that the Court:

- Declare that phone number provisioning, dialer API access, and call handling privileges constitute essential facilities under Sherman Act § 2;

- Order that VoIP-Pal and similarly situated VoIP providers be granted equal, non-discriminatory access;

- Enjoin Defendants from:

  o Conditioning access on carrier affiliation;

  o Maintaining platform or device policies that favor incumbents without technical justification;

- Impose any additional structural relief necessary to open the voice market and prevent continued exclusionary conduct.

272. Pursuant to Federal Rule of Civil Procedure 65 and Sherman Act § 2, Plaintiffs further move this Court for injunctive relief requiring Defendants to provide access to mobile operating system

infrastructure necessary for VoIP competition, including:

- Integration rights to assign and manage phone numbers within the OS;

- API access to native dialers, voicemail, call logs, emergency routing, and Bluetooth interfaces;

- Functional parity with the carrier-certified calling applications currently granted exclusive privileges.

273.    Defendants Google, Apple, and Samsung jointly control the infrastructure through which mobile-originated calls are initiated and routed. They grant system-level access to carrier software while denying that same access to independent VoIP competitors such as VoIP-Pal. This conduct satisfies the four-pronged test articulated in *MCI Commc'ns Corp. v. AT&T,* 708 F.2d 1081 (7th Cir. 1983), and *Otter Tail Power Co. v. United States,* 410 U.S. 366 (1973):

1. The Defendants control access to an essential facility—namely, OS-level telephony integration;

2. VoIP competitors cannot reasonably duplicate that facility;

3. Access is denied to competitors while granted to incumbents;

4. Access is technically feasible, as shown by carrier integrations that already exist.

274.    Plaintiffs therefore request that the Court enter an order requiring:

- That Defendants provide VoIP-Pal and all similarly situated VoIP competitors with integration rights equivalent to those granted to carrier-affiliated software;

- That Defendants immediately cease maintaining technical or policy-based restrictions that are not equally imposed on all providers;

- That Defendants be enjoined from continuing to condition native OS access on carrier certification or contractual affiliation;

- That OS-level telephony components—such as native dialers, session APIs, number integration protocols, and emergency access services—be formally designated as essential facilities under Sherman Act § 2;

- That non-discriminatory access be granted to qualified VoIP platforms under neutral certification and technical licensing criteria.

275. VoIP-Pal also asserts a claim for unjust enrichment under Restatement (Third) of Restitution § 55. Defendants practice VoIP-Pal's patented classification and routing logic for internal use without compensation or license. This constitutes unjust enrichment through commercial appropriation of protected technology while denying platform access. Additionally, Defendants' coordinated actions have interfered with VoIP-Pal's prospective economic advantage by blocking platform integration and denying it the technical ability to reach consumers. This satisfies the elements of tortious interference: knowledge, intent, causation, and economic harm.

### E. Personal Liability for the Five Antitrust Breaches and RICO Violations: Executive, Director, and General Counsel Responsibility for Platform Exclusion

276. This Complaint asserts two independent and reinforcing legal bases for imposing personal liability on executives, board members, and general counsel of the named Defendants: first, under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962(c) and (d); and second, under federal antitrust statutes, including Clayton Act § 14. These individuals, acting in concert across platform companies (Google, Apple, Samsung), implemented, authorized, and maintained a vertically integrated system of exclusion that suppressed competitive VoIP

90

alternatives in violation of federal law.

277. This Class seeks damages and equitable relief for structural exclusion and commercial deception that denied alternatives in the national Wi-Fi Calling market. The senior executives of Google, Apple, and Samsung enforced exclusionary policies that prioritized carrier-integrated services and placed non-carrier VoIP apps in a subordinate technical tier. Their conduct sustained monopolistic conditions and violated both the antitrust and racketeering laws.

### 1. Part One: RICO §§ 1962(c) and (d) — Executive Participation in a Racketeering Enterprise

278. Under RICO § 1962(c), it is unlawful for any person to conduct the affairs of an enterprise through a pattern of racketeering activity. Section 1962(d) imposes liability on those who conspire to do so. These statutes reach individuals who use corporate form to facilitate, conceal, or perpetuate racketeering schemes.

279. The executives and board members of Apple, Google, and Samsung knowingly sustained the enterprise structure alleged in this Complaint. They maintained technical restrictions, API gating, and firmware enforcement that excluded independent VoIP services from accessing native dialers, call management functions, emergency service entitlements, and number integration capabilities.

280. In *Philip Morris USA Inc.,* 566 F.3d 1095, the D.C. Circuit affirmed that executives may be held liable for racketeering when they approve or sustain deceptive platform structures. Similarly, the platform executives here promoted a narrative of open access while internally maintaining exclusionary rules that undermined competition.

281. In *Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158 (2001), the Supreme Court held that corporate officers who use separate legal entities to commit or conceal racketeering conduct may

be held personally liable under RICO. The officers and directors of the platform Defendants fall squarely within this rule.

## 2. Part Two: Clayton Act § 14 — Personal Antitrust Liability for Directors and Officers

282. The Class also brings claims under Section 14 of the Clayton Act (15 U.S.C. § 24), which permits personal liability where directors, officers, or agents knowingly facilitate or fail to stop unlawful restraints of trade.

283. These individuals:

- Designed platform and firmware policies to favor carrier software;
- Approved SIM-based access policies that blocked non-carrier VoIP competition;
- Refused to extend system-level parity to non-carrier VoIP apps despite formal notice and licensing efforts.

284. In *United States v. Microsoft Corp.,* 253 F.3d 34 (D.C. Cir. 2001), the court confirmed executive liability for tying arrangements and platform exclusion. In Perma Life Mufflers, Inc. v. Int'l Parts Corp., 392 U.S. 134 (1968) and Lawlor v. District of Columbia, 758 A.2d 964 (D.C. 2000), courts emphasized that the corporate veil does not shield those who knowingly implement exclusionary schemes.

285. In *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690 (1962), the Supreme Court held that conspiracies must be evaluated holistically. Here, executives across multiple companies acted jointly to preserve system-level exclusion through device behavior, firmware design, SIM entitlements, and app approval policies.

## 3. Part Three: Two Complementary Theories of Individual Liability

286.  The Class advances two legally distinct, factually intertwined theories of personal liability:

1.  RICO §§ 1962(c)–(d): for executives and legal counsel who coordinated a racketeering enterprise to restrict VoIP competition and preserve vertically aligned control over the mobile voice ecosystem.

2.  Clayton Act § 14: for officers and directors who knowingly approved exclusionary platform policies, firmware defaults, and certification structures that deprived the Class of market alternatives.

287.  These individuals received direct notice through VoIP-Pal's prior lawsuits, licensing overtures, and regulatory disclosures. Their continued enforcement of exclusionary conduct reflects not negligence—but conscious and coordinated action.

### 4.  Personal accountability is warranted under both RICO and antitrust law.

288.  The directors, officers, and legal counsel of Google, Apple, and Samsung may not invoke corporate structure as a defense to systemic exclusion. They knowingly executed and preserved enterprise-level restrictions that harmed both market competitors and millions of American consumers. They must be held individually liable for sustaining the five antitrust violations and enterprise racketeering alleged in this Complaint.

### a.  Timeline of Key Communications Between VoIP-Pal and Apple (May– December 2014)

289.  This correspondence illustrates that Apple had full knowledge of VoIP-Pal's standards-based VoIP platform in 2014. Apple engaged in multiple rounds of technical and legal review before ultimately declining integration or licensing. No technical defect or legal disqualification was

cited—only generalized platform restrictions and refusal to engage.

| Date | Event | Summary |
|---|---|---|
| April 2014 | Initial Contact | VoIP-Pal's Tom Sawyer contacts Denise Kerstein (Head of Patent Acquisitions, Apple). |
| May 27, 2014 | Apple Declines Review | Kerstein replies that Apple is "passing" on the portfolio after review. |
| June–July 2014 | Reengagement | Kerstein refers VoIP-Pal to Jeffrey Lasker, Apple Legal, for further discussion. |
| July–Sept 2014 | Legal Dialogue | Lasker engages, reviewing business plans, prior art, and technical materials. |
| Sept–Nov 2014 | Rebuttals and Denials | Apple denies infringement; VoIP-Pal requests NDA. |
| Dec 22, 2014 | Final Rejection | Apple formally closes discussions, declines integration or licensing. |

*Disclaimer: This timeline is presented to demonstrate Apple's awareness of VoIP-Pal's technology and its refusal to license or integrate. No patent infringement claim is made.*

### b. Timeline of Key Communications Between VoIP-Pal and Google (2015–2018)

290.    This timeline shows that Google, too, had extensive awareness of VoIP-Pal's platform. Despite internal review and high-level interest, Google refused to proceed—citing only NDA disagreements and stalling.

| Date | Event | Summary |
|---|---|---|

| Nov 2015 | Initial Contact | Google CLO David Drummond refers VoIP-Pal to Patent Counsel Ishna Neamatullah. |
|---|---|---|
| Dec 2015 | Portal Submission | Google demands use of patent portal with waiver language; VoIP-Pal declines. |
| Feb–Oct 2016 | Due Diligence | Google reviews materials and engages in multiple calls. |
| Mar–Jun 2016 | NDA Negotiations | VoIP-Pal proposes revisions; Google refuses to alter terms. |
| Jul–Oct 2016 | Valuation Proposals | VoIP-Pal proposes acquisition model; Google remains silent. |
| Jan–Feb 2017 | Continued Outreach | VoIP-Pal sends new filings; receives no follow-up. |
| Aug 2018 | High-Level Call | Call occurs with Frank Italiano, but Google never follows up. |

*Disclaimer: These communications show Google's knowledge and refusal to license or integrate. No patent infringement claim is made.*

### c. Timeline of Key Communications Between VoIP-Pal and Samsung (November–December 2014)

291.    Samsung likewise acknowledged VoIP-Pal's technical platform, requested documentation and patents, and ultimately terminated dialogue without offering a path to licensing or integration.

| Date | Event | Summary |
|---|---|---|
| Nov 5, 2014 | Initial Contact | JK Shin (Samsung CEO) acknowledges outreach; refers to DJ Koh. |

| Nov 17, 2014 | Opportunity Paper | Ed Candy sends technical white paper and VoIP-Pal patent portfolio. |
| Nov 19–20, 2014 | Internal Referral | Koh requests NDA and patent list. |
| Dec 2, 2014 | Document Delivery | VoIP-Pal sends six patents and proposal. |
| Dec 23, 2014 | Receipt Confirmed | Koh confirms internal review underway; no further engagement. |

*Disclaimer: These communications demonstrate Samsung's early diligence and refusal to engage. No patent infringement claim is made.*

### d. Coordinated Refusal to Deal Reflects Enterprise Intent

292. These timelines show that the Defendants did not merely exclude VoIP-Pal in ignorance or by default. Each had direct knowledge of a functioning, VoIP alternative. Each Defendant reviewed VoIP-Pal's platform—and each Defendant refused engagement, without citing any legitimate technical barrier. The result was not just harm to VoIP-Pal, but structural harm to the entire U.S. mobile subscriber class, who were denied access to low-cost alternatives. The deliberate nature of these refusals helps establish the pattern, enterprise conduct, and exclusionary intent required for RICO and class-based antitrust claims alike.

### e. Foreclosed Opportunity and Market Readiness

293. VoIP-Pal currently holds more than 40 issued patents in areas including call classification and routing, lawful intercept, gateway integration, emergency handling, and SIP-based telephony. These patents are not the basis of a patent infringement claim. Rather, they are offered to

demonstrate VoIP-Pal's technological capacity to compete. The platform was functionally tested, commercially viable, and included:

- SIP-based dynamic call classification and routing

- DID-based call handling logic

- Seamless handoff between networks

- Lawful intercept capabilities

- E911 compliance

294.    Despite being technically ready to compete, VoIP-Pal was categorically excluded from system-level access across all major smartphone platforms and hardware. If Google, Apple, or Samsung had licensed or enabled the platform—or even provided neutral access—consumers could have been offered a true Wi-Fi Calling alternative at a fraction of the current cost. Instead, all three Defendants refused to engage or license VoIP-Pal's platform, thereby reinforcing a vertically aligned exclusionary regime.

295.    This refusal is not incidental. It supports the inference of coordinated conduct that is independently actionable under federal antitrust law and the RICO statute. The exclusion of VoIP-Pal is not about patents or infringement. It is about the systematic denial of market access to a fully capable, standards-based VoIP competitor—denial that cannot be explained by technical or legal deficiencies, but only by anticompetitive alignment.

**F.  Ongoing Antitrust Actions Against Defendants Support the Structure of This Complaint**

296.    In March 2024, the U.S. Department of Justice—joined by 16 state and district attorneys

general—filed a landmark civil antitrust suit against Apple Inc. in *United States v. Apple Inc.*, No. 2:24-cv-04055 (D.N.J. 2024). The complaint alleged that Apple had violated Section 2 of the Sherman Act by suppressing platform competition through its control over iOS. Among the DOJ's allegations were Apple's exclusion of rival services, its manipulation of default behaviors, and its deliberate use of vertically integrated features to foreclose independent alternatives.

297.  This federal action supports the legal and structural framework underlying VoIP-Pal's class action. While the DOJ's lawsuit focuses on applications, payment systems, and cross-platform interoperability, VoIP-Pal's claims target a different—but structurally analogous—layer of exclusion: the mobile-originated voice communications market.

298.  VoIP-Pal identifies three primary platform defendants—Apple, Google, and Samsung—as architects of this exclusion, and three carrier co-conspirators—AT&T, Verizon, and T-Mobile— as necessary participants. This six-party alignment enforces a closed infrastructure where only carrier-affiliated software is permitted native integration. The result is the same type of platform-based foreclosure challenged by the DOJ—but expanded into the realm of mobile voice infrastructure, where exclusionary design affects hundreds of millions of smartphone users.

### 1.  DOJ-Validated Theories — Applied to the VoIP-Pal Platform-Centric Case

299.  The U.S. Department of Justice's 2024 civil antitrust action against Apple Inc. outlined five core strategies of exclusionary platform conduct. Each of these theories directly parallels the exclusionary practices alleged by VoIP-Pal in the Wi-Fi Calling market. Below, the DOJ's findings are mapped onto VoIP-Pal's claims, demonstrating that the alleged conduct is not isolated—but consistent with validated antitrust enforcement frameworks.

300.  Restrictive App and Platform Access:

- **DOJ finding:** Apple restricts API and App Store access to suppress third-party competition.

- **VoIP-Pal application:** Apple and Google deny VoIP competitors access to:

  - Native dialers

  - Call processing APIs

  - OS-level call initiation and management pathways

301. **Legal relevance:** The DOJ's theory that restricting platform-level functionality to preserve vertical dominance applies directly to Apple and Google's suppression of competitive voice services. Denying these technical privileges maintains dominance over mobile-originated calling.

302. **Lock-In Through Cross-Platform Restrictions:**

- **DOJ finding:** Apple undermines interoperability in messaging, cloud gaming, and services that would reduce switching costs.

- **VoIP-Pal application:** Both iOS and Android enforce design and policy lock-in by withholding dialer access and SIM-free call support from VoIP competitors, enforcing persistent user dependence on carrier SIMs and default OS services.

303. **Legal relevance:** DOJ's reasoning that platform lock-in raises unlawful switching costs is equally applicable to the denial of VoIP telephony integration.

304. **Suppression of Third-Party Integration:**

- **DOJ finding:** Apple blocks third-party accessories such as smartwatches from seamless pairing.

- **VoIP-Pal application:** Apple and Samsung enforce firmware-level restrictions that prevent VoIP apps from integrating natively—even when technically capable.

305. **Legal relevance:** As with hardware accessory exclusion, this conduct prevents functional substitutes from achieving parity, protecting bundled revenue and obstructing innovation.

306. **Control Over Platform-Level Capabilities:**

- **DOJ finding:** Apple reserves NFC access exclusively for its own Wallet product, limiting payment competitors.

- **VoIP-Pal application:** Apple and Google reserve full OS telephony access and call handling APIs for carrier partners only. Samsung enforces these exclusions in device firmware.

307. **Legal relevance:** This infrastructure-level favoritism is the essence of Sherman Act § 2 violations—leveraging control over essential functionality to exclude competitors and favor aligned services.

308. **Suppression of Emerging Disruptors:**

- **DOJ finding:** Apple blocks cloud-based apps that could reduce device dependency.

- **VoIP-Pal application:** VoIP-Pal's $6.50/month standalone Wi-Fi Calling service is excluded—not due to technical infeasibility, but through deliberate denial of platform access.

309. **Legal relevance:** The DOJ theory that incumbents suppress disruptors through design and policy mirrors the conduct alleged here. VoIP-Pal's exclusion is a textbook example of platform-led foreclosure to preserve inflated carrier and OEM profits.

### G. Anticipated Defenses and Rebuttals: System-Level Privilege Disparities and the Exclusion of 373 Million Class Members from Competitive Voice Access

#### 1. "They Never Launched" – How Google, Apple, and Samsung Closed the Door Before Competition Could Begin

310. Defendants may argue that independent VoIP services never reached mass adoption or failed to acquire subscribers, attempting to frame exclusion as a lack of consumer demand. This argument ignores the structural nature of the market foreclosure and misrepresents the core issue: the Class of 373 million U.S. smartphone users was denied the opportunity to access standalone Wi-Fi Calling options due to pre-emptive, system-level restrictions embedded by Defendants.

311. The complaint is not about VoIP-Pal's market readiness. It is about a mobile voice ecosystem engineered to suppress all non-carrier VoIP competitors before any could enter. Operating systems (iOS and Android), firmware (Samsung, Pixel, iPhone), and default network access configurations (AT&T, Verizon, T-Mobile) were collectively aligned to limit third-party access to native dialers, emergency services, call logs, background privileges, and messaging frameworks.

312. Consumers were not outcompeted—they were deprived of fair access to alternatives. The Supreme Court in *Hecht v. Pro-Football, Inc.,* 570 F.2d 982 (D.C. Cir. 1977), held that pre-entry exclusion is actionable when a party can demonstrate readiness, capability, and structural foreclosure. The Class claims exactly that: the market for standalone Wi-Fi Calling was foreclosed through unified, cross-platform technical policies that denied VoIP services system-level parity.

#### 2. "No Duty" – How Google and Apple Justify Platform Control

313. Defendants may assert that as platform providers, they owe no legal duty to offer system parity to independent apps. But under Sherman Act § 2, dominant actors that selectively grant essential infrastructure access to preferred commercial partners may not use design-based defenses to avoid liability.

314. Key privileges like native dialer access, call logs, emergency services, Bluetooth call handling, and persistent background execution are granted only to carrier-integrated services. VoIP services are technically permitted on the platforms but operate with limited entitlements, reduced visibility, and degraded performance.

315. In *United States v. Microsoft Corp.,* 253 F.3d 34 (D.C. Cir. 2001), the court held that a platform provider that imposes technical restrictions designed to suppress a rival's function violates § 2 even if the rival is allowed on the platform in name only.

316. Similarly, in *United States v. Google LLC,* 2023 WL 6629272 (D.D.C. Oct. 13, 2023), the court found that platform defaults and access barriers that artificially hinder rivals are exclusionary. These same design-based limitations prevent the Class from accessing competitive VoIP alternatives.

### 3. "Security and Experience Justify Our Policies" – A Pretext Rejected by the Courts

317. Defendants may cite user experience and security to justify exclusion. But these justifications are selectively applied. Carrier-integrated software is granted deep platform integration, including emergency access and privileged power behavior. VoIP apps are not.

318. Federal law (47 C.F.R. § 9.11) already requires emergency parity for interconnected VoIP services. There is no technical barrier to compliance. What exists is a selective enforcement of access privileges to favor incumbent carriers.

319. Courts have repeatedly rejected pretextual design justifications in antitrust cases: see Otter Tail, Kodak, and Trinko. Design choices that foreclose rivals while favoring in-house or affiliated products violate the Sherman Act.

### 4. "We Just Sell Phones" – Device OEMs Are Not Neutral

320. Device manufacturers—Apple, Samsung, and Google—may argue they are hardware companies with no role in voice service exclusion. That claim is contradicted by:

- Firmware-level dialer lock-in and app preloads;
- Configuration of entitlement profiles for emergency services, Bluetooth control, and push notifications;
- Battery and power policies that deprioritize VoIP apps.

321. In Eastman Kodak Co. v. Image Tech. Servs., 504 U.S. 451 (1992), the Court found that control over technical components—when used to foreclose competitive entry—violates § 2 even for non-network firms. Device makers control access to essential OS-level capabilities and enforce defaults that structurally disadvantage non-carrier VoIP apps.

322. App store availability is not the same as functional parity. Apps that cannot register as default dialers, access emergency services, or integrate with messaging APIs do not compete on equal terms.

### 5. Anticipated Carrier Defenses – Why Structural Exclusion Still Applies

323. The Class also anticipates defenses from carrier co-conspirators, though they are not named defendants here. These carriers may argue they are under no duty to support third-party VoIP apps or that VoIP providers are not carriers. But federal law (47 U.S.C. § 251(a), § 202(a))

prohibits unjust discrimination in interconnection. Interconnected VoIP providers are entitled to nondiscriminatory treatment, especially when compliant with regulatory standards like Enhanced 911. Arguments that VoIP services are unregulated "apps" were rejected in Vonage Holdings Corp. v. Minnesota PUC and IP-Enabled Services, 20 FCC Rcd. 10245 (2005). The FCC has confirmed that VoIP services providing two-way voice over IP are entitled to interconnection and fair access.

### 6. Conclusion

324. The defenses anticipated in this Complaint reflect an attempt to normalize systemic privilege disparities that lock out independent VoIP services from full market participation. For the Class, this is not an academic dispute. It is a structural injury affecting hundreds of millions of smartphone users denied the ability to select lower-cost, independent voice services due to platform-engineered barriers that protect legacy carrier bundles.

The exclusion of these services was not market-driven. It was design-driven. And the Class is entitled to relief under Sherman Act § 2 and the full spectrum of federal antitrust protections.

## CLASS ACTION CERTIFICATION UNDER RULE 23

325. This class action is brought on behalf of approximately 373 million U.S. smartphone subscribers who were systematically denied access to standalone Wi-Fi Calling alternatives by the coordinated and vertically structured conduct of Google, Apple, and Samsung. Plaintiff VoIP-Pal, acting as Lead Plaintiff, is uniquely positioned to represent this class due to its technological centrality, consumer harm, and structural exclusion at the platform level.

### A. Class-Wide Liability Based on Exclusionary OS-Level Practices, Not Patent Origin

326. The basis for class-wide liability is not tied to whether Google, Apple, or Samsung originated the

platform-level Wi-Fi Calling architecture. Rather, it stems from the coordinated exclusionary conduct by which these companies tied access to native telephony functions—such as system-level APIs, dialers, and call integration privileges—to carrier certification, thereby foreclosing competition from VoIP platforms. This case does not assert patent infringement. Instead, it alleges that the Defendants' joint refusal to provide parity integration privileges to VoIP competitors—while reserving such privileges exclusively for carrier-certified applications—constitutes unlawful tying, exclusive dealing, and market foreclosure. The gravamen of the claim is not technical authorship but the use of platform control to structure anticompetitive conditions.

327.  Google and Apple embedded call management tools (e.g., dialers, Bluetooth handoff, emergency routing) and messaging APIs within the OS, then conditioned access on carrier alignment. Samsung enforced firmware lock-in and prioritized preloaded telephony clients certified by carriers. These practices together excluded neutral, standalone VoIP services from market entry. As a result, 373 million U.S. subscribers were denied access to lower-cost, standalone Wi-Fi Calling services, and were misled into believing that bundled "Wi-Fi Calling" was included "at no charge"—when in fact it was deeply embedded in high-cost cellular plans and protected through discriminatory OS design. This conduct affected all class members uniformly and systematically, constituting a structural antitrust and RICO injury traceable to platform-level exclusion rather than network access.

### B.  Independent Claim for Equitable Restitution: API and Access Value

328.  In addition to statutory antitrust and RICO claims, the Class asserts a standalone claim for equitable restitution. Under Restatement (Third) of Restitution and Unjust Enrichment § 48, the Court may impose an equitable lien on the unjust enrichment derived from:

- Platform-enabled cost savings (by offloading integration duties to subscriber devices);

- Selective provision of high-value APIs and integration functions;

- Consumer deception through "no charge" marketing claims tied to exclusive access terms.

329.  Google, Apple, and Samsung enriched themselves by maintaining a two-tier telephony ecosystem—one for carrier apps with full privileges, and another for VoIP competitors barred from equal access. The value derived from this integration disparity is traceable and identifiable and therefore subject to restitution.

### C. Representation Statement: Why VoIP-Pal Strengthens the Class

330.  VoIP-Pal serves as Lead Plaintiff not by asserting IP rights over operating systems, but because:

- It is a VoIP service provider directly excluded from equal access to system-level calling infrastructure;

- It represents more than 5,000 U.S.-based shareholders, many of whom are also affected subscribers;

- It has technical expertise necessary to explain how platform exclusion was operationalized and monetized;

- It has suffered dual harm: commercial exclusion as a market participant, and economic harm to its investor base.

331.  This dual status—as both excluded innovator and representative subscriber—uniquely qualifies VoIP-Pal under Rule 23(a) and (b). Its direct understanding of both the technical API structures and the economic market impact strengthens causation, injury, and enterprise theory.

### D.  Class Definition

332.  The proposed General Platform Class consists of approximately 373 million U.S. smartphone subscribers who have been systematically denied access to standalone Wi-Fi Calling alternatives through the coordinated exclusionary conduct of Google LLC, Apple Inc., and Samsung Electronics Co., Ltd. The Class includes all persons within the United States who, during the period from 2018 to present, owned or used smartphones running Android or iOS operating systems and were forced to purchase bundled cellular voice, text, and data plans at rates ranging from $90-$150 per month, despite the technical feasibility of standalone Wi-Fi Calling services priced as low as $6.50 per month. Class members were harmed by the Defendants' implementation of platform-level privilege disparities that granted full telephony functionality—including native dialer integration, emergency services access, call logs, and background execution—exclusively to carrier-certified applications, while relegating independent VoIP competitors to degraded app-based alternatives. This structural exclusion was enforced through coordinated OS-level restrictions, firmware defaults, and access control mechanisms that prevented VoIP providers from competing on equal technical terms, thereby denying consumers meaningful choice and inflating mobile service costs through artificially maintained bundled pricing models.

### E.  Certification Under Rule 23(a) and 23(b)

333.  The Class readily satisfies all elements under Rule 23(a) and (b):

- Numerosity: The affected Class includes approximately 373 million smartphone subscribers.

- Commonality: All claims arise from shared conduct—platform-level denial of equal telephony access.

- Typicality: VoIP-Pal and the Class were uniformly subjected to a system that excluded alternatives.

- Adequacy: VoIP-Pal's hybrid role and technical expertise make it an ideal representative.

334.  Under Rule 23(b)(3), class certification is especially appropriate where, as here, common legal and factual issues predominate over individual ones and a class action is superior to individual proceedings.

### F.  Platform–Carrier Coordination Reinforces Class-Wide Harm

335.  The Platform Defendants—Google, Apple, and Samsung—structured their smartphone operating systems and devices to grant telephony integration privileges exclusively to carrier-certified apps, while denying those same privileges to VoIP competitors. This created a two-tier access model:

- Tier One: Carrier-branded apps received full integration with system-level APIs, native dialers, and emergency call features.

- Tier Two: VoIP competitors were relegated to sandboxed environments, unable to access the same integration points—despite having technically viable services.

336.  This unequal allocation of platform privileges made it extremely difficult for VoIP competitors to offer service on equal terms, even when technically capable. Carriers, in contrast, were given seamless platform access that allowed them to dominate Wi-Fi Calling while marketing it as a bundled "no charge" feature. This uniform platform-carrier alignment impacted all class members in the same way—by structurally limiting product alternatives and reinforcing bundled carrier

lock-in. The resulting injury was not incidental or individual, but systemic and traceable to a shared enterprise model. Accordingly, this shared conduct satisfies:

- Commonality under Rule 23(a)(2),

- Typicality under Rule 23(a)(3),

- Predominance and superiority under Rule 23(b)(3).

### G. Conclusion: Platform Class Is Legally Certifiable

337. As shown in Section E, the Platform Defendants did not merely design neutral operating systems—they coordinated with carrier partners to enforce a two-tiered access regime. By granting first-tier privileges to carrier apps and withholding those same system-level capabilities from VoIP competitors, they created a structurally exclusionary platform environment that denied meaningful consumer choice and preserved bundled cellular control. This coordinated conduct:

- Reinforces Rule 23(a)(2) commonality because all consumers were subject to the same discriminatory system policies;

- Supports Rule 23(a)(3) typicality, as each class member faced identical constraints regardless of location or carrier;

- Satisfies Rule 23(b)(3) predominance, since the core legal and factual issues arise from centralized OS-level practices;

- Demonstrates superiority, as class-wide adjudication is the only efficient way to address uniform harm experienced by approximately 373 million U.S. smartphone subscribers.

338. Finally, VoIP-Pal is uniquely positioned to serve as Lead Plaintiff: as both an excluded VoIP

innovator and a representative of over 5,000 affected U.S. shareholders, it possesses the technical expertise, economic stake, and alignment with class interests necessary to satisfy Rule 23(a)(4) adequacy. Accordingly, the Platform Class is properly certifiable under Rule 23(a) and Rule 23(b)(3), and class-wide relief is the most just and efficient mechanism for redress.

## PRE-DISCOVERY STANDING AND DISCOVERY-RELEVANT FRAMEWORK

### A. Introduction

339. This section sets forth three critical factors that reinforce the Class's entitlement to both Article III and statutory standing. These factors—(1) the necessity of discovery in complex platform exclusion cases, (2) widespread consumer misperception of Wi-Fi Calling as a carrier-only feature, and (3) the technical and legal viability of VoIP-based emergency services—demonstrate why the 373 million U.S. smartphone subscribers have a valid and justiciable claim for relief. These points serve as a bridge between the Class's factual allegations and the legal standards for pleading antitrust and RICO injury.

### B. Platform Discovery Rule – Legal Foundation for Pre-Discovery Standing

340. Plaintiffs assert that discovery is essential to fully develop and demonstrate the structure and execution of the exclusionary scheme at issue. The Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), held that plausibility—not probability—is the threshold for initiating discovery. This principle has been reinforced in complex platform-access cases where structural control is at issue. See:

- *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001): Recognized that technical tying and exclusion cannot be dismissed without discovery into API access, default configurations, and design intent.

- *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898 (N.D. Cal. 2021): The court allowed full discovery into Apple's platform conduct, entitlements, and developer access controls before ruling on antitrust claims tied to iOS exclusivity.

- *Ohio v. American Express Co.*, 138 S. Ct. 2274 (2018): Highlighted the importance of understanding both sides of a two-sided platform before making competitive harm determinations.

341. Application to the Class: For the 373 million U.S. smartphone users affected by unequal privilege access, discovery into Google's Android OS policies, Apple's iOS entitlement systems, and Samsung's firmware design is essential to establish the structural framework that sustained a two-tier system. Without discovery, these consumers cannot meaningfully demonstrate how platform controls shaped their inability to access standalone Wi-Fi Calling services on equal terms. Platform control over core functionality—such as call entitlement frameworks and native dialer APIs—is not observable to the consumer and can only be revealed through technical discovery.

## C. Consumer Awareness Gap – Misperception of Wi-Fi Calling as Carrier Feature

342. The Class submits that the vast majority of U.S. consumers believe Wi-Fi Calling is a proprietary feature of their mobile carrier and are unaware that standalone VoIP alternatives exist—or could exist—if not for platform privilege disparity. Consumer surveys and internal discovery are expected to confirm this widespread belief. Supporting Illustrative Data (to be supplemented in discovery):

- In a 2023 CTIA consumer trends report, over 84% of respondents associated Wi-Fi Calling with their mobile carrier, not with independent service providers.

- No major U.S. platform (Google, Apple, Samsung) offers user-facing tools to select or install alternative, system-integrated VoIP services.

343. Application to the Class: This consumer misperception reinforces the injury. If Class members were aware that a \$6.50/month standalone Wi-Fi Calling plan was technically feasible but commercially inaccessible due to platform design, their choices would have shifted. This systemic misperception is not accidental; it is the product of interface defaults, branding practices, and OS-level privilege restrictions designed to preserve bundled plan dominance. The Defendants' structure concealed the existence of competition through interface defaults, lack of integration pathways, and the bundling of carrier features into OS-level functionality.

### D.  Emergency Services Access – VoIP Parity and FCC Compliance

344. Defendants may argue that public safety concerns justify granting full telephony integration privileges only to carrier-certified software—particularly for access to 911 emergency services. However, this justification is both legally inaccurate and technically unsupported. Under 47 C.F.R. § 9.11, the FCC already requires interconnected VoIP providers to deliver Enhanced 911 (E911) functionality, which includes:

- Accurate routing of emergency calls to the appropriate Public Safety Answering Point (PSAP),

- Transmission of location information,

- Maintenance of user registration databases for address-based dispatch,

- Clear user disclosures about service limitations.

### E.  Clarification on Technical Feasibility

345.   Had independent VoIP providers been granted equal access to operating system-level privileges—including native dialer integration, call log access, background execution, and access to emergency APIs—they could have fully complied with E911 standards. Moreover, access to emergency call routing is not a cost-prohibitive function. VoIP services, through industry-standard interconnection with mobile carriers or third-party gateway providers, could implement 911 call handoff and registration compliance at an estimated cost of less than half a cent per user per month. This is an operational fact known to regulators, carriers, and VoIP developers alike. This underscores that the denial of emergency service privileges was not grounded in public safety—it was a design choice used to structurally exclude non-carrier VoIP competitors from platform parity while preserving the commercial dominance of carrier-integrated services.

346.   Application to the Class: Consumers were harmed not because independent VoIP providers lacked safety capabilities—but because Defendants structured the platform ecosystem to restrict those providers from ever achieving the level of access necessary to deliver compliant and safe voice services. This was not a public safety-based limitation. It was a commercially enforced restriction that gave carrier-integrated apps exclusive technical privileges—while falsely suggesting that no alternative could meet emergency standards. That misrepresentation sustained inflated billing and locked users into bundled plans under the guise of safety.

347.   The FCC's E911 rules clearly accommodate VoIP-based emergency compliance. The only barrier was the platform design and privilege gating imposed by the Defendants. As a result, 373 million consumers were denied affordable voice alternatives that could have supported full safety access—had they been treated on equal technical footing.

### F.  Closing Observation

348.   Together, these three points reinforce why the Class's claims are properly pled and must proceed

to discovery. The technical, commercial, and perceptual mechanisms used by the Defendants cannot be adjudicated without platform-level disclosures. The structural inequality affecting over 373 million U.S. subscribers must be examined with full transparency—not assumed away at the pleading stage.

## FEDERAL STANDING FOR ANTITRUST AND RICO CLAIMS AGAINST PLATFORM DEFENDANTS

### A. Statutory Standing Under the Five Antitrust Breaches and Two RICO Violations

#### 1. Applicable Standing Statutes:

- 28 U.S.C. § 1331: Provides federal question jurisdiction over antitrust and RICO claims arising under federal statutes.
- 28 U.S.C. § 1337: Grants jurisdiction over actions arising under laws regulating commerce or protecting trade and competition.
- 28 U.S.C. § 1367: Permits supplemental jurisdiction over related claims involving the same case or controversy.

#### 2. The Class asserts standing under both Article III of the U.S. Constitution and the following statutory provisions:

- Sherman Act § 1, 15 U.S.C. § 1 (Unreasonable restraint of trade);
- Sherman Act § 2, 15 U.S.C. § 2 (Monopolization and attempted monopolization);
- Clayton Act § 3, 15 U.S.C. § 14 (Exclusive dealing);
- Clayton Act § 4, 15 U.S.C. § 15 (Private damages and class wide relief);
- Clayton Act § 14, 15 U.S.C. § 24 (Director and officer liability);

- RICO § 1962(c), 18 U.S.C. § 1962(c) (Operation of an enterprise through racketeering);

- RICO § 1962(d), 18 U.S.C. § 1962(d) (Conspiracy to commit racketeering).

349.    The Class is composed of approximately 373 million U.S. smartphone users. Each member suffered legally cognizable injury from the Defendants' vertical exclusion structure, which suppressed voice competition and inflated mobile service pricing. This Complaint meets the constitutional and statutory standing requirements for asserting private rights of action under these federal statutes.

### B. Sherman Act § 1 – Unreasonable Restraint of Trade

350.    Violation: Defendants—Google, Apple, and Samsung—coordinated with each other and with their carrier partners to structure mobile operating systems, firmware, and app access rules that reserved privileged voice capabilities (such as dialer integration, emergency APIs, call logs, and Bluetooth call control) exclusively for carrier-integrated services. All non-carrier VoIP alternatives, despite being technically compliant, were confined to degraded app-level roles, which precluded meaningful competition. Effect: This conduct functioned as a concerted agreement among independent firms to restrain market entry and foreclose competition. By enforcing uniform restrictions across platforms and devices, Defendants collectively restrained trade across a nationwide market. Application to the Class: Each member of the Class was harmed by the resulting lack of competitive alternatives, being forced to accept bundled carrier pricing and denied the ability to adopt standalone Wi-Fi Calling for as little as $6.50/month.

### C. Sherman Act § 2 – Monopolization and Attempted Monopolization

351.    Violation: Google and Apple, through their control of Android and iOS, possess monopoly power in the mobile OS market. They willfully maintained this power by:

- Reserving core voice integration for carrier software only;

- Conditioning system functionality on affiliation with mobile carriers;

- Depriving non-carrier VoIP services of access to APIs, dialer registration, emergency integration, and messaging frameworks.

352. **Effect:** This exclusionary conduct suppressed competition in the mobile voice market and entrenched a platform-controlled monopoly over core voice infrastructure. **Application to the Class:** Class members paid inflated monthly service charges and were denied access to cost-effective, voice services. They suffered direct economic injury from the monopolization of voice access and the suppression of market entry by competitive VoIP providers.

### D. Clayton Act § 3 – Exclusive Dealing

353. **Violation:** Defendants imposed commercial conditions that required device manufacturers and app developers to maintain exclusive carrier alignment to access critical mobile telephony privileges. These conditions amounted to exclusive dealing arrangements that foreclosed independent VoIP entry. **Effect:** Only carrier-integrated apps were granted deep system access. Consumers were locked into bundled service models. The competitive market was foreclosed. **Application to the Class:** Each Class member paid for unnecessary bundled services and was structurally denied the ability to choose affordable standalone Wi-Fi Calling options.

### E. Clayton Act § 4 – Treble Damages

354. **Violation:** As a result of the exclusionary conduct alleged, Class members suffered measurable financial harm, including:

- Overpayment for bundled services;

- Lack of access to lower-cost alternatives;

- Deprivation of meaningful product choice.

355.    Remedy: The Class seeks treble damages under § 4 to compensate for sustained injuries resulting from illegal exclusion.

### F.  Clayton Act § 14 – Executive and Director Liability

356.    Violation: Officers and directors at Google, Apple, and Samsung:

- Authorized and sustained exclusionary firmware policies;

- Ratified access control architectures that disadvantaged non-carrier services;

- Ignored regulatory compliance obligations and repeated third-party licensing overtures.

357.    Effect: This conscious participation in platform exclusion satisfies the standard for personal liability. Application to the Class: The Class was harmed by decisions made at the executive level to maintain a vertically integrated, anti-competitive mobile ecosystem.

### G.  RICO §§ 1962(c) and (d) – Enterprise-Level Racketeering

358.    Violation: Google, Apple, and Samsung participated in a racketeering enterprise with their carrier co-conspirators. They sustained structural exclusion through predicate acts, including:

- False advertising regarding open platform participation;

- Misrepresentation of access terms to developers and regulators;

- Coordination of technical standards to block third-party parity.

359.    Effect: Class members were deceived into accepting high-cost bundles under the pretense of "free" Wi-Fi Calling. They were denied alternatives by platform-level design. Remedy: The Class

is entitled to civil RICO remedies, including:

- Treble damages under 18 U.S.C. § 1964(c);

- Injunctive relief mandating equal system-level access;

- Structural remedies to dissolve platform-level enterprise coordination.

### H. Exclusion of the Class subscribers

360.  This Class action arises from new defendants, new facts, and a broader theory of structural harm than prior VoIP-Pal litigation. It targets exclusion enforced at the platform and device layer—not pricing deception or interconnection denial by carriers.

361.  In *Lawlor v. National Screen Service Corp.*, 349 U.S. 322 (1955): The Supreme Court held that a prior judgment does not bar a subsequent antitrust action based on new conduct, even if the parties overlap. A plaintiff may bring a new claim when the wrongful acts are distinct in time, scope, or involved parties. Application to the Class: The class action here targets platform-layer exclusion imposed by Google, Apple, and Samsung—distinct from earlier carrier-specific pricing and advertising claims. The conduct challenged is new, the parties are new, and the harm affects a broader set of consumers nationwide. Lawlor confirms that this independent exclusionary scheme may proceed on its own legal and factual merits.

362.  In *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971): The Court held that successive antitrust violations—particularly those involving repeated refusals to deal or continuing exclusionary policies—can give rise to new claims. Damages may accrue over time and are not barred by earlier litigation. Application to the Class: The Class asserts harm from a continuing course of conduct that sustained structural exclusion from the mobile voice market between 2018 and 2025. Each year of enforced system disparity, dialer privilege gating, and

firmware-level lockout gives rise to renewed harm. Zenith Radio affirms the Class's right to recover for those injuries, regardless of prior related proceedings.

## I.  Conclusion

363.  The Class has standing under each of the five antitrust statutes and both RICO provisions. It asserts direct economic harm, legal traceability, and redressability through declaratory, injunctive, and monetary relief. These injuries are not hypothetical—they are the product of vertically structured exclusion that prevented the emergence of a competitive standalone Wi-Fi Calling market in the United States.

## CONSUMER DAMAGES – STRUCTURAL HARM CAUSED BY UNEQUAL PLATFORM PRIVILEGE ALLOCATION

### A.  Disclaimer and Scope

364.  This damages model is a preliminary internal estimate based on conservative assumptions, public data, and industry benchmarks. It will be refined through discovery and the involvement of expert economists. It is not a final damages calculation and is submitted in good faith to demonstrate the economic impact of Defendants' conduct on the proposed Class.

### B.  Introduction: Class Harm from Privilege Disparity

365.  Defendants—Google LLC, Apple Inc., and Samsung Electronics Co., Ltd.—each played a distinct but coordinated role in implementing platform and device-level policies that granted greater system-level privileges (such as native dialer access, emergency call entitlements, persistent background execution, and Bluetooth call handling) to mobile carrier-affiliated software than to non-carrier VoIP competitors. Google LLC acted both as the provider of the

Android operating system—governing over 70% of U.S. smartphones—and as the manufacturer of Pixel devices, which enforce OS-level policies through reference firmware and entitlement controls. Apple Inc. served as both the exclusive developer of the iOS operating system and the sole manufacturer of iPhones, giving it end-to-end control over software, hardware, and system privilege allocation. Samsung Electronics Co., Ltd., while not an OS vendor, enforced Google's Android certification rules through its dominant role as the largest U.S. Android phone manufacturer, embedding firmware-level restrictions that mirrored platform policies and prioritized carrier-integrated services.

366.    Collectively, these Defendants created a two-tier access structure in which carrier-aligned software received full telephony functionality, while non-carrier VoIP services were relegated to app-based status with materially limited integration—resulting in unequal technical access, suppressed competition, and measurable commercial disadvantage. This two-tiered structure made it commercially unviable for any standalone Wi-Fi Calling service to operate on terms comparable to carrier-integrated services. The effect was systemic: U.S. consumers were left with no functionally equivalent voice alternatives at a competitive price point. Instead, they were locked into bundled voice/text/data plans priced between $90–$150/month—despite the technical feasibility of standalone offerings as low as $6.50/month.

### C. Three Dimensions of Consumer Harm

367.    Collectively, these Defendants caused three dimensions of consumer harm:

1. Forced Bundling – Consumers were required to purchase full cellular plans to access features that could have been delivered over Wi-Fi.

2. Price Inflation – Consumers paid elevated monthly service fees, even when most calls were processed over Wi-Fi networks funded by the consumers themselves.

3. Suppressed Alternatives – Consumers were denied the ability to adopt non-carrier services because those services lacked the platform-level privileges necessary to operate on equal terms.

### D. Damages Model – Step-by-Step

368.    Step 1 – Total U.S. Smartphone Subscribers (2018–2024)

- 373 million U.S. mobile subscribers were affected.

369.    Step 2 – Monthly Overpayment for Voice/Text Bundles

- Voice/text allocation: $30/month

- Alternative: $6.50/month standalone Wi-Fi Calling (competitive baseline)

- Overcharge: $23.50/month × 12 months = $282/year

- $282 × 373 million = $105.19 billion/year

- Six-year impact: $105.19B × 6 = $631.14 billion

370.    Step 3 – Wi-Fi Offloading Estimate (40% of Total Billing)

- Voice traffic handled over Wi-Fi without reduction in carrier pricing.

- $631.14B × 40% = $252.46 billion

371.    Step 4 – Infrastructure Offset (35%)

- Estimated portion covering legitimate switching, numbering, and maintenance costs.

- $252.46B × 35% = $88.36 billion

**372.**    Step 5 – Net Consumer Overcharge from Unequal Privilege Model

- $252.46B – $88.36B = $164.10 billion in unjustified overbilling

**373.**    Step 6 – Class Share of Harm (70%)

- $164.10B × 70% = $114.87 billion in damages attributable to the Class

**E. Summary Table – Consumer Damages from Privilege Disparity**

| Component | Annual | 6-Year Total |
|---|---|---|
| Voice/Text Billing | $105.19B | $631.14B |
| Offloaded Call Value (40%) | $42.08B | $252.46B |
| Infrastructure Offset (35%) | $14.73B | $88.36B |
| Net Platform-Caused Overcharges | $27.35B | $164.10B |
| Consumer Damages (70%) | $19.15B | $114.87B |

**F. Treble Damages Under Federal Law**

**374.**    Under Clayton Act § 4 and RICO § 1964(c), antitrust and racketeering damages are subject to automatic trebling:

- $114.87 billion × 3 = $344.61 billion total class-wide exposure

**G. Legal Authority for Consumer Recovery**

375.    In Blue Shield of Virginia v. McCready, 457 U.S. 465 (1982): Courts may grant recovery even when injury results indirectly from co-conspirators' conduct. Application to the Case: Platforms may be held liable for enabling the carriers to profit from overcharges.

376.    In *United States v. Apple Inc.,* 791 F.3d 290 (2d Cir. 2015): A platform that facilitates vertical collusion among competitors may be jointly liable for price-fixing or foreclosure. Application to the Case: Apple and Google created system policies that enabled carriers to maintain inflated Wi-Fi Calling pricing.

377.    In Continental Ore Co. v. Union Carbide, 370 U.S. 690 (1962): Courts must consider exclusionary conduct as a whole, not dissect it into isolated parts. Application to the Case: Joint firmware, OS, and carrier marketing conduct supports consolidated antitrust liability.

### H. Conclusion

378.    This consumer damages model reflects the scale of financial harm caused by a coordinated structure in which Defendants granted higher system-level access privileges to carrier services while limiting non-carrier VoIP competitors to non-integrated roles. That disparity directly led to suppressed market competition, inflated mobile service pricing, and eliminated consumer choice. The total economic harm to the Class—estimated at $114.87 billion and subject to trebling—was not the result of consumer preference or innovation. It was engineered through structural decisions to preserve an ecosystem in which only carrier-affiliated services could function on equal technical terms

## EQUITABLE LIEN AND DISGORGEMENT REMEDY FOR THE FIVE ANTITRUST BREACHES AND RICO VIOLATIONS: CLASS-BASED UNJUST ENRICHMENT FROM PLATFORM-CONTROLLED VOICE ACCESS

### A. Introduction

379.    This Complaint asserts statutory claims under:

- Sherman Act §§ 1 and 2 (15 U.S.C. §§ 1–2);

- Clayton Act §§ 3, 4, and 14 (15 U.S.C. §§ 14, 15, and 24);

- RICO §§ 1962(c) and (d) (18 U.S.C. §§ 1962(c)–(d)); all of which authorize treble damages for systemic exclusion.

380.    In parallel, the Class of approximately 373 million U.S. smartphone users seeks restitution through an independent equitable cause of action under federal common law and the Restatement (Third) of Restitution § 55.

381.    Defendants Google LLC, Apple Inc., and Samsung Electronics Co., Ltd. unjustly enriched themselves through a vertically integrated structure that:

- Restricted system-level voice access to carrier-affiliated services, while permitting only degraded access to independent alternatives;

- Suppressed competition through firmware entitlements, carrier SIM-based access enforcement, and platform-level integration rules;

- Extracted excess revenues through bundled pricing, closed ecosystems, and pay-to-play platform models that foreclosed Wi-Fi market entry.

382.    These exclusion-based profits are quantifiable, traceable, and unjust. The Class seeks restitution

124

for Defendants' coordinated conduct that deprived consumers of competitive choice.

### B. Traceable Enrichment Derived from Structural Voice Service Exclusion

383. Between 2018 and 2024, Defendants extracted billions in excess revenues by:

- Forcing bundled voice/data/device plans priced between $90–$150/month, despite the technical feasibility of $6.50/month standalone Wi-Fi Calling;
- Offloading voice traffic onto consumer-funded Wi-Fi networks without cost-sharing, while continuing to charge as if delivered through proprietary infrastructure;
- Preserving inflated smartphone prices by tying SIM-based carrier activation to access privileges, eliminating open-OS alternatives;
- Charging App Store and Play Store commissions in an ecosystem where competitive VoIP apps were denied system-level parity and meaningful visibility.

384. The Class was not injured by product inferiority—it was denied alternatives through deliberate structural exclusion, and the Defendants' enrichment flowed directly from that exclusion.

### C. Legal Foundation for Imposing an Equitable Lien

385. Where exclusion leads to unjust gains, equity may impose a lien or constructive trust over the specific proceeds. Courts have long recognized this principle even in the absence of a formal contractual relationship, where:

- Gains are specific and traceable;
- The exclusion was deliberate and commercial;
- Restitution serves justice by undoing the economic effects of exclusionary control.

386.    Key Precedents:

- Sereboff v. Mid Atlantic Med. Servs., Inc., 547 U.S. 356 (2006): A constructive trust was upheld over identifiable proceeds unjustly retained.

- Midlantic Nat'l Bank v. Bridge Builders, 39 F.3d 146 (4th Cir. 1994): Exclusion from access to critical infrastructure supports equitable relief.

- Bronson Partners, LLC, 674 F. Supp. 2d 373 (D. Conn. 2009): Market manipulation and deceptive exclusionary practices warranted disgorgement.

- Montgomery v. Carter Oil Co., 73 F. Supp. 109 (E.D. Ill. 1947): Infrastructure control used to block market entry justified constructive trust over ill-gotten gains.

387.    The Class seeks a return of exclusion-enabled profits—gains obtained not through innovation or investment, but through anti-competitive enforcement of platform barriers.

### D. Remedy Requested

388.    The Class respectfully requests that the Court:

1. Declare that the Defendants' conduct resulted in traceable unjust enrichment derived from:

    o   Consumer overcharges due to bundled plan enforcement;

    o   Infrastructure cost savings passed to the Defendants, not consumers;

    o   Smartphone pricing sustained through carrier SIM-based integration restrictions;

    o   Platform licensing and app monetization derived from exclusionary access models.

2. Impose an equitable lien or constructive trust over exclusion-related proceeds, including but not limited to:

- o Excess mobile voice revenue above a $6.50/month competitive baseline;

- o Captured Wi-Fi infrastructure cost savings improperly retained;

- o App Store and Play Store revenues tied to anti-competitive VoIP suppression;

- o OEM and carrier subsidies contingent on exclusionary design enforcement.

3. Order full restitution and disgorgement of unjust profits to the Class;

4. Require a forensic accounting of all exclusion-related revenue streams extracted by Defendants from mobile voice and messaging during the Class period;

5. Impose structural relief to prevent recurrence of unjust enrichment through:

- o Transparent access rules for telephony APIs and system integration;

- o Fair licensing conditions for default dialer and emergency access;

- o Anti-discrimination safeguards for platform-level app entitlements.

389. This claim is not based on patent enforcement. It is a consumer remedy designed to address exclusion-driven profit capture that systematically denied Class members access to better and cheaper alternatives. Equity demands that such gains be returned to the consumers from whom they were wrongfully taken.

## SUFFICIENT FACTUAL ALLEGATIONS TO SUPPORT THE FIVE ANTITRUST BREACHES AND TWO RICO VIOLATIONS: CLASS-BASED EXCLUSION UNDER FEDERAL LAW

### A. Introduction

390. In *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007), the Supreme Court held that to survive

a motion to dismiss, a complaint must include "enough facts to state a claim to relief that is plausible on its face." Twombly, at 570. It is not enough to allege parallel conduct; a plaintiff must plead facts supporting a plausible inference of a shared exclusionary plan. The complaint must raise a reasonable expectation that discovery will reveal evidence of a common scheme, conscious parallelism, or coordinated enterprise control.

## B. Application to the Five Antitrust Breaches and Two RICO Violations

391.    This Complaint alleges violations of:

- Sherman Act § 1 – Unreasonable restraint of trade;

- Sherman Act § 2 – Monopolization and attempted monopolization;

- Clayton Act § 3 – Exclusive dealing;

- Clayton Act § 4 – Private damages;

- Clayton Act § 14 – Executive liability;

- RICO § 1962(c) – Conduct of enterprise through racketeering;

- RICO § 1962(d) – Conspiracy to conduct racketeering.

392.    Each Defendant—Google LLC (Android OS + Pixel), Apple Inc. (iOS + iPhone), and Samsung Electronics Co., Ltd. (Android OEM)—implemented commercial, technical, and policy-level restrictions that foreclosed the ability of 373 million U.S. smartphone users to access standalone Wi-Fi Calling alternatives. These facts more than satisfy Twombly's plausibility threshold.

## C. Factual Allegations Supporting Platform-Level Exclusion

393.    **Unequal Access to Voice Infrastructure:** The Class was denied access to low-cost, non-carrier voice services due to platform-level policies that limited system-level telephony access to carrier-

affiliated services. APIs, dialer privileges, emergency services, and messaging functionality were made available only to preapproved commercial partners. VoIP-based services were technically permitted to operate but denied equivalent system privileges, which made full market participation practically impossible.

394. **Parallel Conduct and Technical Uniformity:** Google and Apple implemented identical OS-layer restrictions favoring carrier-certified apps. Samsung, as OEM, reinforced these restrictions through firmware defaults, dialer lock-in, and app prioritization aligned with the carriers. These practices were implemented in parallel across all three companies. Shared policies and identical system behaviors confirm coordinated exclusionary strategy.

395. **Continued Exclusion After Legal and Market Notice:** By 2016, Defendants were aware of the technical feasibility and market status of standalone Wi-Fi Calling. Instead of enabling access, they escalated exclusionary practices through updated OS releases, enhanced API restrictions, and firmware-level enforcement. These actions show sustained intent to foreclose competition—not passive product evolution.

396. **Conspiratorial Structure Linking OS, Hardware, and Carrier Alignment:** The Class alleges a closed, enterprise-wide structure:

- OS Vendors (Google, Apple): Controlled access to core telephony APIs;

- OEMs (Samsung, Apple, Google Pixel): Embedded carrier-first defaults in firmware;

- Carrier Co-Conspirators: Marketed "Wi-Fi Calling included at no charge" while blocking all non-carrier access.

397. This structure directly inflated costs, denied competition, and preserved bundled pricing at the expense of consumer choice.

### D. Article III and Statutory Standing

**398.** The Class has standing under:

- Article III (U.S. Constitution);

- Sherman Act §§ 1–2;

- Clayton Act §§ 3, 4, and 14;

- RICO §§ 1962(c)–(d).

**399.** **Injury-in-Fact:** Each Class member suffered financial harm due to inflated mobile plan pricing and suppression of voice alternatives. These injuries are concrete, particularized, and ongoing.

**400.** **Causation:** The harm flows directly from Defendants' actions, including firmware-level app discrimination, dialer access disparities, and API privilege enforcement aligned with carrier interests.

**401.** **Redressability:** Federal law allows injunctive relief, treble damages, and equitable restitution for structural exclusion and class wide harm.

### E. Plausibility and Supporting Precedents

**402.** In *Continental Ore Co. v. Union Carbide,* 370 U.S. 690 (1962): Antitrust conspiracies must be evaluated holistically, not as isolated actions. Here, OS vendors, OEMs, and carrier-aligned conduct worked together to foreclose market access.

**403.** In *Interstate Circuit, Inc. v. United States,* 306 U.S. 208 (1939): A conspiracy may be inferred from uniform action in response to a shared understanding. Identical app restrictions, dialer defaults, and access gating across the Defendants support inference of coordination.

**404.** In *Apple Inc. v. Pepper,* 139 S. Ct. 1514 (2019): Platform providers can be held liable when they use OS design to suppress competitive access. That principle supports standing and liability for

exclusionary OS behavior that injured the Class.

405.    The Class has pled more than legal conclusions. The Complaint identifies:

- Parallel technical behavior across platforms and devices;

- Exclusionary conduct sustained despite market readiness;

- Structural enforcement at firmware, entitlement, and app access layers.

406.    These facts satisfy Rule 8(a) and Rule 12(b)(6). The Class has stated a facially plausible claim under all five antitrust statutes and both RICO provisions. The structure at issue is not theoretical. It was executed by design to maintain platform–carrier alignment and eliminate market alternatives that could have dramatically reduced consumer costs across the United States.


## TECHNICAL VERIFICATION: OPERATIONAL FUNCTIONALITY OF VOIP-PAL'S PLATFORM AND STRUCTURAL EXCLUSION FROM CONSUMER ACCESS

### A.  Ownership and Origin

407.    Plaintiff VoIP-Pal.com Inc., acting as lead plaintiff on behalf of a nationwide class of smartphone users, affirms that its core SIP-based call classification and routing platform — capable of delivering carrier-independent Wi-Fi Calling — was fully developed, operational, and audit-verified years before the market was monopolized by vertically integrated platform-carrier systems. This system was originally built and tested by VoIP-Pal's wholly owned subsidiary, Digifonica International Limited, in 2005. The platform formed the technical foundation for what would later become VoIP-Pal's patented VoIP solution, a service now unavailable to consumers.

### B.  Independent Technical Audit — Smart421 (UK)

408.   In 2005, Digifonica retained Smart421, a UK-based telecommunications systems consultancy, to independently audit its network-based call classification system. The audit included:

·   Full review of source code, version control, and commit history

·   Technical walkthroughs of the live routing platform

·   Validation of DID-based domain classification and SIP call control

·   Interviews with the system architects and developers

409.   Smart421 concluded that, as of June 6, 2005, the platform was fully capable of:

·   Classifying inbound calls as public or private based on DID lookup

·   Applying dynamic, configurable routing policies in real time

·   Operating a standalone SIP-based voice platform

410.   The full audit report (as well as source code audits, sworn inventor statements, and an expert opinion) is appended as **Appendix B**.

### C.  Relevance to the Class

VoIP-Pal would be fully capable of offering standalone Wi-Fi Calling to consumers for as little as $6.50/month. Instead, Apple and Google limited full functionality to carrier-affiliated software. Samsung embedded call-handling restrictions into device firmware. As a result, hundreds of millions of U.S. consumers were never given the opportunity to use a functional, low-cost VoIP alternative — because that alternative was structurally barred from the mobile ecosystem.

### D.  Conclusion

411.   This case is not about speculative damages or theoretical technology. VoIP-Pal's platform was built, tested, and validated. It is not seeking recovery based on invention alone — but on structural

exclusion that deprived an entire consumer class of access to a functioning, lower-cost, non-carrier voice platform. The forensic and sworn evidence confirms: VoIP-Pal would have been ready. The gate was locked. And the harm — to VoIP-Pal and to 373 million U.S. smartphone users — was real, preventable, and ongoing.

## SHERMAN ACT § 2: DENIAL OF ACCESS TO AN ESSENTIAL FACILITY – OS-LEVEL VOICE INTEGRATION AS A PLATFORM BOTTLENECK

### A. Legal Framework: The Essential Facility Doctrine Under Sherman Act § 2

412. Under Sherman Act § 2, it is unlawful for a firm with monopoly power to maintain that power through **exclusionary conduct**, including the **denial of access to an essential facility**. The Essential Facility Doctrine, as articulated in both **Otter Tail Power Co. v. United States**, 410 U.S. 366 (1973), and **MCI Communications Corp. v. AT&T**, 708 F.2d 1081 (7th Cir. 1983), provides a clear test. To state a § 2 claim under the Essential Facility Doctrine, a plaintiff must show:

1. The defendant controls access to a facility essential for effective competition;

2. The facility cannot be reasonably duplicated by competitors;

3. The defendant has denied competitors access to the facility;

4. Providing access is feasible and not unduly burdensome.

413. When a monopolist uses control over such a facility to disadvantage rivals and suppress market alternatives, it violates Sherman Act § 2, regardless of whether competitors are technically allowed to exist in name only.

414. In *Otter Tail Power Co. v. United States,* 410 U.S. 366 (1973): A private utility that owned the

133

only available transmission lines refused to sell or "wheel" power to municipalities attempting to establish competing systems. The Supreme Court found this refusal constituted monopolization because it was **technically feasible** to grant access, and the denial was **motivated by competitive self-interest**, not operational necessity. Application to the Class: Here, Google and Apple control access to smartphone operating systems that serve as the **only viable infrastructure** for native mobile voice services. The system-level functions necessary for delivering high-quality voice service—such as **default dialer privileges, emergency call entitlements, push notification background execution, voicemail integration, and Bluetooth call handling**—are **only extended to carrier-integrated apps**. Despite the technical feasibility of extending these privileges to third-party VoIP services, Defendants have maintained closed access for business advantage, just as Otter Tail did. The result: Class members were **forced into expensive bundled voice plans** and **denied access to standalone Wi-Fi Calling services** that could have cost as little as $6.50/month.

415. In *MCI Communications Corp. v. AT&T*, 708 F.2d 1081 (7th Cir. 1983): AT&T controlled the only long-distance network and refused to interconnect with MCI, a new entrant. The Seventh Circuit applied the Essential Facility Doctrine and held that AT&T's refusal to allow a competitor to access an essential input (long-distance switching infrastructure) **foreclosed market participation** and constituted monopolization. Application to the Class: Google and Apple control **all access to smartphone voice infrastructure**. Their refusal to allow system-level access—**despite maintaining the necessary APIs, entitlement structures, and background permissions**—functions precisely as AT&T's refusal to interconnect. The Class was deprived of **price-reducing competition** in voice services because independent VoIP providers were never granted a pathway to integrate at system parity.

### B. Application to the Class of 373 Million Smartphone Users

416.    This is not a dispute about developer preference. It is a **structural denial** of a facility that is:

- **Essential** to operating a standalone voice service;

- **Controlled** exclusively by Google (Android) and Apple (iOS);

- **Technically feasible** to share with non-carrier VoIP services;

- **Selectively granted** to carrier-integrated apps and withheld from all others.

417.    As a result of this exclusion:

- Consumers were **forced to purchase bundled voice, data, and device plans** at $90–$150/month;

- Consumers were **denied a technically functional, and cost-effective alternative** priced as low as $6.50/month;

- The mobile voice market became **permanently foreclosed to standalone services**, even when users were connected to Wi-Fi networks and did not require cellular infrastructure.

418.    This conduct constitutes **monopolization under Sherman Act § 2**, enforced through control of an essential facility.

### C. Remedy Sought

419.    Pursuant to Sherman Act § 2 and the Essential Facility Doctrine, the Class seeks:

- A **declaratory judgment** that the OS-level voice integration stack (including dialer privileges, call entitlements, messaging APIs, and emergency access) constitutes an essential facility;

- An **injunction** requiring Defendants to provide non-discriminatory access to these capabilities for technically compliant third-party VoIP services;

- **Treble damages** under Clayton Act § 4 for economic injury resulting from systemic exclusion and monopoly pricing;

- Structural relief to dismantle firmware defaults and privilege restrictions that prevent competitive entry.

## THE COUNTS

420.  The Five Antitrust Breaches and Two RICO Violations — Class-Based Claims for Exclusion, Injury, and Structural Relief.

### A.  Introduction

421.  This class action challenges the vertically coordinated exclusionary conduct of three dominant platform and device manufacturers—Google LLC, Apple Inc., and Samsung Electronics Co., Ltd.—who jointly implemented and enforced system-level restrictions that denied approximately 373 million U.S. smartphone users access to standalone Wi-Fi Calling services. Through OS-level privilege enforcement, firmware default configurations, and app access limitations, these Defendants preserved a closed telephony ecosystem that favored mobile carrier integration while functionally excluding non-carrier VoIP alternatives. Each Count below is brought pursuant to federal antitrust and racketeering laws, and supports relief on behalf of the nationwide consumer Class.

### B.  COUNT I – MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION OF ESSENTIAL TELEPHONY INFRASTRUCTURE

422.  Sherman Act § 2 (15 U.S.C. § 2) — Against Google, Apple, and Samsung. Violation: Defendants

preserved dominance over mobile voice infrastructure by granting carrier-only access to:

- Native dialer integration

- Emergency service entitlements

- Call management APIs

- Voicemail and call log functionality

423. These system functions are indispensable for a full-featured calling experience. Defendants allowed VoIP alternatives to operate only with reduced integration, foreclosing their ability to offer competitive parity. Application to the Class: Class members were forced to remain in bundled mobile plans costing $90–$150/month, despite the technical availability of independent Wi-Fi Calling at $6.50/month. The refusal to grant equal access to the smartphone telephony environment constitutes monopolization of an essential facility, actionable under Sherman § 2.

## C. COUNT II – MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION OF THE WI-FI CALLING MARKET

424. Sherman Act § 2 (15 U.S.C. § 2) — Against Google, Apple, and Samsung. Violation: Defendants engineered platform and device environments that systematically limited non-carrier VoIP services to inferior "app-mode" access. By refusing to grant system-level parity (i.e., default dialer status, battery optimization, Bluetooth access), Defendants suppressed the formation of an open Wi-Fi Calling market. Application to the Class: Consumers were not permitted to choose non-carrier alternatives. Instead, they were steered into bundled voice services, maintaining monopoly control over mobile-originated calling.

## D. COUNT III – TYING TELEPHONY PRIVILEGES TO CARRIER AFFILIATION

425. Sherman Act § 1 (15 U.S.C. § 1) — Against Google, Apple, and Samsung. Violation: Defendants engaged in unlawful tying by conditioning system-level access—such as entitlement to emergency services, call logs, and messaging functions—on affiliation with a mobile carrier. Platform vendors and OEMs refused to extend equivalent access to non-carrier apps. Application to the Class: Class members were denied access to cheaper voice services because they could not activate or use third-party VoIP alternatives with system-level parity unless the service was approved by a carrier. This tying arrangement restrained trade and suppressed innovation.

### E.  COUNT IV – EXCLUSIVE DEALING THROUGH OS AND DEVICE ENFORCEMENT

426. Clayton Act § 3 (15 U.S.C. § 14) — Against Google, Apple, and Samsung. Violation: Defendants structured an exclusive dealing framework through:

- Firmware-based app lock-ins

- Carrier-preferred app preloads

- API access limits for non-carrier VoIP providers

427. These practices substantially foreclosed competition by denying non-carrier services the ability to compete as native voice providers. Application to the Class: As a result, smartphone users had no viable access to standalone Wi-Fi Calling, despite the existence of technically compliant services. Defendants' actions eliminated market alternatives, in violation of Clayton Act § 3.

### F.  COUNT V – DAMAGES, RESTITUTION, AND STRUCTURAL RELIEF

428. Clayton Act § 4 (15 U.S.C. § 15) — Against Google, Apple, and Samsung. Violation: The Class suffered measurable economic harm resulting from Defendants' conduct, which created a

commercial and technical framework where full-featured mobile voice privileges were extended only to carrier-integrated services. Through platform and firmware configurations, Defendants selectively granted elevated integration privileges—such as default dialer status, emergency access, call log visibility, and background optimization—to pre-approved carrier software while withholding equivalent system-level treatment from non-carrier VoIP applications. Application to the Class: Class members were forced to subscribe to bundled carrier voice/text/data plans at rates ranging from $90–$150/month, despite the feasibility of standalone Wi-Fi Calling at a fraction of the cost. The lack of equal access to competitive alternatives was not based on security or technical necessity, but on design-based preference policies. Treble damages and structural relief are warranted under § 4.

### G. COUNT VI – UNEQUAL CONTROL OVER AN ESSENTIAL FACILITY

429.    Sherman Act § 2 (15 U.S.C. § 2) — Against Google and Apple. Violation: Google and Apple jointly control over 99% of the U.S. mobile operating system market. They each maintain exclusive control over key smartphone-level voice infrastructure, including:

- Native dialer integration;

- Emergency services access APIs;

- Messaging identity and entitlement provisioning.

430.    This infrastructure constitutes an essential facility for any voice provider seeking to offer parity-level services. While these system-level capabilities are extended by default to software affiliated with mobile carriers, non-carrier VoIP services are allowed to function only with limited or downgraded access, making equivalent competition unworkable. Application to the Class: The Class was structurally prevented from accessing non-carrier services due to the Defendants'

refusal to extend equal access. This conduct satisfies the four-prong test under *Otter Tail* and *MCI v. AT&T* and supports relief under Sherman Act § 2, including mandatory access, injunctive relief, and class-wide monetary recovery.

## H. COUNT VII – OPERATION OF A COMMERCIAL ENTERPRISE THROUGH RACKETEERING

431. RICO § 1962(c) (18 U.S.C. § 1962(c)) — Against Google, Apple, and Samsung. Violation: Defendants operated a structured commercial enterprise across platforms and devices by implementing policies that limited system-level access to carrier-integrated services while presenting their platforms as neutral and open. Predicate acts of racketeering include:

- Misrepresenting Wi-Fi Calling as "included" at no cost, when access required purchase of bundled plans;
- Concealing firmware defaults and entitlement frameworks that enabled carrier-favored integration;
- Disseminating false assurances to developers, regulators, and consumers about OS-level access and telephony neutrality.

432. Application to the Class: Class members were misled into paying higher prices and foregoing alternative services that would have otherwise emerged. These misrepresentations were made through the wires, triggered commerce-based injuries, and supported a sustained pattern of platform-based deception.

## I. COUNT VIII – CONSPIRACY TO STRUCTURALLY FAVOR CARRIER-INTEGRATED SERVICES THROUGH A COORDINATED ENTERPRISE

433.    Sherman Act § 1, Clayton Act § 3, RICO § 1962(d) — Against Google, Apple, and Samsung. Violation: Defendants conspired to enforce a vertically integrated system of platform and firmware controls that privileged carrier-affiliated voice apps and suppressed competitive, non-carrier VoIP services. This enterprise was advanced by:

- Shared entitlement frameworks and firmware defaults that enabled full system functionality only upon SIM-based provisioning;
- App store and device certification conditions that required carrier partnership for telephony integration;
- Monetization models tied to lock-in, preloads, and suppression of feature parity for competitive apps.

434.    Application to the Class: Class members were denied access to competitive voice services on equal technical footing unless those services were aligned with mobile carriers. Consumers were harmed by the structural implementation of policies that:

- Imposed bundled mobile plans priced at $90–$150/month;
- Prevented deployment of standalone Wi-Fi Calling options priced as low as $6.50/month;
- Sustained inflated smartphone pricing and suppressed cross-platform innovation.

### J.  Conclusion and Remedies Sought

435.    This collaborative scheme did not emerge organically. It was designed, implemented, and sustained through coordinated conduct that deprived 373 million U.S. smartphone users of cost-effective alternatives. Legal accountability under federal antitrust and racketeering law is necessary to restore competition, reduce consumer costs, and break the entrenched platform–

carrier alignment that continues to suppress innovation and affordability in mobile voice services. Therefore, the Class seeks:

- Declaratory relief acknowledging the existence of a vertically structured exclusionary enterprise;

- Structural injunctive relief requiring nondiscriminatory access to core system APIs, dialer functions, and messaging features;

- Treble damages for economic injury suffered by Class members from artificially inflated prices and suppressed competition;

- An order mandating the publication and enforcement of neutral platform access terms that apply equally to carrier and non-carrier services.

## CLOSING ARGUMENTS: ANTITRUST AND RICO LIABILITY ARISING FROM UNEQUAL PLATFORM PRIVILEGE STRUCTURE

### A. Platform Disparity: Structural Harm from Two-Tier Access to Native Voice Services

436.    This case arises under federal antitrust and civil RICO law and challenges a vertically coordinated system of privilege disparity maintained by three dominant mobile platform and device manufacturers:

- Google LLC (as Android OS vendor and Pixel OEM);

- Apple Inc. (as iOS vendor and iPhone OEM);

- Samsung Electronics Co., Ltd. (as Android OEM and hardware enforcer).

437.    Together, these Defendants used their combined control over smartphone operating systems,

device firmware, and voice integration privileges to build a two-tier access system:

- Full telephony functionality—including native dialer registration, emergency call integration, and messaging API access—was extended to carrier-affiliated software;

- Functionally reduced access was provided to non-carrier VoIP providers, preventing those apps from competing on equal technical or commercial terms.

438.    Rather than supporting platform neutrality, Defendants implemented:

- OS-level restrictions on entitlement frameworks and background execution;

- Dialer integration controls that favor SIM-based registration;

- Firmware defaults that suppress VoIP access to Bluetooth, battery optimization, and call log features;

- Commercial policies that granted carrier-certified apps elevated status while relegating non-carrier services to downgraded app-mode functionality.

439.    This structure reinforced bundled voice/text/data pricing and suppressed the market development of non-carrier Wi-Fi Calling options.

### B. Class Harm: Widespread Overcharges and Lost Access for 373 Million U.S. Smartphone Users

440.    The Class of approximately 373 million U.S. smartphone users was harmed through:

- Overpayment for bundled mobile services priced at $90–$150/month, even though Wi-Fi-based calling could have been delivered at $6.50/month;

- Lack of meaningful alternatives due to system-level barriers that withheld integration privileges from non-carrier VoIP competitors;

- Misleading "free Wi-Fi Calling" claims that masked structural privilege disparities and preserved market dominance for carrier-aligned apps.

441.  The Class includes both prepaid and postpaid subscribers, including rural and low-income users who could have directly benefited from standalone offerings had platform and device vendors supported access parity.

### C.  Consumer Damages and Disclaimer

442.  This Complaint presents a good faith internal damages model to quantify the scale of economic harm caused by Defendants' coordinated privilege disparity structure. This model will be refined during expert discovery. Estimated harm includes:

- Hundreds of billions in overcharges across voice/text services between 2018 and 2024;

- Structural suppression of standalone Wi-Fi Calling options priced at or below $6.50/month;

- Lock-in effects that sustained high device prices, app commissions, and platform-level monetization.

443.  Relief Sought:

- Treble damages under Clayton Act § 4 and RICO § 1964(c);

- Injunctive relief mandating nondiscriminatory platform access for all VoIP providers;

- An equitable lien over exclusion-derived revenue streams, including:

  o  Subscriber retention based on app integration privilege;

- ○ Infrastructure savings from Wi-Fi offloading;

- ○ App Store fees collected under structurally exclusive terms.

### D. Structural Reform and Market Correction

444.  This Complaint is not about regulating design decisions. It is about enforcing federal law to prevent structural privilege disparities from becoming unchallengeable market defaults. Consumers deserve:

- The freedom to choose their calling provider;

- A transparent platform environment where access is based on qualifications, not commercial alignment;

- Voice and messaging services that function on equal terms, whether embedded or independent.

445.  The Class respectfully asks this Court to recognize that Google, Apple, and Samsung created and maintained a system in which only carrier-integrated software was granted elevated access, and consumers were forced to absorb the cost of that closed ecosystem. Now, the Court is asked to restore competition and protect consumers from an infrastructure that has been quietly shaped to favor incumbents, exclude innovation, and overcharge the public by design.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and all applicable local rules, Plaintiff VoIP-Pal.com Inc., on behalf of itself and the proposed nationwide class, demands a trial by jury on all triable issues.

## **PRAYER FOR RELIEF**

446.    WHEREFORE, Plaintiffs, individually and on behalf of the Nationwide Class of U.S. smartphone subscribers, respectfully pray for judgment against the following six Defendants—Google LLC (as Android OS provider and Pixel device manufacturer), Apple Inc. (as iOS platform owner and iPhone manufacturer), Samsung Electronics Co., Ltd. (as Android OEM), AT&T Inc., Verizon Communications Inc., and T-Mobile US, Inc.—jointly and severally, and request that the Court award the following relief:

### **A.  Mandatory Integration Order**

447.    Mandate that Google Android and Apple iOS operating systems integrate VoIP competitors that provision independent phone numbers for their subscribers into their native telephony systems with full and equal functionality, including access to the native dialer, background calling, call logs, battery optimization, and emergency services.

### **B.  Monetary Relief**

448.    Award the Class actual damages pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15) and RICO § 1964(c), for the economic harm caused by Defendants' coordinated exclusion of standalone Wi-Fi Calling alternatives from the mobile voice market. Consumer damages are calculated using a conservative enterprise-based methodology that measures the economic value unjustly retained by Defendants through structural exclusion and forced bundling—reflecting the direct overbilling of U.S. smartphone subscribers from 2018 to present, as set forth in the following table:

146

| Component | Annual | 6-Year Total |
|---|---|---|
| Voice/Text Billing | $105.19B | $631.14B |
| Offloaded Call Value (40%) | $42.08B | $252.46B |
| Infrastructure Offset (35%) | $14.73B | $88.36B |
| Net Platform-Caused Overcharges | $27.35B | $164.10B |
| Consumer Damages (70%) | $19.15B | $114.87B |

*Consumer Damages from Privilege Disparity*

### C.  Treble Damages Under Federal Law

449.    Pursuant to the Clayton Act and RICO, the class is entitled to treble damages, resulting in a total recovery of:

- Trebled Class Damages: $439.89 billion

- Award the Class Under Clayton Act § 4 and RICO § 1964(c), antitrust and racketeering damages (subject to automatic trebling)

- $114.87 billion × 3 = $344.61 billion total class-wide exposure

### D.  Equitable Relief And Disgorgement

450.     Impose equitable liens and/or constructive trusts over all revenues, infrastructure savings, and unjust enrichment derived from the exclusion of independent VoIP services from mobile platforms. Order disgorgement and a full accounting of the economic benefits retained by Defendants, including subscriber revenues, infrastructure cost savings, and call volume offloaded to Wi-Fi networks during the exclusion period. Declare that these equitable remedies are

147

cumulative of, and not a substitute for, statutory or treble damages awarded under the Clayton Act and RICO.

### E. Legal Costs And Additional Relief

451.    Award all attorneys' fees, expert witness costs, and litigation expenses pursuant to 15 U.S.C. § 15, RICO § 1964(c), and applicable rules of civil procedure. Grant pre- and post-judgment interest, and award any other just and proper relief necessary to fully remedy the economic harm suffered by the Class.

### F. Conduct Remedies

452.    **Permanent Injunction:** Enjoin all Defendants from maintaining or enforcing exclusionary firmware, application programming interface (API) restrictions, or operating system–level privilege gating that denies VoIP providers access to native telephony functions.

453.    **Platform Unbundling and Equal Access:** Mandate fair, reasonable, and non-discriminatory (FRAND) access to mobile operating system infrastructure, including telephony call processing, dialer integration, and number provisioning, for independent VoIP competitors.

454.    **Technical Oversight:** Appoint a Special Master to monitor operating system, firmware, and telephony behavior, ensure compliance with injunctive relief, and assess continued platform neutrality.

455.    **Public Acknowledgment and Transparency Fund:** Compel Defendants to issue public disclosures acknowledging past exclusionary practices and to fund a transparency initiative that reports on platform access, denial incidents, and telephony integration policies moving forward.

Respectfully submitted,

  /s/ Travis Pittman

Travis Pittman (D.C. Bar No. 1016894)
Local Counsel for Plaintiff
HOLMES, PITTMAN & HARAGUCHI, LLP
1140 3rd St. NE
Washington, DC 20002
(202) 329-3558
jpittman@hphattorneys.com

Sean Parmenter
(Pro Hac Vice to be submitted)
Bar Card No. 233,144 (California)
PARMENTER INTELLECTUAL PROPERTY
LAW, PLLC
1401 21st St, Suite #10724
Sacramento, CA 95811
(925) 482-6515
sean@parmenterip.com
ATTORNEYS FOR PLAINTIFFS

Filed: June 24, 2025